IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UPMC d/b/a University of Pittsburgh Medical Center, a
Pennsylvania Non-Profit, Non-Stock Corporation

and

UPMC Altoona f/k/a Altoona Regional
Health System, a Pennsylvania Non-Profit Corporation,   Civil Case No.: 3:16-cv-204

    Plaintiffs

v.

CBIZ, Inc., a Delaware Corporation; CBIZ Benefits &
Insurances Services, Inc., a Missouri Corporation; and
Jon S. Ketzner, an Individual,

    Defendants.
_____/

**COMPLAINT**

NOW COME Plaintiffs UPMC, a Pennsylvania non-profit, non-stock corporation and UPMC Altoona, formerly known as Altoona Regional Health System ("Altoona"), a Pennsylvania non-profit corporation, and hereby file this Complaint against CBIZ, Inc., a Delaware corporation; CBIZ Benefits & Insurance Services, Inc., a Missouri corporation; and Jon S. Ketzner.  UPMC and Altoona allege as follows:

**The Parties**

1.    Plaintiff UPMC is a Pennsylvania non-profit corporation, organized and operated exclusively for charitable purposes and recognized by the IRS as exempt from federal income taxation pursuant to Section 501(c)(3) of the Internal Revenue Code.  UPMC operates health care facilities in and around Pittsburgh, Pennsylvania.  Its principal place of business is 600 Grant Street, Pittsburgh, PA 15219.  UPMC is also the parent and supporting organization for numerous other

non-profit health care providers, each existing as a separate and distinct corporate entity, including hospitals and outpatient facilities located throughout the Commonwealth of Pennsylvania.

2. Plaintiff Altoona is one such subsidiary of UPMC. Altoona is a Pennsylvania non-profit corporation, organized and operated exclusively for charitable purposes and likewise recognized by the IRS as exempt from federal income taxation. Altoona operates a health care system with facilities located throughout Blair County, Pennsylvania, and the surrounding region, with its principal place of business at 620 Howard Avenue, Altoona, PA 16601.

3. Until July 1, 2013, the Central Pennsylvania Health Services Corporation ("CPHSC"), also a non-profit Pennsylvania corporation, owned 100% of the membership interest in Altoona, which was then known as Altoona Regional Health System. Other than its membership interest in Altoona, CPHSC owned no other material assets or interests. On July 1, 2013, CPHSC merged into Altoona; UPMC acquired Altoona Regional Health System; which was immediately re-named "UPMC Altoona." As part of the acquisition of Altoona, UPMC agreed to acquire all of Altoona's outstanding assets and liabilities, including its pension and benefit plan debt. UPMC is currently the sole corporate member of Altoona.

4. Defendant CBIZ, Inc. is a professional services corporation incorporated in Delaware with its principal place of business at 6050 Oak Tree Boulevard South, Suite 500, Cleveland, Ohio 44131. CBIZ is the corporate parent for numerous subsidiary businesses, including Defendant CBIZ Benefits & Insurance Services, Inc.

5. Defendant CBIZ Benefits & Insurance Services, Inc. ("CBIZ-B&I") is a Missouri Corporation and wholly-owned subsidiary of Defendant CBIZ, Inc. Together, CBIZ and CBIZ-B&I provide retirement plan services including actuarial valuations, certifications and statements of accounting liabilities; actuarial determination of legally-required retirement plan contributions; 401k plan design; and group insurance benefits consulting. CBIZ-B&I is registered to do business in

Pennsylvania and maintains an office in this judicial district located at 1 Pasquerilla Plaza, Suite 125, Johnstown, PA 15907.

6. CBIZ-B&I also maintains an office at 44 Baltimore Street, Cumberland, MD 21502, where Defendant Jon S. Ketzner ("Ketzner") worked at all relevant times. For many years, including from 2008 to 2014, Altoona engaged CBIZ and CBIZ-B&I, and in particular Mr. Ketzner in the Cumberland, Maryland office, to prepare actuarial valuations and certifications of the liabilities for Altoona's two largest pension benefit plans, and to prepare and certify various governmental filings for the same plans.

7. Defendant Ketzner is an Enrolled Actuary, a Member of the American Academy of Actuaries, a Fellow of the Conference of Consulting Actuaries, and a Member of the American Society of Pension Professionals and Actuaries' College of Pension Actuaries. As such, Ketzner was required to follow and uphold certain standards of professional conduct and competence. Until 2015, Ketzner was employed by CBIZ and CBIZ-B&I. Upon information and belief, Ketzner resides in Maryland. For at least the past 13 years, until January 1, 2015, Ketzner was the lead and sole actuary engaged by Altoona to value the obligations and liabilities for Altoona's two largest pension benefit plans.

## Jurisdiction and Venue

8. This Court has jurisdiction under 28 U.S.C.A. § 1332 because this is a civil action in which the amount in controversy exceeds $75,000 and the dispute is between citizens of different states.

9. Venue is proper here because the Defendants transact business here and the events giving rise to the claims asserted herein arose here.

**Nature of the Action**

10. This action seeks redress for actuarial malpractice and negligent misrepresentation which has caused well over $100 million in damages to UPMC and Altoona. As described more fully below, from 2002 through February 2015, Defendants served as actuarial consultants for Altoona's two largest pension benefit plans (the "Plans"). In this capacity, Defendants represented that they were experienced, qualified, and capable in the actuarial valuation of pension benefit plans. Each year, Defendants prepared actuarial valuations of the Plans' benefits to allow Altoona to fund the Plans in compliance with regulatory requirements; to certify the funded status of the Plans in order to allow for the Plans' operation and administration; to file PBGC premiums; and to account for the Plans in its financial statements in accordance with generally accepted accounting standards. CBIZ and CBIZ-B&I were paid substantial fees to perform this work.

11. During the course of this engagement, from at least July 1, 2008 through February 2015, Defendants failed to adhere to actuarial standards of practice and consequently materially erred in valuing the obligations and liabilities of Altoona's pension benefit plans for funding, compliance, and accounting purposes. As described in more detail below, as of June 30, 2014, Defendants' multiple errors caused the Altoona Plans' Projected Benefit Obligation ("PBO") to be falsely stated on Altoona's balance sheet at $240 million. In fact, Altoona's PBO was then $373 million: Defendants had understated the liability by approximately $132.5 million.

12. Until March 2015, these errors were undisclosed and unknown to Altoona and UPMC.

13. Further, UPMC was induced to purchase Altoona in reliance upon the actuarial valuations prepared by Defendants for the Plan Year ending June 30, 2012 which understated Altoona's pension expense for that year -- and consequently vastly overstated Altoona's profitability for the same period as measured by its Earnings Before Interest Depreciation and Amortization

("EBIDA") -- by at least $18 million.  Thus, Defendants' failure to value the Altoona Plans in accordance with actuarial standards of practice materially changed Altoona's overall financial picture such that, had the true state of affairs been known, UPMC likely would not have acquired Altoona, or in the very least, would have negotiated and structured a different deal for Altoona. Now, UPMC owns an entity, Altoona, whose obligations are substantially greater than UPMC had bargained for.

14. Moreover, due to Defendants' professional malpractice over a period of many years in valuing Altoona's pension plans, Altoona was unable to administer those plans properly, such as by implementing "plan freezes" or otherwise limiting benefits, which would have been statutorily-required had the correct Plan valuations been known, and would have reduced the Plans' liabilities.

15. Finally, as a result of the Defendants' material breaches of their duties to UPMC and Altoona, UPMC and Altoona are likely to incur other financial losses in the form of far greater contributions to the Plans, as well as penalties, interest, and premiums payable to regulatory agencies such as the IRS and Pension Benefit Guaranty Corporation (PBGC) resulting from Defendants' massive understatement of the Altoona Plans' liabilities.

## Background

**Altoona's Retirement Benefit Plans**

16. Historically, Altoona operated two noncontributory defined benefit pension plans covering all employees who met stated eligibility requirements. One Plan was offered to union employees, the "Bargaining Unit" Plan.[1]  The other Plan was offered to non-union employees generally working in Altoona's hospital, the "Non-Bargaining Unit" Plan.  On July 1, 2013, following UPMC's acquisition of Altoona, Altoona merged the two Plans, and on December 31, 2014, that Plan was itself merged into UPMC's pension benefit plan.

---

[1]    Effective July 1, 2008, the Bargaining Unit Plan was partially frozen such that no new participants were permitted entry into the Plan.

17. The Altoona Plans were accounted for under a fiscal year commencing July 1 and ending on June 30. Benefits under the Plans were based on years of service and the employee's compensation.

18. Pension plans are subject to certain minimum funding requirements by the Internal Revenue Code and the Employee Retirement and Income Security Act of 1974 ("ERISA"). ERISA, in turn, created the PBGC to encourage the continuation and maintenance of private defined-benefit pension plans, such as the Altoona Plans, and to ensure timely and uninterrupted payment of pension benefits. To do this, the PBGC operates a pension insurance program in which qualified pension plans, such as the Altoona Plans, pay yearly insurance premiums to the PBGC based on the number of participants in the plan and the funded status of the plan.

19. The PBGC premiums increase substantially based on the level of a plan's "unfunded vested benefits," which are a measure of a plan's assets compared to what it owes plan participants.

20. Under ERISA, the Plans also face minimum funding requirements which, if not met, will subject the Plans to excise taxes payable to the Internal Revenue Service. It was Altoona's policy to meet these minimum funding requirements to avoid such excise taxes.

21. Moreover, under ERISA and the Internal Revenue Code, when the plan's "funded ratio" – another measure of ability to pay benefits -- drops below a certain level, the plan must be completely "frozen" such that no new participants may join; no new benefits may be earned; and payment of certain other benefits is prohibited. Here, for example, it is likely that the two Altoona Plans, Bargaining and Non-Bargaining, should have been fully frozen by October 1, 2011 and October 1, 2012 respectively, if correct actuarial valuations had been used instead of CBIZ's wholly inaccurate ones.

**Defendants' Services for Altoona**

22.     Before and during the time they provided services to the Plans and Altoona, Defendants held themselves out as experienced, qualified, and capable in employee pension benefit consulting and actuarial services.

23.     From approximately 2002 through 2015, Defendants CBIZ, CBIZ-B&I and Ketzner were engaged by Altoona to provide actuarial valuation services for the Plans. Other units of CBIZ provided complementary consulting and benefits services to Altoona and, upon information and belief, developed corresponding knowledge about Altoona's actual and contemplated business and plans therefor.

24.     The actuarial services included (1) the calculation of benefits owed for purposes of funding the Plans in compliance with ERISA requirements and for the determination of premiums owed to the PBGC (the "Funding Reports"); (2) valuing the Projected Benefit Obligation expense under Generally Accepted Accounting Principles for the purpose of including the pension plan expenses in Altoona's financial statements ("GAAP and the "GAAP Reports"); (3) certifying the Plans' funded ratios; (4) preparing required filings such as schedules to the Plans' annual Form 5500s to its regulators; and (5) certifying the Plans' PBGC premium filings.

25.     CBIZ and its fellow Defendants knew that it was an essential function of their actuarial work to accurately value and state the Plans' funded status, and their annual and projected future cost to Altoona.

26.     Upon information and belief, Defendants knew that Altoona relied on their work to make crucial financial and administrative decisions regarding the Plans, including whether to freeze those Plans.

27.     Indeed, Defendant Ketzner certified in each valuation report authored by him that "this valuation fully and fairly discloses the actuarial position of the plan and has been prepared

using reasonable methods and assumptions." In fact, the methods and material assumptions employed by Defendants were required to be disclosed in each valuation report, and both UPMC and Altoona believed that all such methods and assumptions had been disclosed in Defendants' GAAP and Funding Reports.

28.     Further, upon information and belief, Defendants knew that UPMC relied on the actuarial valuation report prepared for the plan year ending June 30, 2012, certified as accurate by Defendant Ketzner on September 17, 2012, before the Altoona acquisition, in evaluating the Altoona Plans' benefit obligations and liabilities. In particular, Defendants knew that UPMC relied on (1) the Plans' Projected Benefit Obligation (contained in Altoona's GAAP Reports), which is the present value of all employees' pensions, and booked as a liability on the balance sheet; (2) the statement of Altoona's Accrued Pension Liabilities (also contained in the GAAP Reports), which is the difference between the Projected Benefit Obligation and the value of the Plan assets; and (3) the service cost and amortization expense which are components of pension expense and thus EBIDA.

**Defendants' Valuation Errors**

29.     Despite Defendants' representations that they were fully qualified and experienced in the actuarial valuation of pension benefit plans, and despite the certifications in each valuation report by Ketzner that they had used "reasonable methods and assumptions," and had disclosed all material assumptions made in valuing the pension benefit plans, in fact – and completely unknown to Altoona, and subsequently UPMC – Defendants' work was riddled with significant errors caused by the undisclosed material assumptions.

30.     Beginning at least for the Plan year ending June 30, 2009, Ketzner erroneously calculated – and thus materially undervalued – the Plans' liabilities, preventing Altoona from making financial and administrative decisions to mitigate the Plans' liabilities (such as imposing mandatory

or discretionary freezes on the Plans) and – as described in more detail below – inducing UPMC to invest in Altoona based on the materially erroneous actuarial valuations.

31. Neither Altoona nor UPMC could have discovered the errors because those errors were the result of erroneous assumptions and methodologies undisclosed in the GAAP and Funding Reports prepared by Defendants. In fact, Altoona and UPMC only learned of the errors when another CBIZ actuary, Alvin K. Winters, reviewed the funding calculation for the Plans after Defendant Ketzner retired. Specifically, sometime in November 2014 Defendant Ketzner informed UPMC Treasury Department employee Erin Klinger that the estimated contribution required to be made to the Plans in order to eliminate PBGC variable rate premiums, due in March 2015, was $6.5 million. Around February 2015, Ms. Klinger called Defendant CBIZ-B&I to confirm the Plans' PBGC funding contribution. By that time, Ketzner had retired. On March 6, 2015, Alvin Winters notified Ms. Klinger that the Plans' actual contribution necessary to eliminate PBGC variable rate premiums for the year was $66.6 million, $60 million more than Ketzner had estimated. Shortly thereafter, on March 11, 2015, Winters disclosed to UPMC the errors he had discovered in Ketzner's assumptions and methodology.

32. Defendants have admitted three substantial errors that Ketzner made beginning at least for the Plan Year ending June 30, 2009 and continuing to the Plan Year ending June 30, 2014 that materially understated the Projected Benefit Obligation in the GAAP Reports and the Plan funding obligations in the Funding Reports, each of which was undisclosed to Altoona and UPMC. Each error violated actuarial standards of practice and/or federal law requiring disclosure of all material assumptions in pension filings with the IRS and PBGC:

(a) <u>Application of a "Data Credibility Factor</u>." Ketzner artificially reduced certain liability amounts by a so-called "data credibility factor" which was undisclosed in the Reports. Ketzner inexplicably used this factor to discount the Plans' liabilities. The factor used varied from year to

9

5676981.1

year. CBIZ and Winters have acknowledged that there is no support in the Plans' data for the application of this factor, which is a very unusual (and perhaps unprecedented) adjustment, and they cannot explain why it was applied. This assumption was nowhere disclosed in Defendants' annual valuations.

(b) <u>Retirement Age Adjustment for Vested Terminated Participants</u>. Ketzner assumed vested terminated participants would commence receipt of plan benefits at age 67, rather than the normal retirement date of age 65, with no actuarial adjustment to the associated accrued benefit in order to account for retirement after age 65 as required under ERISA. This assumption was also undisclosed in Defendants' valuations.

(c) <u>Determining the Projected Benefit Obligation Using an Incorrect Method</u>. Upon information and belief, Ketzner valued the Projected Benefit Obligation using an erroneous "attribution" method which failed to account for projected future benefits and instead only valued benefits earned as of the valuation date and spread those benefits over the participant's entire career. Under Statement of Financial Accounting Standards No. 87 (now Accounting Standards Codification 715), the accrued pension liability for an active participant in plans like Altoona's is determined by allocating the liability for a projected benefit, owed at the termination of employment, over an employee's career. CBIZ and Winters have acknowledged that this Standard was not followed and that by failing to follow this Standard, the Plans' Projected Benefit Obligation was materially understated for each year in which this methodology was employed. Like the other two assumptions, this incorrect application of the required methodology was also undisclosed by Defendants.

33. As a result of these errors, CBIZ and Winters have confirmed that the Plans' Projected Benefit Obligation for the last full Plan Year ending June 30, 2014, the last Plan Year in

which Defendants were engaged to value the Altoona Plans, was understated by at least $132.5 million.

34. Further, had CBIZ and Ketzner valued the Plans using proper actuarial methods, as opposed to the unsupported, unreasonable, and undisclosed errors and assumptions described above, the Bargaining Unit Plan would have been mandatorily frozen on October 1, 2011 due to insufficient funding, and the Non-Bargaining Unit Plan would have been mandatorily frozen on October 1, 2012 due to insufficient funding, such that no new benefits would have accrued to any participants.  Due to Defendants' failure to value the Plans using proper actuarial methods and standards of practice, Altoona was deprived of the opportunity to properly administer its Plans and mitigate its liabilities under the Plans.

**UPMC Acquires Altoona**

35. On July 1, 2013, UPMC acquired Altoona in a transaction in which UPMC agreed to acquire all of Altoona's liabilities, including its pension and benefit plan liabilities as of June 30, 2013 (the Closing Date), invest $250 million in Altoona over ten years, and contribute $10 million to Altoona's foundation.

36. The acquisition process began over two years before the deal finally closed.  Upon information and belief, at least as early as January 1, 2011, Altoona had begun looking for a buyer due to its challenging financial position.  The fact that Altoona was looking for a buyer was widely known throughout Altoona and in the industry and region where Altoona is located.

37. Upon information and belief, CBIZ and Ketzner, as Altoona's long-time actuarial services and benefits professionals, were aware of Altoona's financial position and were further aware that Altoona was looking for a financial partner, such as UPMC.

38. In fact, in February 2011, UPMC executives began looking closely at Altoona as a potential acquisition target because the "word on the street" was that Altoona was interested in being acquired and thus would be "doing something with somebody."

39. In reviewing Altoona's financial situation at the time, based on publicly-available financial information, UPMC noted that Altoona's "pension obligations [were] formidable" even at the stated $56 million level. (In fact, that number vastly understated Altoona's obligations.)

40. On March 15, 2011, two UPMC executives, Liz Concordia and Marshall Webster, met with Altoona CEO Jerry Murray, CMO David Cowgher, and CFO Charles Zorger to discuss Altoona's situation.

41. Over the course of the next year, Altoona continued to "feel out" potential partners and UPMC continued to monitor the potential opportunity presented by acquiring Altoona.

42. On June 1, 2012, UPMC and Altoona signed a Confidentiality Agreement to advance the merger talks by agreeing to the exchange of confidential business and financial information to evaluate the potential opportunity for merger and facilitate discussion on broad deal terms.

43. In this regard, as part of its initial due diligence, UPMC reviewed Altoona's financial statements, including its Projected Benefit Obligation and Accrued Pension Liabilities. In reliance upon this financial information, on November 13, 2012, UPMC made an initial expression of interest in a merger with Altoona in which UPMC would, among other things, assume Altoona's pension liabilities.

44. On November 19, 2012, Altoona's Board voted to pursue an exclusive affiliation with UPMC along the lines of the terms discussed by UPMC.

45. Likewise, on December 12, 2012, UPMC's Board of Directors approved the proposed merger, subject to a number of conditions, including due diligence and further financial review.

46. In January 2013, UPMC's due diligence on the proposed transaction began. As part of its due diligence, UPMC again reviewed Altoona's long-term debt, including its Projected Benefit Obligation and Accrued Pension Liabilities.

47. In so doing, UPMC relied on – among other things -- the GAAP Report for both Altoona Plans prepared by Defendants for the Plan Year ending June 30, 2012, which was signed and certified as accurate by Ketzner on September 17, 2012 (the "2012 GAAP Valuation"). According to the 2012 GAAP Valuation, the Projected Benefit Obligation for the Altoona Plans was approximately $185 million. This resulted in approximately $63,655,814 in Accrued Pension Liabilities (assuming $121,359,891 as fair value of the Plans' assets).

48. UPMC's Board approved the proposed merger based on the expectation that the Accrued Pension Liability UPMC would be assuming was only approximately $79 million, including the $64 million from the Altoona Plans and another $15 million from a pension plan sponsored by an Altoona-related entity serviced by a different actuarial services firm.

49. Further, as part of its standard procedure for assessing potential acquisitions, UPMC reviews a potential "rate of return" on UPMC's investment in the entity to be acquired. In Altoona's case, UPMC used information from Altoona's GAAP valuations to calculate the rate of return on UPMC's proposed investment. If Defendants had stated CBIZ's GAAP valuation correctly, the Altoona investment would have produced dramatically worse returns, and UPMC would never have completed the acquisition.

50. Upon information and belief, both before and during the due diligence period, Defendants were aware that UPMC, or other entities focused on a transaction with Altoona, would rely and did rely on CBIZ's GAAP Valuations.

**The 2012 GAAP Valuation Significantly Understated the Plans' Liabilities**

51. In fact, due to the three errors belatedly acknowledged by CBIZ and Winters, the 2012 GAAP Valuation substantially understated the Altoona Plans' Projected Benefit Obligation.

52. The actual 2012 Projected Benefit Obligation, correcting for the three undisclosed material errors committed by Defendants, was approximately $123 million greater than the $185 million reported to Altoona and relied on by UPMC.

53. Likewise, the 2012 Accrued Pension Liability, relied on by UPMC, was actually approximately $123 million greater than the $79 million shown in Altoona's financial statements and relied on by UPMC.

54. Correcting for these errors, Altoona's balance sheet as of June 30, 2012 should have shown a *deficit* of approximately $4 million, rather than a *surplus* of $119 million.

55. UPMC would not have purchased Altoona had UPMC known the true liabilities confronting the Altoona Plans at the time UPMC was evaluating whether to purchase Altoona and on what terms.

56. As a result of the misrepresentations contained in the 2012 GAAP Valuation, UPMC has now acquired an additional $123 million in pension plan debt which was hidden from UPMC and for which UPMC never bargained.


**UPMC and Altoona Are Likely to Incur Additional Fines and Penalties due to Defendants' Wrongful Misstatements**

57. UPMC and Altoona may now be required to pay excise taxes to the IRS which, with associated interest and penalties, could exceed $5,000,000, for violations of ERISA's minimum funding requirements due to Defendants' wrongful misstatement of the funding requirements which prevented Altoona from making contributions as required based on correct information.

14

58. UPMC and Altoona may now also be required to pay penalties to the IRS which, as permitted by law, could exceed $1,000,000, related to late Form 5330 filings for violations of the benefit restrictions under Internal Revenue Code § 436, resulting from Defendants incorrectly certifying that the Plans' funded status did not trigger benefit restrictions, when in fact, benefit restrictions applied.

59. Finally, UPMC and Altoona may now also be required to pay penalties, interest, and back premiums to the PBGC which, when including all potential penalties as permitted by law, could exceed $100,000,000 for underpayment of premiums, inaccurate filings, missed filings, and late filings due to the Defendants certifying the Plans' liabilities at levels materially below the true liabilities.

60. Had UPMC known of Defendants' undisclosed, unreasonable, and unsupported errors and assumptions in Altoona's GAAP and Funding Reports before closing on the Altoona deal, the additional anticipated regulatory burden (and the additional penalties, interest and back premiums) caused by Defendants' errors, which UPMC has now assumed, would have been yet another factor preventing UPMC from pursuing the Altoona merger. In addition to raising the cost of the acquisition very substantially (and driving UPMC's rate of return even lower), knowledge of these errors and their likely regulatory and financial consequences would have been a prominent "red flag" dictating against the transaction.

## Count 1
## Altoona's Professional Negligence Claim against all Defendants

61. Altoona repeats and realleges the allegations of paragraphs 1 through 60 as if fully set forth herein.

62. Defendants owed Altoona a duty to use such skill, prudence, and diligence as other members of the actuarial profession commonly possess and exercise.

63. By their persistent errors and failure to act in accordance with its professional responsibilities, and by concealing their errors and mistaken assumptions, Defendants breached that duty.

64. As a direct, proximate, and foreseeable result of Defendants breach of duty, Altoona sustained damages in an amount to be determined at trial, but no less than $142,000,000.

## Count 2
### Altoona's Breach of Contract Claim against all Defendants

65. Altoona repeats and re-alleges the allegations of paragraphs 1 through 60 as if fully set forth herein.

66. Defendants promised and agreed to provide reasonably competent actuarial services to Altoona, including the actuarial valuation of the Altoona Plans' pension liabilities and the preparation of accurate and complete required filings that certified those liabilities, in a manner that fully complied with all actuarial standards of practice as well as federal law and regulations.

67. There was good and valuable consideration for these promises and agreements, including Altoona's payment of substantial fees to CBIZ and/or CBIZ-B&I.

68. Defendants breached those agreements for the reasons outlined above, by preparing wildly inaccurate actuarial valuations of the Plans; failing to disclose the erroneous assumptions and methodology that caused those inaccurate valuations; and preparing inaccurate filings that did not comply with federal law and regulations.

69. As a direct and reasonably foreseeable result of Defendants' breach of contract, Altoona has sustained damages in an amount to be proved at trial, but no less than $142,000,000.

5676981.1

**Count 3**
**UPMC's Negligent Misrepresentation Claim against all Defendants**

70. UPMC repeats and re-alleges the allegations of paragraphs 1 through 60 as if fully set forth herein.

71. Defendants were required to exercise the reasonable care and competence required of actuaries in the same or similar circumstances when performing the actuarial valuations of Altoona's pension benefit plans.

72. Defendants failed to adhere to the accepted standard of care and practice in performing these actuarial valuation services for Altoona.

73. As a result, Defendants made materially false representations which the Defendants, in the exercise of reasonable care in the performance of these actuarial services, knew or should have known to be false.

74. Defendants knew or should have known that UPMC would rely on the information contained in the actuarial valuations for the Altoona Plans. Because of their positions and actions, Defendants also had a public duty to provide this information.

75. UPMC reasonably and justifiably relied on the actuarial valuations of the Altoona Plans prepared by Defendants in determining whether to acquire Altoona and assume its long-term debt, including the Plans' debt.

76. As a direct, proximate, and foreseeable result of the Defendants' negligent misrepresentations concerning the benefits and liabilities of the Altoona Plans, UPMC has suffered damages in an amount to be determined at trial, but in no event less than $142,000.000.

77. Defendants' conduct in valuing the Altoona Plans was so egregious and outrageous as to constitute willful, wanton, and reckless indifference to actuarial standards of practice and the duty to exercise reasonable care.

WHEREFORE, Plaintiffs UPMC and Altoona pray for judgment against the Defendants, as follows:

(1) Damages in an amount no less than $142,000,000;

(2) Punitive damages in an amount to be determined at trial;

(3) Costs associated with the suit; and

(4) Such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Dated:  September 16, 2016

By: _____/s/ John A. Schwab_____

Cy Smith, Esquire (*pro hace vice* pending)
Sara Alpert Lawson, Esquire (*pro hace vice* pending)
ZUCKERMAN SPAEDER LLP
100 East Pratt Street, Suite 2440
Baltimore, MD  21202-1031
Tel.:  410-332-0444
Fax:  410-659-0436
csmith@zuckerman.com
slawson@zuckerman.com


John A. Schwab, Esquire
Pa. I.D. No.:  89596
PIETRAGALLO GORDON ALFANO
BOSICK & RASPANTI, LLP
One Oxford Centre, 38th Floor
Pittsburgh, PA  15219
Tel.:  412-263-1849
Fax:  412-263-4275
JAS@Pietragallo.com

*Counsel for UPMC and UPMC Altoona*