## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UPMC** *d/b/a* **UNIVERSITY OF PITTSBURGH MEDICAL CENTER, and UPMC ALTOONA** *f/k/a* **ALTOONA REGIONAL HEALTH SYSTEM,** | ) ) ) ) ) | **Case No. 3:16-cv-204** <br><br> **JUDGE KIM R. GIBSON** |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | |
| **CBIZ, INC., CBIZ BENEFITS & INSURANCES SERVICES, INC., and JON S. KETZNER,** | ) ) ) ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

This case arises from the acquisition of a healthcare facility in Altoona, Pennsylvania. Plaintiffs allege that defendants' actuarial valuation of that facility's pension plan understated the plan's liabilities by $132.5 million, and that this valuation caused plaintiffs to unwittingly assume those liabilities. This opinion does not delve deep into those allegations. Instead, it addresses a voluminous discovery dispute between the parties—specifically, plaintiffs' motion for protective order (ECF No. 53) and defendants' motion to compel (ECF No. 56). For the reasons below, both motions will be denied in part and granted in part.

## I.       Relevant Background

The University of Pittsburgh Medical Center—UPMC—is a nonprofit corporation that operates healthcare facilities in the western part of Pennsylvania. UPMC is also the parent company for numerous entities throughout Pennsylvania that provide healthcare services. UPMC Altoona is one such entity. UPMC Altoona operates healthcare facilities in and around

Blair County, Pennsylvania, and is headquartered in—as its name suggests—Altoona, Pennsylvania. UPMC Altoona was known as Altoona Regional Health System (hereinafter "Altoona Regional") until July 1, 2013, when it was acquired by UPMC.

This case stems from that acquisition. CBIZ, Inc. and its subsidiary, CBIZ Benefits & Insurances Services, Inc. (hereinafter "CBIZ B&I"), provide retirement-plan services for organizations, including services such as actuarial valuations, certifications and statements of accounting liabilities, actuarial determinations of legally required retirement plan contributions, 401k plan designs, and insurance-benefits consulting. From 2002 through February 2015, CBIZ and CBIZ B&I performed actuarial valuations for Altoona Regional's (and, after it was acquired by UPMC, for UPMC Altoona's) two largest pension-benefit plans. In that capacity, CBIZ and CBIZ B&I prepared certifications of the liabilities of those pension-benefit plans and prepared certain certified governmental filings regarding those plans on behalf of Altoona Regional and UPMC Altoona. Jon S. Ketzner is an actuary who was employed by CBIZ and CBIZ B&I until his retirement in early 2015. For at least the 13 years prior to retirement, Ketzner was the lead (and only) actuary to value the obligations and liabilities of Altoona Regional's and UPMC Altoona's two largest pension-benefit plans.

On September 16, 2016, UPMC and UPMC Altoona filed this case against CBIZ, Inc., CBIZ B&I, and Ketzner. Plaintiffs allege that—from at least July 1, 2008, through February 2015—defendants failed to adhere to actuarial standards of practice and that, as a result, they significantly undervalued the obligations and liabilities of Altoona Regional's and UPMC Altoona's pension-benefit plans. Plaintiffs assert, among other things, that defendants understated the plans' Projected Benefit Obligations—the amount of money to be paid into the

plans to satisfy all pension entitlements—by roughly $132.5 million, and overstated Altoona Regional's profitability as a result. Plaintiffs assert also that UPMC purchased Altoona Regional in reliance on defendants' erroneous valuations. UPMC Altoona brings claims for professional negligence and breach of contract against all defendants, while UPMC brings a claim for negligent misrepresentation against all defendants. Defendants moved to dismiss plaintiffs' claims and that motion remains pending. In the meantime, discovery has begun and is ongoing.

On July 20, 2017, plaintiffs filed a motion for protective order (ECF No. 53). Plaintiffs seek an order stating that they do not have to respond to certain document requests and interrogatories propounded by defendants. Plaintiffs argue that these discovery requests are not relevant, unduly burdensome, and not proportional to the needs of the case. On July 21, 2017, defendants filed a motion to compel documents from UPMC (ECF No. 56). Both motions are now fully briefed and ready to be decided.

## II.     Jurisdiction & Venue

UPMC is a Pennsylvania nonprofit corporation with its principal place of business in Pittsburgh, Pennsylvania. (ECF No. 1 ¶ 1.) UPMC Altoona is likewise a Pennsylvania nonprofit corporation, with its principal place of business in Altoona, Pennsylvania. (*Id.* ¶ 2.) Plaintiffs allege that CBIZ, Inc. is a Delaware corporation with its principal place of business in Cleveland, Ohio, that CBIZ B&I is a Missouri corporation (they do not mention CBIZ B&I's principal place of business), and that Ketzner resides—and presumably mean that he is domiciled—in Maryland. (*Id.* ¶¶ 4-7.) Plaintiffs seek damages "in an amount no less than" $142 million. (*Id.* at 18.) Thus, this case is between citizens of different states and the amount in controversy exceeds $75,000. This Court therefore has subject-matter jurisdiction over plaintiffs' claims under 28 U.S.C.

§ 1332(a)(1). And because a substantial part of the events giving rise to plaintiffs' claims occurred in the Western District of Pennsylvania, venue is proper in this district under 28 U.S.C. § 1391(b)(2).

## III.    Legal Standard

Federal Rule of Civil Procedure 26 provides the general framework for discovery in federal civil litigation. Rule 26(b)(1) defines the scope of discovery as "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."  This scope formerly included matters that were "reasonably calculated" to lead to the discovery of admissible evidence, but Rule 26 as amended—and effective December 1, 2015— no longer includes this language.  A matter is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence; and . . . the fact is of consequence in determining the action." *See* Fed. R. Evid. 401.  In determining whether discovery is proportional to the needs of the case, courts must consider "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  Fed. R. Civ. P. 26(b)(l).

Rule 37 provides the mechanism to compel discovery from a person or party who refuses to provide discovery.  The party moving to compel discovery under Rule 37 bears the initial burden of proving the relevance of the material requested. *See Morrison v. Phila. Hous. Auth.*, 203 F.R.D. 195, 196 (E.D. Pa. 2001) (citations omitted).  If the movant meets this initial burden, then the burden shifts to the person resisting discovery to establish that discovery of the material requested is inappropriate. *Momah v. Albert Einstein Med. Ctr.*, 164 F.R.D. 412, 417 (E.D. Pa. 1996)

(citation omitted). The person resisting discovery must explain with specificity why discovery is inappropriate; the boilerplate litany that the discovery sought is overly broad, burdensome, oppressive, vague, or irrelevant is insufficient. *See Josephs v. Harris Corp.*, 677 F.2d 985, 991-92 (3d Cir. 1982).

Rule 26(c) authorizes a person or party resisting discovery to move for a protective order. If the movant establishes good cause for such an order, then the court may impose restrictions on the extent and manner of discovery "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1). "Good cause is established on a showing that disclosure will work a clearly defined and serious injury to the party seeking closure." *Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059, 1071 (3d Cir. 1984) (citation omitted). This injury, too, must be shown with specificity; "[b]road allegations of harm, unsubstantiated by specific examples or articulated reasoning," do not establish good cause. *Cipollone v. Liggett Grp., Inc.*, 785 F.2d 1108, 1121 (3d Cir. 1986) (citation omitted). Additionally, Rule 26(b)(2)(C) provides that—on motion or its own initiative—the court must limit the extent of discovery if it determines that "the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive," or that "the proposed discovery is outside the scope permitted by Rule 26(b)(1)."

## IV.    Discussion & Analysis

Two motions are before the Court: plaintiffs' motion for protective order (ECF No. 53) and defendants' motion to compel (ECF No. 56.) Although there are some discrepancies between the

exact discovery requests addressed in the two motions,[1] the dispute in both motions boils down to an argument about whether the requests at issue fall within the scope of discovery provided by Rule 26(b)(1). The Court will thus analyze the motions together.

To do so, however, it is first necessary to know the exact discovery requests that are disputed. The parties' submissions are less than clear on this point; they cite numerous requests throughout their motion and brief (ECF Nos. 53, 57), but both of their proposed orders (ECF Nos. 53-2, 56-2) include language regarding requests never explicitly cited in their motion and brief. Because the parties' proposed orders appear to be the most comprehensive listings of the disputed requests, the Court will analyze the parties' motions with respect to the requests referenced in the proposed orders. These are defendants' requests for production numbers 9-20, 35-44, 56, 69, 72-75, 78-81, 84, 92, and 94-98. (*See* ECF Nos. 53-2, 56-2.) Plaintiffs also seek a protective order with respect to numbers 7-8 and 10 of defendants' interrogatories to UPMC. (ECF No. 53-2.)

There is one more notable issue with the parties' motions. Although their proposed orders give some guidance on the disputed requests, the parties do not clearly connect their arguments to specific discovery requests. Thus, when it is not entirely clear which requests a specific argument applies to, the Court will analyze the argument generally in an attempt to clarify the scope of allowable discovery.

---

[1] Specifically, plaintiffs seek a protective order with respect to fewer than all of the requests defendants raise in their motion to compel. (*Compare* ECF No. 53-2, *with* ECF No. 56-2.) Plaintiffs opposed defendants' motion to compel in its entirety, though, so this discrepancy is of no real consequence.

A.        Negligent-Misrepresentation Claim

Because the parties' arguments are based on UPMC's negligent-misrepresentation claim, it is useful to outline the elements of such a claim under Pennsylvania law before addressing the arguments. The Pennsylvania Supreme Court has adopted § 552 of the Restatement (Second) of Torts for negligent-misrepresentation claims like the claim in this case. *See Bilt-Rite Contractors, Inc. v. Architectural Studio*, 866 A.2d 270, 287 (Pa. 2005) ("we hereby adopt Section 552 as the law in Pennsylvania in cases where information is negligently supplied by one in the business of supplying information").[2] Section 552 provides in relevant part:

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, [negligently] supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information . . . .

> (2) [This liability] is limited to loss suffered

>> (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

>> (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

To establish liability under § 552, a plaintiff must show that (1) the defendant was in the business of providing information for the guidance of others, (2) the defendant had a pecuniary interest in

---

[2] By its terms, § 552 is limited to cases where the defendant "in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions." In other cases, Pennsylvania common law—which provides substantially similar elements as § 552—governs the tort of negligent misrepresentation. *See Bilt-Rite*, 866 A.2d at 287 ("we do not view Section 552 as supplanting the common law tort of negligent misrepresentation, but rather, as clarifying the contours of the tort as it applies to those in the business of providing information to others").

the transaction in which he provided the information, (3) the information was false, (4) the defendant failed to exercise reasonable care in obtaining or communicating the information, (5) the plaintiff justifiably relied on the information, and (6) the plaintiff suffered injury as a result. *See Excavation Techs., Inc. v. Columbia Gas Co. of Pa.*, 936 A.2d 111, 115-16 (Pa. Super. Ct. 2007). Implicit in this last element is a causation requirement. *See Bouriez v. Carnegie Mellon Univ.*, 585 F.3d 765, 771 (3d Cir. 2009) ("proximate cause is an essential element of both fraudulent misrepresentation and negligent misrepresentation claims" (citation omitted)); *Gibbs v. Ernst*, 647 A.2d 882, 890-91 (Pa. 1994) (describing elements of negligent-misrepresentation claim under Pennsylvania common law, including proximate-cause requirement).

While § 552 contains the elements of a negligent-misrepresentation claim (with § 552(2) limiting what kind of loss is recoverable), § 552B governs the issue of damages for a negligent-misrepresentation claim. Section 552B provides:

> (1) The damages recoverable for a negligent misrepresentation are those necessary to compensate the plaintiff for the pecuniary loss to him of which the misrepresentation is a legal cause, including
>
> > (a) the difference between the value of what he has received in the transaction and its purchase price or other value given for it; and
> >
> > (b) pecuniary loss suffered otherwise as a consequence of the plaintiff's reliance upon the misrepresentation.
>
> (2) the damages recoverable for a negligent misrepresentation do not include the benefit of the plaintiff's contract with the defendant.

Although the Pennsylvania Supreme Court has explicitly adopted § 552, it has not—yet—adopted § 552B. Federal courts in this circuit, however, have predicted that the Pennsylvania Supreme Court would adopt § 552B if the issue presented itself. *See Brand Mktg. Grp. LLC v. Intertek Testing Servs., N.A.*, 801 F.3d 347, 356 (3d Cir. 2015) ("we predict that the Pennsylvania Supreme Court

would adopt § 552B"); *Torres v. Borzelleca*, 641 F. Supp. 542, 546 (E.D. Pa. 1986) ("It is this Court's prediction, however, that the Pennsylvania Supreme Court would follow [S]ection 552B . . . ."). Because this Court agrees with that prediction—and because both plaintiffs and defendants rely on § 552B (*see* ECF Nos. 53 at 5, 57 at 4)—the Court applies § 552B here.

### B.    Defendants' Discovery Requests

According to defendants, the disputed requests for production relate to four categories of documents:

> (1) post-acquisition documents regarding the financial performance of Altoona [Regional], including the consideration paid by UPMC, Altoona[] [Regional's] value, and the financial benefit derived by UPMC from the acquisition, (2) post-acquisition valuations and assessments regarding Altoona[] [Regional's] impact on UPMC's health insurance business, (3) specific limited documents regarding similar acquisitions by UPMC involving defined benefit plans, and (4) pension valuation reports prepared by UPMC's own actuaries for UPMC's pension plans, apart from Altoona [Regional].

(ECF No. 57 at 4.)  Condensing a dispute about 39 document requests to 4 categories makes it a lot more manageable, but not all of the disputed requests support defendants' categorization.  For example, requests 9-19 and 94-97—which defendants contend fall within the first two categories of requests seeking postacquisition documents (*see* ECF No. 56-2 at 1)—contain no language limiting the requests to postacquisition documents.  Some of these requests actually disclaim such a limitation.  (*See* ECF No. 56-1 ¶¶ 9 ("2008 to present"), 10-11 ("2011 to present"), 12-13 ("2008 to present"), 14 ("2011 to present"), 15 ("prior to and after the Acquisition") 16-19 (no temporal scope), 94 ("2008 to the present") 96-97 (same).)  Based on defendants' arguments, the Court

assumes that defendants are now limiting these requests to postacquisition documents only. The Court will thus analyze defendants' first two categories of requests accordingly.

### 1. Postacquisition Financial Information (Requests 9-20, 72-75, 92, and 94-98, as well as Interrogatories 7-8)

Through their requests for postacquisition financial information (requests 9-20, 72-75, 92, and 94-98 as well as interrogatories 7-8), defendants seek extensive information regarding—among other things—the financial performance of both UPMC and UPMC Altoona since the acquisition, as well as the effects the acquisition had on UPMC's health-insurance business. Defendants argue that this information is discoverable because it is relevant to (1) causation and damages,[3] (2) reliance, and (3) plaintiffs' duty to mitigate. The Court will address these grounds in turn.

#### i. Causation & Damages

First, the Court will examine causation and damages. As a threshold matter, defendants argue that they are entitled to plaintiffs' postacquisition financials to determine the actual consideration UPMC paid for Altoona Regional. Defendants point out that plaintiffs—in their complaint—allege that UPMC committed to "invest[ing] $250 million in [UPMC] Altoona over ten years, and contribut[ing] $10 million to [UPMC] Altoona's foundation." (*See* ECF No. 1 ¶ 35.) And defendants note that the acquisition agreement gives UPMC some discretion on how to satisfy this commitment. Defendants argue that gauging how UPMC is satisfying this ten-year commitment—determining the source of funds and amounts paid—necessarily requires

---

[3] In their filings, defendants do not clearly distinguish between causation and damages in their arguments why plaintiffs' postacquisition financials are relevant. This makes sense since these elements—and defendants' arguments about them—appear to overlap. The Court will therefore likewise discuss causation and damages together.

postacquisition financials, and that this information is relevant to the injury and causation analysis.

Plaintiffs disagree to some extent. They point out that defendants' document request 116 already sought "[a]ll documents reflecting, evidencing, or otherwise relating to any amount paid or any other consideration provided by UPMC in the Acquisition." (ECF No. 56-1 ¶ 116.) And plaintiffs represent that they have "already agreed to produce (and in fact [have] never objected to producing) documents sufficient to show the payments UPMC has made under the 2013 Integration and Affiliation Agreement with [UPMC] Altoona." (ECF No. 61 at 2.) In response, defendants assert that these documents would be insufficient because defendants seek to discover more than just the payments themselves—they seek to discover the source of the funds for the payments.[4]

As an initial matter, the Court notes that defendants' requests for postacquisition financials are comprised of 22 document requests (requests 9-20, 72-75, 92, and 94-98) and 2 interrogatories (7-8), and that most of these discovery requests do not relate to the consideration UPMC exchanged for Altoona Regional. But even the requests that do relate to consideration are problematic. The requests that could be construed as seeking information regarding consideration—in the Court's view, requests 12-14, 92, and 94-96—stray far beyond simply seeking such information. For example, requests 12-14 seek "[a]ll documents reflecting analyses of and communications related to accounting for . . . assets, liabilities, equity, revenue, and

---

[4] Defendants gloss over *why* the exact source of UPMC's consideration is relevant. As best the Court can make out, defendants seek to corroborate plaintiffs' allegations regarding UPMC's investment commitment. Although the exact source of funds would seemingly not affect damages, the Court recognizes that plaintiffs' allegations regarding UPMC's investment commitments sufficiently place this topic at issue for discovery to be proper.

expenses, including but not limited to all audited and unaudited financial statements and underlying work papers, schedules, communications, and analyses, from 2008 to the present" of UPMC, UPMC Altoona, and Altoona Regional. (ECF No. 56-1 ¶¶ 12-14.) Request 94 seeks "[a]ll documents and communications related to . . . working capital and cash flows from 2008 to the present" for UPMC Altoona and Altoona Regional. (*Id.* ¶ 94.) And request 96 seeks "[t]he general ledger and all documents reflecting general ledger data"—in other words, the record reflecting *every financial transaction*—of UPMC, UPMC Altoona, and Altoona Regional from 2008 to now. (*See id.* ¶ 96.) Defendants argue that they need "[t]argeted documents reflecting how assets, revenue, liabilities, and cash have flowed between UPMC and [UPMC] Altoona" (ECF No. 66 at 3) to determine the consideration UPMC paid for Altoona Regional. But their definition of "targeted documents" seemingly includes every single record prepared by the accounting departments of both UPMC Altoona (and formerly Altoona Regional) and UPMC, plus every underlying communication that went into those records, for the last nine years. Such a position is untenable, and does not comport with the scope of discovery under the Federal Rules of Civil Procedure.

Information sought to determine the amount UPMC actually paid for Altoona Regional— and the source of funds—is certainly relevant. That information would relate directly to plaintiffs' damages and their allegations regarding UPMC's investment commitments, meaning discovery of these topics is appropriate. But defendants' requests far exceed these topics and are not reasonably directed at discovering this information. The Court will therefore not order plaintiffs to respond to defendants' current requests that seek information about consideration. Defendants may issue revised discovery requests that are actually targeted at determining the

amount UPMC paid for Altoona Regional, including the source of funds, to the extent plaintiffs

have not already produced such information in response to request 116.[5]  And contrary to

plaintiffs' arguments, defendants may discover the underlying financial records showing the

amounts UPMC paid for Altoona Regional and the source of funds.[6]

But defendants' consideration argument applies to only a small portion of the disputed

requests for postacquisition financials.  Defendants' main argument why postacquisition

financials are relevant to causation and damages has to do with the calculation of damages for a

negligent-misrepresentation claim.

Defendants, quoting § 552B, assert that a plaintiff in a negligent-misrepresentation claim

is "entitled to recover 'the pecuniary loss to him of which the misrepresentation is the legal

cause[,]" and that "[r]ecoverable 'pecuniary loss' includes the 'difference between the value of

what he has received in the transaction and its purchase price or other value given for it.'"  (ECF

No. 57 at 4.)  Refreshingly, it appears that plaintiffs agree with this measure of damages.[7]  (*See*

ECF No. 53 at 5 ("UPMC is entitled to damages 'necessary to compensate [it] for the pecuniary

loss to [it] of which the misrepresentation is a legal cause, including (a) the difference between

---

[5] If UPMC's consideration for Altoona Regional includes postacquisition payments—monetary or otherwise—the Court assumes that plaintiffs have produced this information to defendants or will do so in response to request 116.

[6] This does not mean defendants are entitled to all of plaintiffs' financial records.  But defendants need not rely on plaintiffs' summaries regarding consideration; discovery is not so restricted, and financial information that falls within Rule 26(b)(1)'s scope is discoverable in its original form.  Defendants are thus entitled to plaintiffs' financial records regarding UPMC's consideration for UPMC Altoona.

[7] Though it seems they may not think so; plaintiffs state that "CBIZ's [sic] asserts that UPMC is only entitled to recover its 'actual loss,'" and appear to quibble with that purported assertion.  (*See* ECF No. 61 at 2.)  But nowhere in their briefs do defendants argue that actual loss is the *only* recoverable loss.  Defendants invoke actual loss because that is what—according to them—the postacquisition financials are relevant to.  Defendants, like plaintiffs, rely on § 552B's "pecuniary loss" standard for damages (*see* ECF Nos. 57 at 4, 53 at 5), and there is no indication of a true disagreement about whether this standard governs damages here.

the value of what [it] has received in the transaction and its purchase price or other value given for it; . . ."" (quoting § 552B).)  But defendants and plaintiffs disagree on two points regarding the *calculation* of damages under this measure: (1) as of when value should be calculated, and (2) how value should be calculated.

(1)        **As of When Value Should Be Calculated**

According to defendants, plaintiffs' postacquisition financials, including information about the acquisition's effect on UPMC's health-insurance business, are relevant to calculating the value of what UPMC received in the transaction, namely UPMC Altoona.  (ECF No. 57 at 4-10.)  In response to this argument, plaintiffs assert that the value of what a plaintiff in a negligent-misrepresentation claim received is determined as of the closing date—not later—and that postacquisition financials are therefore irrelevant to damages.

For the reasons discussed above, the Court agrees with the parties that § 552B controls UPMC's negligent-misrepresentation claim.  Regarding as of *when* value is calculated under § 552B and for negligent-misrepresentation claims in general, plaintiffs have the better argument.  Generally, in a negligent-misrepresentation claim "[t]he value of the item acquired is . . . determined by the market value *at the time of the transaction*."  *Med. Consultants Network, Inc. v. Cantor & Johnston, P.C.*, No. 99-cv-0528, 2001 WL 10788, at *2 (E.D. Pa. Dec. 27, 2000) (emphasis added citing cases).  This conclusion follows from both logic and case law.  It follows logically because "[m]aking the comparison after the plaintiff has had control of the company raises serious causation questions.  Is the company worth so little because it was worthless at the time of the acquisition or because of events after the acquisition, unrelated to the defendants' alleged illegal conduct?"  *Id.* at *3.  Determining value after the time of acquisition would unmoor damage

calculations; how far past the acquisition does one look? Such a method of valuation makes little sense if one seeks to determine the value of what a plaintiff should have received at an earlier time. Furthermore, this method would always allow a defendant to argue that he caused no (or less) harm. If a plaintiff's business that was acquired on a misrepresentation failed, the defendant could argue that his misrepresentation caused no harm because the business has no value *now*. And if a plaintiff who acquired a business based upon a defendant's misrepresentation managed to turn that business into a successful enterprise despite the misrepresentation, the defendant could argue that his misrepresentation caused no—or less—harm because the business's value *now* was high. That is not how proper valuation should be determined.

Case law reinforces this conclusion. *See Med. Consultants*, 2001 WL 10788, at *2 ("The value of the item acquired is generally determined by the market value at the time of the transaction.") (citing cases). Valuation at the time of the transaction is common in analogous causes of action as well. Under Pennsylvania law, the standard of damages for both fraud and fraudulent-misrepresentation claims are similar to the standard of damages for negligent-misrepresentation claims, *see Advance Capital Partners, LLC v. Rossmann*, No. 09-cv-3467, 2011 WL 5428554, at *11 (E.D. Pa. Nov. 9, 2011), and "[a]ctual value in a fraud case is generally '*determined as of the time of the transaction*.'" *Harnish v. Widener Univ. Sch. of Law*, 833 F.3d 298, 307 (emphasis added) (quoting *Kaufman v. Mellon Nat'l Bank & Trust Co.*, 366 F.2d 326, 331 (3d Cir. 1966)). *See also Tilghman v. Dollenberg*, 213 A.2d 324, 326 (Pa. 1965) ("'The measure of damages in an action of deceit for fraud in the sale of stock is * * * the difference between what the plaintiff was induced to pay for the stock and its actual value at the time of the purchase.'" (quoting *Curtis v. Buzard*, 98 A. 777, 778 (Pa. 1916)); *Neuman v. Corn Exch. Nat. Bank & Trust Co.*, 51 A.2d 759, 766 (Pa. 1947) ("the measure

of damages in an action for deceit in the sale of property is . . . the difference between the *real*, or market, value of the property at the time of the transaction and the higher, or *ficticious* [sic], value at which it was purchased" (citation and quotation marks omitted)); *Sands v. Forrest*, 434 A.2d 122, 124 (Pa. Super. Ct. 1981) ("[I]n an action for fraud and deceit the measure of damages is the difference in value between the real, or market, value of the property *at the time of the transaction* and the higher, or fictitious, value which the buyer was induced to pay for it." (emphasis added) (citing cases)).  Put simply, the proper moment of valuation in a negligent-misrepresentation claim is as of the time of the transaction.  And subsequent events are generally not relevant to the asset's value.  *Cf. Harnish*, 833 F.3d at 307 n.3 ("As a loose analogy, a lottery ticket's actual value at sale does not retroactively plummet to zero the moment a purchaser loses or skyrocket the moment a purchaser wins.").

There is a narrow exception to the general rule of valuation at the time of the transaction. This exception is noted in comment c of the Restatement (Second) of Torts § 549[8]: "the price that determines the value of the article is not necessarily the price that it would bring at the time the sale is made."  Defendants make much of this language, but omit its full context.  The full paragraph provides as follows:

> *c. Value, how ascertained.*  In a sales or exchange transaction the loss for which the recipient of a fraudulent misrepresentation is entitled to recover is usually the difference between the price paid or the value of the thing given in exchange and the value of the thing acquired.  The value of the article is normally determined by the price at which it could be resold in an open market or by private sale if its quality or other characteristics that affect its value were known.  However, the price that determines the value of the article

---

[8] Section 549 governs damages for fraudulent-misrepresentation claims, but because the measure of damages for negligent and fraudulent misrepresentation are the same, "comments a to f under § 549 are . . . applicable to [§ 552B], so far as they are pertinent."  § 552B cmt. a.

is not necessarily the price that it would bring at the time the sale is made. In many cases this price is due to the widespread belief of other buyers in misrepresentations similar to that made to the person seeking recovery, as when market price of securities, such as bonds or shares, is the result of widely spread misrepresentations of those who issue or market them. *The fact that the market price is inflated or depressed by the misrepresentations is the important factor making the price fictitious*; it is, therefore, immaterial that the inflated or depressed price does or does not result from the misrepresentations of the same person who made the misrepresentation on which the person seeking recovery relied. In this case if the recipient of the misrepresentation, in reliance upon it, retains the securities either as a permanent or temporary investment, their value is determined by their market price after the fraud is discovered when the price ceases to be *fictitious* and represents the consensus of buying and selling opinion of the value of the securities as they actually are. If the plaintiff has resold the securities in the interim, however, his loss is the difference between the price paid and that received.

§ 549 cmt. c (emphasis added). As this comment explains, the exception applies when the price at the time of the transaction is somehow fictitious—like in cases of widespread fraud on the market.[9] In such cases, the "real" price at the time of purchase is fictitious because that price itself is a product of the misrepresentation. Valuation at the time of the transaction would thus be an inaccurate measure—meaning it is necessary to look beyond the time of the transaction to determine value.

The two cases defendants cite for the proposition that assets are sometimes valued post-transaction actually illustrate this animating fictitious-price principle, although neither case

---

[9] *See Harnish*, 833 F.3d at 307 n.2 ("To the extent that the 'market' price at the time of the transaction might itself be inflated due to widespread dissemination of the misrepresentation, one must ascertain the fair price that would be paid if the broader market knew the truth. (citing § 549 cmt. c)); *Med. Consultants*, 2001 WL 10788, at *2 ("Only in special circumstances, like market inflation or depression, is the value of an article not determined by its market value at the time of acquisition." (footnote omitted)); *Neuman*, 51 A.2d at 766-67 ("'[W]hen the market price is unnaturally inflated by unlawful and fraudulent practices, it cannot be the true means of ascertaining what is just compensation'." (citation omitted)).

involved claims similar to negligent misrepresentation. *See Taylor v. KeyCorp*, 680 F.3d 609, 613-14 (6th Cir. 2012) (holding in ERISA case that "[w]hen a plaintiff alleges that the withholding of information affected share prices, 'the appropriate measure of damages [is] the difference between the investment as taken and the investment as it would have been if not tainted by withheld information.'" (citation omitted)); *In re Boston Scientific Corp. ERISA Litig.*, 254 F.R.D. 24, 31 (D. Mass. 2008) ("If Boston Scientific stock was higher than it 'should have been' throughout the class period, then Plaintiffs made a larger profit than they 'should have' earned when they cashed in their old shares."). These cases do not, however, lend support for the notion that post-transaction valuation is appropriate here.

Nor do the cases cited in defendants' opening brief on this point lend any support. None involved similar claims and the damages issues they addressed are inapposite. *Fishman Organization, Inc. v. Frick Transfer, Inc.*, 564 F. App'x 649 (3d Cir. 2014), was a breach-of-contract case, and—contrary to defendants' assertion—damages were not calculated by examining the value of the assets at the time of judgment. The district court calculated damages by looking to the per-unit price plaintiff originally paid for the products and the Third Circuit affirmed that calculation. *See id.*; *Fishman Org., Inc. v. Frick Transfer, Inc.*, No. 11-cv-4598, 2013 WL 1655984, at *3-4 (E.D. Pa. Apr. 17, 2013). *Blum v. Witco Chemical Corp.*, 829 F.2d 367 (3d Cir. 1987), was an age-discrimination suit under the ADEA, and although the court examined and calculated damages incurred *after* plaintiffs' terminations, that was proper because such damages can be a component of an ADEA claim—this is called front-pay. *Fariss v. Lynchburg Foundry*, 769 F.2d 958 (4th Cir. 1985), was likewise an ADEA case. The court did examine plaintiffs' finances at the time of judgment, but did so because—under his ADEA claim—it was proper to offset his pension

benefits from his damages. *LaSalle Talman Bank F.S.B. v. United States*, 317 F.3d 1363 (Fed. Cir. 2003), was a breach-of-contract case where postbreach financials were relevant to damages because they related to plaintiffs' duty to mitigate. And the premise defendants cite *Levy v. Schmidt*, 573 F. App'x 98 (3d Cir. 2014), for—that past experience of an ongoing, successful business can be used to calculate future performance—is obviously correct, but it has no bearing on whether post-transaction valuation is appropriate in a negligent-misrepresentation claim.

Defendants do not argue and there is no indication that the market value of Altoona Regional at the time of the acquisition would somehow be fictitious. That narrow exception to the appropriate time of valuation in negligent-misrepresentation claims therefore does not apply. This means that the value of what UPMC received—Altoona Regional—is to be determined as of the closing date of the acquisition.

### (2)      How Value Should Be Calculated

Defendants argue in the alternative that, even if value must be determined as of the closing date, postacquisition financials are still relevant to determining Altoona Regional's value. Under this line of reasoning, defendants essentially seek the postacquisition financials to backtrack and value Altoona Regional as of the closing date. This argument also does not justify discovery of plaintiffs' postacquisition financials. Although postacquisition financials are marginally relevant to determining Altoona Regional's value as of the closing date, discovery of such records is inappropriate because it is disproportional to the needs of this case.

Plaintiffs' postacquisition financials are clearly relevant to some extent; if all of plaintiffs' pre-acquisition financial records were destroyed, then its current financials would allow us to backtrack and estimate Altoona Regional's value at the time of the acquisition. Postacquisition

financials are thus relevant to value, and that remains true even when more-recent records do exist. But the same thing can be said for Altoona Regional's financial records from any year. If no other records existed, then Altoona Regional's records from, for example, 2003 would at least allow us to estimate—based on market factors and making certain assumptions—what its value would or could be in 2013. But it would certainly be odd if defendants sought financial records from 2003 to determine Altoona Regional's value as of 2013 if all records from 2003 through the present were intact. It would not be reasonable based upon lack of relevancy.

That hypothetical situation is similar to what defendants seek to do here. There is simply no need to backtrack from plaintiffs' postacquisition financials to value Altoona Regional as of the closing date. Valuing Altoona Regional as of the closing date is properly done through reference to Altoona Regional's financials *as of, and prior to, the closing date*. Postacquisition financials would only be somewhat relevant to Altoona Regional's value as of the closing date, yet the burden of complying with those requests—22 extensive requests for documents spanning four years—appears considerable.[10] Half of those 22 requests (requests 9-16, 35, 72-73, and 92) seek "all documents reflecting analyses of and communications related to" various financial metrics from the acquisition through the present. (*See* ECF No. 56-1.) The other half use different language but are similarly broad. Overall, defendants' requests for postacquisition financials would likely require plaintiffs to locate, review, and produce thousands of documents. And these documents would be only marginally relevant to Altoona Regional's value as of the closing date.

---

[10] Defendants correctly note that a party "cannot avoid . . . specific [discovery] requests by making conclusory statements about burden and proportionality." (ECF No. 66 at 2.) But a party's lack of specificity regarding burden does not mean the Court must close its eyes when the burden is apparent from the discovery requests.

Defendants are entitled to extensive discovery regarding Altoona Regional's financials as of and prior to the closing date in order to determine its value. But plaintiffs' postacquisition financials are only marginally relevant on this point, and this marginal relevance does not justify defendants' discovery requests. Such discovery is thus beyond the scope of allowable discovery under the Federal Rules of Civil Procedure.

### ii.    Reliance

Defendants next argue that plaintiffs' postacquisition financials are relevant to whether UPMC reasonably relied on defendants' financial projections. (*See* ECF No. 60 at 6-7.) Because defendants again do not connect these arguments to specific discovery requests, the Court will discuss these arguments generally in an attempt to clarify the scope of allowable discovery.

Defendants explain that UPMC merged Altoona Regional's pension plan with UPMC's own pension plan in December 2014, and that UPMC's pension plan was less expensive than Altoona Regional's plan—meaning this merger likely reduced plaintiffs' pension liabilities. Defendants posit that UPMC likely factored the reduction of Altoona Regional's pension liabilities into UPMC's strategic plan for the acquisition. But the next part of this argument makes little sense. Defendants argue that

> [p]ostacquisition data regarding this reduction in pension liability . . . is relevant to whether UPMC in fact relied on Mr. Ketzner's projection to any material degree. It is also relevant to whether Mr. Ketzner's projection caused the acquisition, when UPMC strategically planned to eliminate certain of that projected liability in any event.

(*Id.* at 6.) The Court does not follow this argument. Yes, information that UPMC—as of or before the closing date—intended to reduce Altoona Regional's pension liabilities upon acquiring it

could tell us something about UPMC's reliance on defendants' alleged projections. This information could make it more likely that UPMC would have acquired Altoona Regional regardless of defendants' projections. But again, to be relevant such information would have to relate to UPMC's plans as of or before the closing date. Data regarding this reduction in pension liabilities itself—which occurred in December 2014—would tell us nothing about whether UPMC relied on Ketzner's alleged projections in acquiring Altoona Regional in July 2013. Nor would such postacquisition data tell us anything about whether Ketzner's alleged projections caused the acquisition. Thus, defendants' reliance argument does not justify the discovery they seek.

But reliance is an element of a negligent-misrepresentation claim, and information that is actually relevant to reliance would normally be discoverable. And as defendants point out, postacquisition information could be relevant to reliance; "UPMC's financial analyses and reports after the transaction . . . may . . . discuss UPMC's valuation of and reasons for purchasing Altoona [Regional]." (ECF No. 60 at 3.) To the extent plaintiffs' analyses and reports relate to plaintiffs' reliance, defendants are entitled to the production of such documents.[11] And because the Court discerns no specific discovery requests that explicitly address reliance, it will allow defendants to issue revised discovery requests that are actually targeted at this issue.

As for postacquisition data regarding plaintiffs' pension-plan merger, such information is discoverable for a different reason than that it is relevant to reliance. Plaintiffs' claims are based on their allegation that defendants understated Altoona Regional's pension liabilities, and—although defendants do not argue this—information about what happened to those liabilities is

---

[11] Though—again—this does not mean that defendants are entitled to all of plaintiffs' postacquisition financials.

directly relevant to "pecuniary loss suffered otherwise as a consequence of the plaintiff's reliance upon the misrepresentation." § 552B(1)(b). And plaintiffs appear to recognize that information about their pensions is relevant. They point out that to determine UPMC's strategic plan for the acquisition and whether UPMC contemplated merging pension plans, defendants need only look to UPMC's actual strategic plan for the acquisition. Plaintiffs represent that they are in the process of producing this plan to defendants. (*See* ECF No. 67 at 7.) Additionally, plaintiffs represent that "UPMC has already agreed to produce information on what happened to the Altoona [Regional's] pension liabilities post-merger, and [that UPMC] has also agreed to produce all documents which support [plaintiffs'] damages claim." (*Id.*)

It thus seems that defendants will receive all the information they could want regarding plaintiffs' pension plans and the issue of damages. The Court notes, however, that defendants are not limited to the specific documents plaintiff has chosen to provide in their discovery of these issues. If other documents or information would be relevant to plaintiffs' pensions or their damages claim, and discovery of such information comports with this opinion, then defendants are allowed to request that information.

### iii.    Plaintiffs' Duty to Mitigate

Though they do not elaborate much on this point, defendants' final argument why postacquisition financials are discoverable is that these records are relevant to plaintiffs' duty to mitigate. Defendants assert that UPMC has a duty to mitigate damages and argue that they are entitled to discovery of postacquisition documents on that issue as well on other, unspecified defenses. (ECF No. 60 at 6-7.)

It is true that under Pennsylvania law, as a general matter, "'one injured by the tort of another is not entitled to recover damages for any harm that he could have avoided by the use of reasonable effort or expenditure after the commission of the tort.'" *Yost v. Union R.R. Co.*, 551 A.2d 317, 322 (Pa. Super. Ct. 1988) (quoting Restatement (Second) of Torts § 918(1)). There appears to be scarce authority under Pennsylvania law regarding how this duty applies in the context of misrepresentation claims, but the Court sees no convincing reason—and plaintiffs have not argued—that the duty to mitigate damages would not apply to such claims. Assuming that this duty applies, defendants are correct that they are entitled to discovery on plaintiffs' mitigation efforts. And such discovery necessarily implicates postacquisition financials.

But this does not mean that defendants have free rein to discover all of plaintiffs' postacquisition financials. Additionally, the Court discerns no specific discovery requests that seek documents regarding mitigation efforts, and defendants again do not connect this argument to specific discovery requests. The Court therefore holds only that postacquisition financials regarding plaintiffs' duty to mitigate are discoverable.

### 2. Documents & Information Regarding Other Acquisitions by UPMC of Hospitals with Defined-Benefit Pension Plans (Requests 35-44, 56, and 78-81, as well as Interrogatory 10)

In their opening brief, defendants state that they also seek information regarding other acquisitions by UPMC of hospitals with defined-benefit pension plans. Defendants explain that they agreed to narrow the scope of these requests at a June 7, 2017 meeting with plaintiffs and state that they now seek the following: (1) deal documents (such as merger agreements), (2) board presentations from before and after the acquisition that relate to the acquisition, (3) documents sufficient to show the projected financial performance and actual performance of the acquired

entity, (4) documents sufficient to show the projected rate of return ("ROR") and actual ROR of the acquired entity, and (5) due-diligence reports about the defined-benefit pension plans and analyses of the plans during due diligence. Defendants note that they seek similar documents for UPMC's acquisition of Lee Hospital in 1998.

Plaintiffs elaborate a bit on what acquisitions these specific discovery requests would cover, namely UPMC's acquisitions of Lee Hospital in 1998, Mercy Hospital in 2008, and Hamot Medical Center in 2011, as well acquisitions that postdate UPMC's acquisition of Altoona Regional. (*See* ECF No. 61 at 6 n.4.) Those include UPMC's acquisitions of Susquehanna Health in 2016, Jameson Health System in 2016, WCA Hospital in 2016, and PinnacleHealth (currently in process). (*Id.*)

According to defendants, the information they seek about these acquisitions is discoverable because it is relevant to causation and reliance. As for causation, defendants point out that plaintiffs allege that UPMC "would never have completed the acquisition [of Altoona Regional]" (ECF No. 1 ¶ 49) but for defendants' pension valuations, and assert that this allegation places UPMC's "standard procedure for assessing potential acquisitions" (*id.*) at issue. And as for reliance, defendants argue that the scope of UPMC's due diligence regarding pension liabilities in similar acquisitions is relevant to UPMC's alleged reliance on defendants' pension valuations. Plaintiffs offer two arguments in response, namely that information about other acquisitions is not relevant to reliance and that the requests are overbroad. As for defendants' causation argument specifically, plaintiffs leave this largely unaddressed.

Defendants have the better argument on this dispute. A negligent-misrepresentation claim requires both that the plaintiff's reliance on the misrepresentation was justified and that the

misrepresentation caused the loss. *See* § 552; *see also Excavation Techs.*, 936 A.2d at 115-16 (citing § 552 and describing elements for negligent-misrepresentation claim). Turning first to the reliance element,

> [a]s the words of the phrase imply, *justifiable reliance* comprises two elements: (1) the plaintiff must in fact rely on the information; and (2) the reliance must be reasonable. The justifiableness of the reliance is judged in light of the plaintiff's intelligence and experience. For purposes of the tort of negligent misrepresentation, reliance is unjustified when the relying party is negligent.

*Scottish Heritable Tr., PLC v. Peat Marwick Main & Co.*, 81 F.3d 606, 615 (5th Cir. 1996) (footnotes and internal citation omitted). Although the court in *Scottish Heritable* was applying Texas law, this is of no real consequence; the court was applying § 552, which Texas has adopted, and Pennsylvania courts appear to be in agreement with this standard. *See Am. Metal Fabricators Co. v. Goldman*, 323 A.2d 891, 894 (Pa. Super. Ct. 1974) ("[o]ne who has special knowledge, experience, and competence" might not be reasonable in relying on the statements of another "for which the ordinary man might recover" (citation omitted)); *Mellon Bank Corp. v. First Union Real Estate Equity & Mortg. Invs.*, 951 F.2d 1399, 1412 (3d Cir. 1991) (considering parties' degree of sophistication in holding that plaintiff's reliance on promise was not reasonable); *Greenberg v. Tomlin*, 816 F. Supp. 1039, 1056 (E.D. Pa. 1993) (holding in context of fraudulent-misrepresentation claim that, "[a]lthough there are no hard and fast definitions of what constitutes reasonable reliance, the degree of sophistication of the parties and the history, if any, behind the negotiation process are relevant factors in ascertaining reasonableness"). Whether UPMC's reliance on defendants' alleged misrepresentations was justifiable thus implicates UPMC's standard due diligence for acquisitions. If, for example, UPMC failed to follow its usual standards for acquisitions when it

acquired Altoona Regional, it might be that UPMC was unreasonable in relying on defendants'
alleged misrepresentations. Defendants are thus allowed to examine UPMC's standard
acquisition procedures.

Likewise, other acquisitions (and the degree to which pension liabilities factored into the
decisions to undertake those acquisitions) are relevant to whether defendants' alleged
misrepresentations were the but-for cause of UPMC's acquisition of Altoona Regional—as
plaintiffs allege. Defendants accurately explain why this is so; "[f]or example, if the financial
performance of Altoona [Regional] would have met the 'standard' metrics applied by UPMC in
other acquisitions regardless of the pension valuation, this evidence could refute UPMC's
allegations of causation and injury." (ECF No. 57 at 11.)

Information regarding other acquisitions by UPMC of hospitals with defined-benefit
pension plans is thus relevant to both reliance and causation. And plaintiffs' argument that
production of this information would be overly burdensome is unpersuasive; the importance of
this information to defendants' case is apparent and considerable, yet plaintiffs explain only
vaguely the burden that production would impose. Although the Court recognizes that this type
of discovery will likely prove to be voluminous and expensive, plaintiffs' vague explanations are
insufficient when weighed against the relevance of this information. The
relevance/proportionality calculus thus supports production.

Nevertheless, it does not appear that all information about other transactions that
defendants seek is relevant. Defendants have not explained how postacquisition board
presentations regarding other acquisitions would provide insight into causation and reliance
here, nor have they explained how information about acquired entities' postacquisition financial

performance would be relevant. The relevance of pre-acquisition deal documents, board presentations regarding proposed acquisitions, and due-diligence reports of acquisitions, however, is clear. That information is therefore discoverable.

This leaves a temporal issue. Plaintiffs argue that information regarding transactions that significantly predate the acquisition of Altoona Regional, and information regarding transactions that postdate it, would provide scant insight into UPMC's standard procedures for acquisitions at the time it acquired Altoona Regional. Defendants offer no specific argument in response to plaintiffs' temporal argument, but do argue—in their opening brief—that UPMC's 1998 acquisition of Lee Hospital is particularly relevant to this case because Ketzner annually performed the pension valuations for Lee Hospital when UPMC acquired it. According to defendants, information about the Lee Hospital acquisition "may show the extent of UPMC's reliance on Mr. Ketzner's reports and whether UPMC had reason to undertake its own independent valuation" of, presumably, Altoona Regional's pension liabilities. (ECF No. 57 at 13.) Defendants also assert that they plan to "present evidence that UPMC engaged in far greater due diligence of the pension liabilities of Lee Hospital than it did for Altoona [Regional]," and argue that they are allowed to develop this defense through discovery from UPMC. (*Id.* at 14.)

The time that has passed since UPMC's acquisition of Lee Hospital—19 years (or 15 years between then and UPMC's acquisition of Altoona Regional)—both detracts from the relevance of information about that acquisition and likely increases the burden that discovery of such information would impose. The information appears less relevant because UPMC's standard procedures for acquisitions—including the metrics applied—are unlikely to have remained static between 1998 and 2013. And the burden of production is likely increased because the production

of older documents takes more work; email and electronic records were not yet ubiquitous in the workplace in 1998, meaning any records of the Lee Hospital acquisition likely exist only in paper format—requiring manual retrieval, review, scanning, coding, and other steps. But some information about UPMC's acquisition of Lee Hospital seems particularly relevant here because it involved valuations by one of the defendants in this case, Ketzner. Whether UPMC was reasonable in relying on Ketzner's valuations in 2013 can be informed by the extent to which UPMC relied on Ketzner's valuations in the past, how accurate those valuations were, as well as how UPMC viewed them. And that remains so even if the valuations were prepared 15 years before UPMC acquired Altoona Regional. Therefore, while the Court will not allow a far-ranging search through all information regarding the 1998 Lee Hospital acquisition, the Court will allow discovery of any documents and reports prepared by Ketzner from 1995 to 1998 relating to the Lee Hospital acquisition and any UPMC correspondence or documents from 1995 to 1998 that discuss or reference Ketzner or Ketzner-prepared documents.

As for information regarding UPMC acquisitions that significantly predate the acquisition of Altoona Regional, or information regarding acquisitions that postdate it, the Court agrees that production of such information is not appropriate because it is significantly less relevant. Thus, the relevance/proportionality calculus is different for information about these acquisitions. As explained, older acquisitions are less likely to provide insight on UPMC's standard procedures for acquisitions at the time it acquired Altoona Regional. And information about transactions that postdate the Altoona Regional acquisition would also not shed as much light on UPMC's earlier standard procedures for acquisitions or on how much UPMC relied on actuarial valuations. Indeed, UPMC's experience in acquiring Altoona Regional likely changed those

standard procedures. On the proportionality side of the calculus, the extensive nature that discovery of these acquisitions would likely entail seems burdensome when compared against the lower relevance. The Court therefore holds that plaintiffs need produce only relevant information about acquisitions that occurred between 2008 and UPMC's acquisition of Altoona Regional in 2013.

### 3. Pension-Valuation Reports & Engagement Letters (Requests 69 and 84)

Lastly, defendants seek pension-valuation reports for UPMC's own pension plans—other than reports for Altoona Regional's plans—as well as UPMC's engagement letters for the actuaries that prepared those reports, all for the period of 2010 to 2016. Defendants argue that these documents are discoverable because they are relevant to UPMC's reliance and to UPMC's allegation that "CBIZ owed substantial duties to UPMC when providing its report to Altoona [Regional]." (ECF No. 57 at 14.) Defendants base these arguments on their belief that UPMC's actuaries likely included language in their valuation reports that limited the intended use of those reports to their principal (here, UPMC), and disclaimed that the reports were intended to be used by third parties.

In response, plaintiffs state that defendants' request for engagement letter is a non-issue because UPMC has already agreed to produce its engagement letters by its contracted actuary, Aon Hewitt, for engagements related to the Altoona Regional acquisition, the discovery of the Altoona Regional pension-valuation errors, and UPMC's pension plan after the pension-plan merger with UPMC Altoona's plan. Plaintiffs also allege that Ketzner's valuation of Altoona Regional's pension plans contained no disclaimer regarding intended use, and argue that any disclaimers in engagement letters of UPMC's other actuaries are therefore irrelevant.

The Court agrees with defendants. Whether UPMC's alleged reliance on Ketzner's valuation was justified is informed by UPMC's experience with other actuaries and their valuations, as well as whether such valuations—or the engagement letters for the actuaries—contained disclaimers on the valuations' intended use. If it is the case that these engagement letters and valuations typically included such a disclaimer—and UPMC was aware of that fact—this may make it less likely that UPMC's reliance on a valuation that was allegedly not intended for its use was reasonable. And that remains true even if Ketzner's valuation did not include a disclaimer; if these disclaimers were standard, and UPMC was aware of that, a factfinder may find it less likely that UPMC's reliance on Ketzner's report was justified. Thus, UPMC's engagement letters for and pension-valuation reports by other actuaries are relevant. And unlike defendants' request for postacquisition financials, it does not appear that production of UPMC's engagement letters for and pension-valuation reports by other actuaries would be unduly burdensome. These documents are therefore discoverable.

As for the temporal scope—2010 to 2016—the Court notes, just like it did with regard to defendants' requests for postacquisition financials, that documents that postdate UPMC acquisition of Altoona Regional are less probative than those that predate that acquisition. The question here is whether UPMC's alleged reliance on Ketzner's valuation *at the time of the acquisition* was justified. That engagement letters and reports by UPMC's actuaries *after* that acquisition included certain disclaimers tells us little about whether those disclaimers were standard, or known to UPMC, before the acquisition. But it does move the needle somewhat on that question, meaning postacquisition documents are marginally relevant. Although plaintiffs request a "more circumscribed time period," namely 2012 to 2014, they have not provided any

substantive grounds why 2010 to 2016 would be burdensome or disproportional here.  The Court

thus holds that the temporal scope of 2010 to 2016 is appropriate.

C.       **Plaintiffs' Motion for Protective Order**

In the discussion above, the Court has addressed most of the arguments raised in

plaintiffs' motion for protective order and incorporated them into its analysis of the allowable

scope of discovery for the disputed discovery requests.  Thus, the Court need not separately

address plaintiffs' motion for protective order.  But there is one argument raised in plaintiffs'

motion that the Court has not yet addressed, namely plaintiffs' offset argument.  The Court now

turns to that argument.

Plaintiffs assert that "CBIZ seeks to defend its malpractice by claiming that [UPMC]

Altoona benefited by being acquired such that any harm the malpractice caused has been offset,"

and that "CBIZ also contends that benefits UPMC may have realized from the Acquisition may

be considered when evaluating UPMC's 'actual injury.'"  (ECF No. 53 at 3.)  And according to

plaintiffs, "Pennsylvania law makes clear that how the transaction turned out for UPMC and

[UPMC] Altoona has no bearing on Plaintiffs' breach of contract, professional negligence, or

negligent misrepresentation claims against CBIZ because CBIZ cannot offset [UPMC] Altoona's

or UPMC's damages with benefits realized as a result of the Acquisition."  (*Id.* at 3-4 (citation

omitted).)  Plaintiffs argue that this offsetting rationale is the real reason why defendants seek

plaintiffs' postacquisition financials, and that this is improper under Pennsylvania law.

Defendants, on the other hand, assert that they do not seek to offset plaintiffs' damages.  But

defendants also contend that—even if they did seek to argue offsetting—they would be entitled

to discovery of plaintiffs' postacquisition financials to determine whether any benefits were conferred on UPMC.

Pennsylvania courts—including the Pennsylvania Supreme Court—have applied § 920 of the Restatement (Second) of Torts in analyzing offset arguments. *See Ellis v. Sherman*, 515 A.2d 1327, 1329 (Pa. 1986) (applying § 920); *Gorski v. Smith*, 812 A.2d 683, 709-10 (Pa. Super. Ct. 2002) (same). Section 920 provides that

> [w]hen the defendant's tortious conduct has caused harm to the plaintiff or to his property and in so doing has conferred a special benefit to the interest of the plaintiff that was harmed, the value of the benefit conferred is considered in mitigation of damages, to the extent that this is equitable.

Comment d to § 920 elaborates on the causation requirement for this rule; "[u]nder the rule stated in this Section[,] to justify a diminution of damages[,] the benefit must result from the tortious conduct." Additionally, comment d provides also—as plaintiffs point out—that, "if the plaintiff is entitled to claim damages based upon a valuation of property at a particular time, the damages are not reduced by a subsequent beneficial event."

Under § 920, plaintiffs have the better argument here. For the reasons discussed above, defendants are not entitled to discovery of plaintiffs' postacquisition financial information on the grounds of causation and damages, reliance, or plaintiffs' duty to mitigate. And the offsetting argument is too attenuated to justify the extensive discovery of plaintiffs' postacquisition financials that defendants propose. As the Court has discussed, UPMC is entitled to claim damages for its negligent-misrepresentation claim based on a valuation of Altoona Regional at a particular time—namely the closing date. This means the language from comment d applies, and damages would not be reduced by a subsequent beneficial event. Moreover, the purported

benefits that defendants' requests seem directed at—UPMC Altoona's revenues, the acquisition's effects on UPMC's health-insurance business, and UPMC's overall gain from the acquisition—appear to be significantly removed from the harm plaintiffs allege resulted from defendants' acts, namely UPMC assuming responsibility for Altoona Regional's pension liabilities. Put simply, it seems dubious that defendants' alleged tortious conduct *conferred* those benefits on plaintiffs. Information about these areas therefore lacks necessary relevancy and is thus inappropriate for discovery.

## V. Conclusion

Plaintiffs' motion for protective order and defendants' motion to compel will both be denied in part and granted in part as provided in the foregoing discussion. A corresponding order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UPMC d/b/a UNIVERSITY OF** | ) | **Case No. 3:16-cv-204** |
| **PITTSBURGH MEDICAL CENTER, and** | ) | |
| **UPMC ALTOONA f/k/a ALTOONA** | ) | **JUDGE KIM R. GIBSON** |
| **REGIONAL HEALTH SYSTEM,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **CBIZ, INC., CBIZ BENEFITS &** | ) | |
| **INSURANCES SERVICES, INC., and** | ) | |
| **JON S. KETZNER,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

**NOW**, this 15th day of September 2017, upon consideration of plaintiffs' motion for protective order (ECF No. 53) and defendants' motion to compel (ECF No. 56) and for the reasons in the memorandum opinion accompanying this order, it is **HEREBY ORDERED** that both motions are **DENIED IN PART** and **GRANTED IN PART as follows:**

1. Defendants may issue to plaintiffs new discovery requests that are reasonably directed at information about the amount UPMC paid for Altoona Regional as well as the source of funds for those payments. Defendants are allowed to discover the underlying financial records for this information and are not restricted to discovery of documents sufficient to show payments.

2. Defendants may also issue to plaintiffs new discovery requests that are reasonably directed at information about UPMC's reliance on defendants' alleged misrepresentations. Discoverable information on this point includes plaintiffs' postacquisition financials—to the extent they are relevant to reliance—such as analyses and reports that discuss UPMC's valuation of and reasons for purchasing Altoona Regional.

3.  Defendants may discover postacquisition data regarding the pension-plan merger of UPMC and UPMC Altoona. Although plaintiffs appear already to have produced information regarding this topic, if unproduced information would be relevant to plaintiffs' pensions or their damages claim and the discovery of such information comports with the memorandum opinion accompanying this order, then defendants are allowed to request that information.

4.  Plaintiffs shall produce to defendants pre-acquisition deal documents, board presentations regarding proposed acquisitions, and due-diligence reports of acquisitions for acquisitions that occurred between 2008 and UPMC's acquisition of Altoona Regional in 2013.

5.  Plaintiff shall produce to defendants any documents and reports prepared by Ketzner relating to the Lee Hospital acquisition from 1995 to 1998 and any UPMC correspondence or documents that discussed or reference Ketzner or Ketzner-prepared documents from 1995 to 1998.

6.  Plaintiffs shall produce to defendants UPMC's engagement letters for and pension-valuation reports by other actuaries from between 2010 and 2016.

7.  Plaintiffs' Motion for Protective Order is granted to the extent not otherwise covered in this Order and accompanying Memorandum Opinion.

**BY THE COURT:**

**KIM R. GIBSON**
**UNITED STATES DISTRICT JUDGE**