# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UPMC d/b/a UNIVERSITY OF PITTSBURGH MEDICAL CENTER, and UPMC ALTOONA f/k/a ALTOONA REGIONAL HEALTH SYSTEM,** | ) ) ) ) | **Case No. 3:16-cv-204** <br><br> **JUDGE KIM R. GIBSON** |
| **Plaintiffs,** | ) ) ) | |
| **v.** | ) ) | |
| **CBIZ, INC., CBIZ BENEFITS & INSURANCES SERVICES, INC., and JON S. KETZNER,** | ) ) ) ) | |
| **Defendants.** | ) ) | |

## MEMORANDUM OPINION

## I.       Introduction

Pending before the Court is the Motion to Dismiss (ECF No. 12) filed by Defendants CBIZ, Inc., CBIZ Benefits & Insurance Services, Inc., and Jon S. Ketzner (collectively "CBIZ"). CBIZ's Motion asks the Court to dismiss the entirety of Plaintiffs' Complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).

This case arises from Plaintiff UPMC's acquisition of Plaintiff Altoona Regional Health System—an acquisition which, according to Plaintiffs, came with a $132.5 million surprise in the form of CBIZ's negligent understatement of Altoona Regional Health System's pension plan liabilities. For the reasons that follow, CBIZ's Motion to Dismiss will be **DENIED**.

## II.       Relevant Procedural History

On September 16, 2016, UPMC and UPMC Altoona, formerly known as Altoona Regional Health System ("Altoona"), filed their three-count Complaint (ECF No. 1) with the Court, alleging

claims of (1) professional negligence, (2) breach of contract, and (3) negligent misrepresentation against CBIZ. On November 23, 2016, CBIZ filed the present Motion to Dismiss (ECF No. 12) and its accompanying Brief in Support (ECF No. 13). UPMC and Altoona filed their Opposition to Defendants' Motion to Dismiss on January 4, 2017 (ECF No. 29), followed by CBIZ's Reply in Support of Their Motion to Dismiss on February 2, 2017 (ECF No. 32), UPMC and Altoona's Supplemental Memorandum in Opposition to Defendants' Motion to Dismiss on April 10, 2017 (ECF No. 45), and, finally, CBIZ's Response to Plaintiffs' Supplemental Brief on April 17, 2017 (ECF No. 46).

III.    **Factual Allegations Set Forth in the Complaint**

The following facts, which the Court accepts as true in deciding CBIZ's Motion to Dismiss, are alleged in the Complaint (ECF No. 1).

UPMC owns and operates nonprofit healthcare facilities in and around Pittsburgh, Pennsylvania and is the parent and supporting organization for numerous other nonprofit healthcare providers throughout the Commonwealth. (ECF No. 1 ¶ 1.) Altoona Regional Health System operated healthcare facilities in Altoona, Pennsylvania and the surrounding area. (*Id.* ¶ 2.)

Until July 1, 2013, Altoona Regional Hospital operated two noncontributory defined benefit pension plans covering all employees who met certain eligibility requirements ("the Plans"). (*Id.* ¶¶ 3, 16.) On July 1, 2013, UPMC acquired Altoona Regional Health System and renamed it "UPMC Altoona." (*Id.* ¶ 3.) As part of this transaction, UPMC acquired all of Altoona's assets and liabilities, including the Plans. (*Id.* ¶ 3.) Shortly thereafter, Altoona merged

the two Plans and, on December 31, 2014, UPMC merged the now-singular Altoona Plan into UPMC's pension benefit plan.  (*Id.* ¶ 16.)

From approximately 2002 through February 2015, Altoona engaged CBIZ to provide actuarial evaluation services for the Plans for a substantial fee.  (*Id.* ¶¶ 10, 23.)  These services, which CBIZ represented itself to Altoona as being experienced, qualified, and capable of providing, included (1) the calculation of benefits owed for purposes of funding the Plans in compliance with ERISA requirements and for the determination of premiums owed to the Pension Benefit Guaranty Corporation ("PBGC"); (2) valuing the Projected Benefit Obligation expense under Generally Accepted Accounting Principles ("GAAP") for the purpose of including the pension plan expenses in Altoona's financial statements; (3) certifying the Plans' funded ratios; (4) preparing required filing such as schedules to the Plans' annual Form 5500s to its regulators; and (5) certifying the Plans' PBGC premium filings.  (*Id.* ¶¶ 22, 24.)

Defendant Jon S. Ketzner, a CBIZ, Inc. and CBIZ B&I, Inc. employee until January 1, 2015, was the "lead and sole actuary" engaged to value the obligations and liabilities on the Plans.  (*Id.* ¶ 7.)  Ketzner is an Enrolled Actuary, a Member of the American Academy of Actuaries, a Fellow of the Conference of Consulting Actuaries, and a Member of the American Society of Pension Professional and Actuaries' College of Pension Actuaries.  (*Id.*)  Accordingly, he is bound to follow and uphold actuarial standards of professional conduct and competence.  (*Id.*)

However, according to the Complaint, from at least July 2008 through February 2015, CBIZ and Ketzner failed to adhere to these actuarial standards of practice and, consequently, undervalued the Plans' liabilities for funding, compliance, and accounting purposes.  (*Id.* ¶ 29.)  Allegedly, CBIZ admits to committing three substantial mistakes in its valuation that understated

the liabilities under the Plan by at least $132.5 million.  (*Id.* ¶¶ 32-33.)  Until March 2015, this undervaluation was undisclosed, unknown, and unknowable by Altoona and UPMC because the undervaluation was the result of erroneous assumptions and methodologies undisclosed in the reports produced by CBIZ.  (*Id.* ¶ 31.)  In early March 2015, Alvin Winters, another CBIZ actuary who began reviewing the Altoona valuation upon Ketzner's retirement in early 2015, discovered and disclosed the serious errors in Ketzner's assumptions and methodology.  (*Id.*)

The Complaint specifically identifies two injuries that Altoona suffered from CBIZ's alleged errors.  First, had CBIZ valued the Plans properly, the Plans would have mandatorily "frozen"—one plan on October 1, 2011 and the other plan on October 1, 2012—due to insufficient funding, and no new benefits would have accrued to any participants.  (*Id.* ¶ 34.)  Second, UPMC and Altoona "may" be required to pay excise taxes, penalties, interest, and back premiums to the Internal Revenue Service ("IRS") and the PBGC.  (*Id.* ¶¶ 57-59.)[1]  Additionally, the Complaint states that UPMC suffered damages of at least $142 million dollars when it acquired Altoona's unexpectedly high pension liabilities.  (*Id.* ¶ 76.)

## IV.    Jurisdiction and Venue

UPMC is a Pennsylvania nonprofit corporation with its principal place of business in Pittsburgh, Pennsylvania.  (ECF No. 1 ¶ 1.)  Altoona is likewise a Pennsylvania nonprofit corporation, with its principal place of business in Altoona, Pennsylvania.  (*Id.* ¶ 2.)  Plaintiffs allege that CBIZ, Inc. is a Delaware corporation with its principal place of business in Cleveland,

---

[1] A number of other factual allegations, especially pertaining to facts relevant to the elements of the tort of negligent misrepresentation, are discussed in greater detail when relevant in the Court's discussion *infra*.

Ohio, that CBIZ B&I is a Missouri corporation,[2] and that Ketzner resides in Maryland.[3] (*Id.* ¶¶ 4-7.) Plaintiffs seek damages "in an amount no less than" $142 million. (*Id.* at 18.) Thus, this case is between citizens of different states and the amount in controversy exceeds $75,000. This Court, therefore, has subject-matter jurisdiction over plaintiffs' claims under 28 U.S.C. § 1332(a)(1). And because a substantial part of the alleged events giving rise to Plaintiffs' claims occurred within the Western District of Pennsylvania, venue is proper in this district under 28 U.S.C. § 1391(b)(2).

## V. Standard of Review

A complaint may be dismissed under Federal Rule of Civil Rule 12(b)(6) for "failure to state a claim upon which relief can be granted." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016). But detailed pleading is not generally required. *Id.* The Rules demand only "a short and plain statement of the claim showing that the pleader is entitled to relief" in order to give the defendant fair notice of what the claim is and the grounds upon which it rests. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting Fed. R. Civ. P. 8(a)(2)).

Under the pleading regime established by *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps.[4] First, the court must "tak[e] note of the elements [the] plaintiff must plead to state a claim." *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009). Second, the

---

[2] Plaintiffs have not alleged the location of CBIZ B&I's principal place of business. The Court does not now raise the issue of lack of subject matter jurisdiction *sua sponte*. However, Plaintiffs are encouraged to enter CBIZ B&I's principal place of business on the record.

[3] Presumably, Ketzner's residence in Maryland also means that he is domiciled in and, thus, a citizen of Maryland.

[4] Although *Iqbal* described the process as a "two-pronged approach," *Iqbal*, 556 U.S. at 679, the Supreme Court noted the elements of the pertinent claim before proceeding with that approach, *id.* at 675–79. Thus, the Third Circuit has described the process as a three-step approach. *See Connelly*, 809 F.3d at 787; *Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 n.4 (3d Cir.2011) (citing *Santiago v. Warminster Township*, 629 F.3d 121, 130 (2010)).

court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679; *see also Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011) (quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 131 (2010)) ("Mere restatements of the elements of a claim are not entitled to the assumption of truth."). Finally, "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *see also Connelly*, 809 F.3d at 786. Ultimately, the plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

VI.    **Discussion**

CBIZ has moved to dismiss the Complaint in its entirety based on three primary arguments: (1) Count 1 and Count 2 should be dismissed for failure to allege damages, (2) Count 1 should be dismissed because Pennsylvania law does not recognize a claim for professional negligence against actuaries, and (3) Count 3 should be dismissed for failure to allege "any" of the essential elements of a negligent misrepresentation claim. (ECF No. 13.) The Court will address each of CBIZ's three theories in turn.

A.    **Count 1 and Count 2 Will Not Be Dismissed for Failure to Allege Damages**

1.    **CBIZ's Argument**

In Count 1 and Count 2 of the Complaint, Altoona—and only Altoona—brings claims of negligence and breach of contract against CBIZ. (ECF No. 1 at 15-16.) CBIZ responds by arguing

that "[b]oth counts should be dismissed for failure to allege damages, because Altoona benefited by UPMC's assumption of the alleged $123 million[5] pension obligation." (ECF No. 13 at 6.) Citing a number of cases—most of which are merely persuasive and all of which are distinguishable, CBIZ argues that, in both contract and tort claims, damages must be offset by any benefits conferred on the plaintiff. (*Id.* at 6-7.) CBIZ further contends that this is precisely the situation alleged by the Complaint, i.e., any alleged harms suffered by Altoona was fully assumed by UPMC, so Altoona itself was not injured. (*Id.*)

In fact, CBIZ goes one step further and posits the theory that, not only was Altoona not injured, but Altoona actually received a "windfall." (*Id.* at 7.) CBIZ argues that, as pleaded in the Complaint, Altoona benefited from CBIZ's alleged negligence and breach of contract because UPMC likely would not have acquired Altoona or would have negotiated a less favorable deal for Altoona had UPMC been aware of the full pension obligation. (*Id.*) In essence, CBIZ suggests that it actually did Altoona a favor by allegedly performing severely flawed calculations because Altoona was able to transfer all of its pension liabilities to an unwitting UPMC—a transfer which would not have occurred, at least on the terms on which it did, unless CBIZ's flawed evaluations had concealed the true extent of Altoona's pension liabilities. (*Id.*)

In response to Altoona's allegation of damages in the form of excise taxes, penalties, interest, and back premiums to the IRS and the PBGC (ECF No. 1 ¶¶ 57-59), CBIZ suggests that

---

[5] CBIZ's brief repeatedly states that the error in the actuarial evaluation is $123 million. (ECF No.13 at 4, 6, 7.) However, the Complaint alleges that the amount of the error was $132.5 million in the final year that CBIZ provided actuarial valuation services, i.e., 2014. (ECF No. 1 ¶¶ 11, 33.) While this disagreement of $9.5 million is scarcely important for resolving CBIZ's Motion to Dismiss, the Court will assume the truth of the amount alleged in the Complaint because the Court must assume the veracity of the allegations of the Complaint for the purposes of a motion to dismiss. *Iqbal*, 556 U.S. at 679.

these allegations amount to nothing more than potential future damages that are too speculative to make out a cognizable claim. (ECF No. 13 at 7.) Moreover, CBIZ argues that, even if these potential future damages are not overly speculative, UPMC also alleges that it assumed "the anticipated regulatory burden (and the additional penalties, interest and back premiums)," so Altoona itself suffered no harm. (*Id.*) Accordingly, CBIZ concludes that Count 1 and Count 2 should be dismissed for failure to allege damages.

### 2. The Applicable Standard

However, as Altoona points out (ECF No. 29 at 10), CBIZ misinterprets the relevant Pennsylvania law regarding "benefits" caused by defendants' misconduct and asks the Court to impose a more onerous pleading standard than that required by the Federal Rules of Civil Procedure and case law.

While neither party laid out the elements of either a professional negligence or a breach of contract claim under Pennsylvania law in their extensive briefs, CBIZ's argument amounts to an assertion that the Complaint fails to include sufficient factual allegations such that the Court can reasonably infer that Altoona suffered actual harm—an essential element of both Count 1 and Count 2. *See King v. Canon Hill Veterinary Clinic, Inc.*, No. 644 WDA 2015, 2016 WL 2647686, at *2 (Pa. Super. Ct. May, 10 2016) (quoting *French v. Commonwealth Associates, Inc.*, 980 A.2d 623, 630-41 (Pa. Super. Ct. 2009)) (providing the elements for a claim of professional negligence under Pennsylvania law); *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016) (citing *J.F. Walker Co., Inc. v. Excalibur Oil Grp.,*

*Inc.*, 792 A.2d 1268, 1272 (Pa. Super. Ct. 2002)) (providing the elements of a breach of contract claim under Pennsylvania law).[6]

The crux of this damages dispute is the applicability of the Restatement (Second) of Torts § 920 (Am. Law Inst. 1979) ("Section 920"). *See Ellis v. Sherman*, 515 A.2d 1327, 1329 (Pa. 1986) (recognizing this section as applicable in Pennsylvania tort actions); *Gorski v. Smith*, 812 A.2d 683, 709 (Pa. Super. Ct. 2002) (same). Unsurprisingly, CBIZ believes that Section 920 dictates that the Complaint has failed to allege damages, and Altoona believes that Section 920 does not apply.[7] The Court agrees with Altoona.

In its entirety, Section 920 states:

> When the defendant's tortious conduct has caused harm to the plaintiff or to his property and in so doing has conferred a special benefit to the interest of the plaintiff that was harmed, the value of the benefit conferred is considered in mitigation of damages, to the extent that this is equitable.

Restatement (Second) of Torts § 920. The direct language of Section 920 requires that the "special benefit" be both conferred by the defendant and that the benefit directly relate to the harm caused by the defendant's tortious conduct. *See id.*; *see also id.* §920 cmt. d ("Under the rule stated in this Section to justify a diminution of damages the benefit must result from the tortious conduct."). Furthermore, Section 920's plain text requires that the Court consider the equity of reducing damages by a benefit. *See* Restatement (Second) of Torts § 920; *id* § 920 cmt. f.

---

[6] In Plaintiffs' Supplemental Memorandum, Altoona states that CBIZ is raising an affirmative defense of mitigation of damages for which CBIZ bears the burden of proof. (ECF No. 45 at 5.) However, the Court agrees that CBIZ's argument is more fundamental, i.e., CBIZ contends that Altoona has not alleged facts sufficient to show damages at all. (ECF No. 46 at 4-5.)

[7] The parties' arguments on damages and Section 920 appear in all five briefs. (ECF Nos. 13, 29, 32, 45, 46.)

### 3. CBIZ Did Not Confer a Benefit on Altoona

While CBIZ argues that it benefited Altoona by creating the illusion of a rosier pension obligation, therein encouraging or inducing UPMC to acquire Altoona, CBIZ did not "confer[] a special benefit to the interest of the plaintiff that was harmed." *Id.* § 920. To the contrary, UPMC unwittingly conferred the benefit on Altoona—not CBIZ. CBIZ may have authored inaccurate reports on Altoona's pension obligations, but CBIZ's flawed calculations did not confer an offsetting benefit on Altoona. UPMC and its decision to fully assume Altoona's pension obligations conferred the benefit.

Although Pennsylvania case law is relatively scarce on Section 920, the Pennsylvania Superior Court has offered guidance in a case in which the appellants made a nearly identical argument to that made by CBIZ here. *See Gorski*, 812 A.2d at 709-10. And, as with the appellants' argument in *Gorski*, CBIZ's argument is unavailing. *Id.* In *Gorski*, Caesar Gorski and Saranne Gorski ("the Gorskis") brought an action against their attorney and his law firm ("the appellants") for negligence and breach of contract relating to the preparation and negotiation of a land sales agreement. *See id.* at 688-90. A jury found the appellants to have been negligent in representing the Gorskis in their negotiation of the land sales agreement and in the litigation that followed against the potential buyer. *Id.* at 690. On appeal, the appellants raised a number of arguments, including that the Gorskis suffered no actual harm. *Id.* at 708.

The Superior Court summarized the appellants' argument as follows:

> In Appellants' next issue they contend that the Gorskis did not suffer actual damages as a result of their breach of contract and negligence. Appellants posit that not only did the Gorskis not suffer damages but Appellants maintain that, in fact, the reverse occurred and that the Gorskis actually profited by the malpractice. Appellants calculate that the Gorskis ultimately received approximately $260,000

more than they would have originally as the result of the malpractice. Appellants theory is apparently based on the fact that the Gorskis eventually sold the subject property for 1.4 million dollars and paid Iacobucci $425,000. Thus, by Appellants view, the Gorskis netted $975,000. Had the Gorskis sold the property to Iacobucci to begin with, Appellants reason, the Gorskis would have received a mere $710,000, what the contract price called for. Hence, because of this apparent "windfall," Appellants maintain that the Gorskis are not entitled to recovery since they cannot show actual damages.

*Id.* at 708-09. The Superior Court proceeded to identify Section 920 as the applicable articulation of the "benefit rule" and concluded that "this section does not apply when the tortious conduct of the defendant did not directly confer on the plaintiff a 'special benefit.'" *Id.* at 709 (citing Restatement (Second) of Torts § 920 cmt. d; *id.* § 920, illus. 9).

In rejecting the appellants' argument under the "benefit rule," the Superior Court explained:

In the case at bar, the actions which the jury found constituted breach of contract and legal malpractice did not directly confer any benefit on the property held by the Gorskis, nor did those actions directly result in any increase in the value of the Gorskis property. Any increase in the selling price of the property was the result of the sewer authority's subsequent correction of the infiltration and capacity problem. That action, however, did not relieve the Gorskis of their liability to Iacobucci under the terms of the original land sales agreement. The amounts which the Gorskis were forced to pay Iacobucci were direct financial losses sustained by them and those losses unquestionably diminished the net amount which they eventually realized from the subsequent sale of the property.

*Id.* at 709-10. Likewise, in the present case, CBIZ's alleged breach of contract and negligence did not directly confer any benefit on Altoona or its pension obligations. CBIZ's alleged miscalculations certainly did not reduce the pension liability or otherwise lessen that burden. Rather, much like the sewer authority's subsequent correction of the infiltration and capacity problem in *Gorskis, see id.*, UPMC—not CBIZ—relieved the pension liabilities from Altoona and conferred the benefit. *See* Restatement (Second) of Torts § 920, illus. 8. Therefore, Section 920

does not eliminate the damages alleged by Altoona,[8] at least at this early stage in the proceedings, because Section 920 and *Gorski* require that CBIZ have directly conferred the benefit.

CBIZ cites numerous cases to support its proposition that the "benefit rule" should apply to nullify any harm Altoona suffered.  (ECF No. 13 at 6-7.)  However, these authorities are largely non-binding authority that do not apply Pennsylvania law and, unlike *Gorski*, are all inapposite. *See LaSalle Talman Bank, F.S.B. v. United States*, 317 F.3d 1363, 1371-72 (Fed. Cir. 2003) (applying federal law to allow mitigation of damages when a contract was breached in good faith by the defendant's adherence to a newly-passed federal statute and the plaintiff mitigated damages through a substitute transaction and emphasizing that this mitigation cannot be too remote and is "limited to profits directly due to the action in mitigation"); *Fishman Org., Inc. v. Frick Transfer, Inc.*, 564 F. App'x 649, 651 (3d Cir. 2014) (disallowing credit for rent paid when the plaintiff used the rented space for which he paid the rent); *S&K Sales Co. v. Nike, Inc.*, 816 F.2d 843, 852-53 (2d Cir. 1987) (applying New York law to allow mitigation for expenses of doing business to be deducted from lost profits and requiring that the benefit "have accrued to the plaintiff because of the breach"); *Blum v. Witco Chem. Corp.*, 829 F.2d 367, 373 (3d Cir. 1987) (allowing the recovery of front pay while noting that, under the ADEA, a greatly increased salary from subsequent employment could offset loss of pension benefits); *Fariss v. Lynchburg Foundry*, 769 F.2d 958, 967-68 (4th Cir. 1985) (holding that, in an ADEA case, the plaintiff's claims for back wages and life insurance premiums were fully offset by a lump sum he received from his employer at

---

[8] Specifically, the Complaint alleges damages in the form of (1) the cost of a $132.5 million understatement of the pension obligation; (2) an immediately due $60 million higher payment in 2014 than the $6.6 million that had been budgeted based on CBIZ's valuation; (3) the added liabilities that Altoona incurred when the statutorily-required "freeze" on the Plans was not triggered due to CBIZ's miscalculations; and (4) penalties, interest, and premiums to the IRS and PBGC.  (ECF No. 1 ¶¶ 14, 31, 33-34, 57-50.)

termination); *Brown v. Medtronic, Inc.*, 619 F. Supp. 2d 646, 650 (D. Minn. 2009) (allowing mitigation in an ERISA case where the defendant's breach of fiduciary duty through an investment in artificially inflated stock actually resulted in a gain because the stock was sold by the plaintiff for a gain at the artificially inflated price); *In re Boston Sci. Corp. ERISA Litig.*, 254 F.R.D. 24, 32 (D. Mass. 2008) (same).

### 4. The Court Will Not Make a Determination of the Equity of Mitigation at this Early Stage

Beyond failing to satisfy Section 920's requirement that the defendant must directly confer the offsetting benefit as part of the same conduct, CBIZ glosses over the final condition of the Restatement. Section 920 requires that the Court consider mitigation damages "to the extent that it is equitable." *Gorski*, 812 A.2d at 709 (quoting Restatement (Second) of Torts § 920). The Court will not make an equitable determination to eliminate well-pleaded damages alleged to be in excess of $142 million at the motion to dismiss stage.

CBIZ argues that the Restatement's reference to equity is intended only to limit the plaintiff's recovery and prevent windfall to the plaintiff—not to benefit the plaintiff. (ECF No. 32 at 3.) CBIZ finds some support in Comment f of Section 920, but chooses to quote, out of context, only those portions of the comment's text that support its view. Read in its entirety,[9] Comment f

---

[9] In its entirety, the relevant comment reads:

> *f. Equitable considerations.* The rule stated in this Section is limited by the general principle underlying the assessment of damages in tort cases, which is that an injured person is entitled to be placed as nearly as possible in the position he would have occupied had it not been for the plaintiff's tort. This principle is intended primarily to restrict the injured person's recovery to the harm that he actually incurred and not to permit the tortfeasor to force a benefit on him against his will. Thus, when a person has land or chattels that he has devoted to a particular purpose, he is entitled to continue to use them for that purpose, and the person who interferes with the use is not entitled to have damages mitigated by the fact that he has added to their market value. In these cases the good faith, and

does not state that equitable considerations must be used only to the detriment of plaintiffs. To the contrary, the comment emphasizes that officious intermeddlers who increase the market value of another's property through tortious conduct are generally still liable to the owner if the owner has acted reasonably in restoring the property to its original condition, even if that original condition is of less monetary value. *See* Restatement (Second) of Torts § 920 cmt. f. Comment f does endorse the basic tort principle that meritorious plaintiffs should be placed in the position they would have occupied had it not been for the defendant's wrongdoing, but it certainly does not suggest that the Court should disregard well-pleaded allegations of damages at the motion to dismiss stage based on equitable considerations. *See id.* Accordingly, the Court is not endorsing an "over-recovery" or windfall for Altoona; the Court is simply recognizing that the Complaint includes sufficient factual allegations for the Court to reasonably infer that Altoona suffered harm.

### 5. The Allegations of Fine and Penalty Damages Are Not Too Speculative

As discussed *supra* Part VI.A.1, CBIZ also argues that Altoona's allegations of damages regarding excise taxes, penalties, interest, and back premiums to the IRS and the PBGC (ECF No. 1 ¶¶ 57-59) are too speculative to make out a cognizable claim. (ECF No. 13 at 7.) CBIZ specifically observes that the Complaint states that these penalties "may" occur in the future. (ECF No. 46 at 2; ECF No. 1 ¶¶ 57-59.)

---

reasonableness of the attitudes, of the parties are factors in determining the measure of recovery. Thus unless the plaintiff is capricious or spiteful and the defendant has acted by mistake, so that his conduct was not knowingly tortious, the damages may not be diminished by the fact that the defendant's interference has increased the monetary value of the property. On the contrary, if the owner has acted reasonably in restoring the property to its original condition, he may recover the cost of doing so.
Restatement (Second) of Torts § 920 cmt. f (internal citations omitted).

Under Pennsylvania law, "damages are considered speculative only if there is uncertainty concerning the existence of damages rather than the ability to precisely calculate the amount or value of damages." *City of Philadelphia, Bd. of Pensions and Retirement v. Clayton*, 987 A.2d 1255, 1262 (Pa. Commw. Ct. 2009) (quoting *Pa. State Univ./PMA Ins. Grp. v. Workers' Comp. Appeal Bd. (Hensal)*, 911 A.2d 225, 233 (Pa. Commw. Ct. 2006)). The test of whether damages are remote or speculative "deals with the more basic question of whether there are identifiable damages." *Wachovia Bank, N.A. v. Ferretti*, 935 A.2d 565, 572 (Pa. Super. Ct. 2007) (citing *Rizzo v. Haines*, 555 A.2d 58, 68 (Pa. 1989)).

In the present case, while CBIZ may be correct that the Complaint's allegations as to the additional fines and penalties are not a picture of perfect clarity, they need not be. Altoona's allegations of additional fines and penalties need only possess sufficient factual content to allow the Court to draw the reasonable inference that the defendant is liable. *See Iqbal*, 556 U.S. at 679; *Connelly*, 809 F.3d at 786. These allegations accomplish this threshold requirement.

As Altoona explained in its Opposition to Defendants' Motion to Dismiss, "[t]he Complaint states that UPMC and Altoona 'may' be required to make these payments as opposed to 'will,' because the exact amount that UPMC and Altoona will be required to pay is pending action by the IRS and possibly also the PBGC." (ECF No. 29 at 4, n.5.) Although the level of clarity captured in this explanation would have been best served within the Complaint itself, this explanation nevertheless comports with the Court's interpretation of these allegations of additional fines and penalties when taking into account the context of these of allegations in the Complaint and the totality of the allegations of the Complaint. Each of the relevant paragraphs in the Complaint that discuss these damages regarding additional fines and penalties states that

the damages "could exceed" a given number (ECF No. 1 ¶¶ 57-59), supporting an interpretation of the Complaint that its expressions of uncertainty relate to the amount, not whether the damages are identifiable. *See Wachovia*, 935 A.2d at 572 (citing *Rizzo*, 555 A.2d at 68). Therefore, the Complaint's allegations as to additional fines and penalties owed to the IRS and PBGC are not speculative and will not be dismissed at this stage.

In addition, CBIZ argues that, regardless of whether these potential future damages are speculative, UPMC also assumed "the anticipated regulatory burden (and the additional penalties, interest and back premiums)"; thus, once again, Altoona itself suffered no harm. (ECF No. 13 at 7.) This line of argument fails for the same reasons discussed above. *See supra* Part VI.A.1-4.

### 6. The Breach of Contract Claim

Thus far, the majority of the Court's discussion has focused on Section 920 and the "benefit rule" as defined by Section 920 of the Restatement (Second) of Torts. Yet, Count 2, which CBIZ has moved to dismiss on the same basis, is a claim for breach of contract. Because the identical standard applies under Pennsylvania law for both Count 1 and Count 2, the Court reaches the same result and rejects CBIZ's claim that the Complaint failed to allege damages.

In *Gorski*, the Gorskis brought a breach of contract and professional negligence claim. *See Gorski*, 812 A.2d at 709. Rather than performing two separate analyses, the Pennsylvania Superior Court proceeded through a single Section 920 analysis for both the breach of contract claim and the negligence claim. After completing this unified analysis, the Superior Court dismissed the appellants' request for mitigation as to both the breach of contract claim and the negligence claim on the basis that the misconduct did not directly confer any benefit on the property held by the

Gorskis. *Id.* Here, the Court's negligence analysis above serves this same dual purpose to conclude that the Complaint sufficiently alleges damages for breach of contract and negligence.

**B.** **Count 1 Will Not Be Dismissed Because the Court Predicts that the Pennsylvania Supreme Court Would Permit Professional Negligence Claims Against Actuaries**

**1. Overview**

In Count 1 of the Complaint, Altoona brings a professional negligence claim against CBIZ. CBIZ challenges this count by contending that, under Pennsylvania law, professional negligence actions can be maintained against only certain licensed professionals. (ECF No. 13 at 15.) CBIZ further suggests that this class of eligible defendants is limited to only those professions explicitly listed in Pennsylvania Rule of Civil Procedure No. 1042.1 ("Rule 1042.1"). From that premise, CBIZ's argument is simple: actuaries are not one of the thirteen professions listed in Rule 1042.1, and, thus, actuaries—like CBIZ—cannot be subject to professional negligence actions under Pennsylvania law.

While CBIZ has admittedly identified some non-binding authority to support this contention, many other authorities take the opposing view. Neither the parties' extensive briefs nor the Court's own research has identified case law from the Third Circuit or the Pennsylvania Supreme Court squarely addressing the effect of Rule 1042.1. Despite the lack of guidance from the Pennsylvania Supreme Court and lack of consensus in federal district courts in the Third Circuit, the Court finds the rationale articulated by those courts viewing Rule 1042.1 as a non-exhaustive list and a procedural rule to be more compelling. The Court interprets the language and context of Rule 1042.1 to provide a procedural mechanism for professional negligence claims brought against the thirteen professions listed therein—not a substantive bar to prevent the

pursuit of claims against professions not included within the Rule—and concludes that case law from the Pennsylvania Superior Court prompts such a conclusion. Consequently, the Court will not dismiss Count 1 because the Court predicts that the Pennsylvania Supreme Court would permit a professional negligence claim to proceed against an actuary.

### 2. The Four-Step Approach to Interpreting Undecided State Law

When interpreting state law, federal courts must follow the state's highest court. *Ill. Nat'l Ins. Co. v. Wyndham Worldwide Operations, Inc.*, 653 F.3d 225, 231 (3d Cir. 2011). If that state's highest court has not provided guidance, federal courts must predict how that highest court would resolve the issue. *Id.* (citing *Canal Ins. Co. v. Underwriters at Lloyd's London*, 435 F.3d 431, 436 (3d Cir. 2006)). To do so, federal courts must take into consideration: (1) what that state's highest court has said in related areas, (2) the decisional law of the state intermediate courts, (3) federal cases interpreting state law, and (4) decisions from other jurisdictions that have discussed the issue. *Id.* (citing *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 675 (3d Cir. 2002)). "Although lower state court decisions are not controlling on an issue on which the highest court of the state has not spoken, federal courts must attribute significant weight to these decisions in the absence of any indication that the highest state court would rule otherwise." *Id.* (quoting *Wisniewski v. Johns–Manville Corp.*, 759 F.2d 271, 273–74 (3d Cir. 1985)).

In following this four-step approach, the Court predicts that the Pennsylvania Supreme Court would hold that Rule 1042.1 does not preclude professional negligence claims against actuaries and would permit such a claim to proceed.

### 3. The Effect of Pennsylvania Rule of Civil Procedure 1042.1

#### i. Pennsylvania State Court Decisions[10]

Beginning with state court decisions, the Pennsylvania Supreme Court has not decided whether Rule 1042.1 constitutes an exhaustive list of those professions for which a professional negligence cause of action is available. However, at least two Pennsylvania Supreme Court decisions, two Pennsylvania Superior Court decisions, and two Pennsylvania Court of Common Pleas decisions point toward the conclusion that Rule 1042.1 does not substantively restrict professional negligence claims to those thirteen professions listed within the Rule.

In regard to the two aforementioned Pennsylvania Supreme Court decisions, both of these cases relate to the procedural nature of Rule 1042.1. *See Bruno v. Erie Ins. Co.*, 106 A.3d 48 (Pa. 2014); *Womer v. Hilliker*, 908 A.2d 269 (Pa. 2006). These cases and the procedural nature of Rule 1042.1 will be discussed *infra* Part VI.B.3.iii.

In regard to intermediate appellate court decisions, the Pennsylvania Superior Court has allowed professional negligence claims to proceed against insurance agents in at least two cases. *See Pressley v. Travelers Property Cas. Corp.*, 817 A.2d 1131, 1138 (Pa. Super. Ct. 2003); *Wisniski v. Brown & Brown Ins. Co. of Pa.*, 852 A.2d 1206, 1212 (Pa. Super. Ct. 2004), *vacated and remanded on other grounds*, 887 A.2d 1238, 1238 (Pa. 2005). Insurance agents are not enumerated on the thirteen-profession list in Rule 1042.1. *See* Pa. R. Civ. P. No. 1042.1. Thus, these two decisions suggest that at least two panels of the Pennsylvania Superior Court do not view Rule 1042.1 as an exhaustive and substantive rule.

---

[10] This section combines the first two steps of the four-step approach articulated by the Third Circuit. *See Ill. Nat'l.*, 653 F.3d at 231.

However, the strength of this inference may be somewhat weakened because neither *Pressley* nor *Wisniski* mention Rule 1042.1, and the Rule is not expressly considered in either opinion. *See Pressley*, 817 A.2d at 1138; *Wisniski*, 852 A.2d at 1212. Instead, the *Pressley* court cites to the Restatement (Second) of Torts § 299A (Am. Law. Inst. 1965) and, with little discussion, concludes that the defendant is subject to a professional negligence action with the appropriate professional standard of care because he is a "licensed insurance agent." *Pressley*, 817 A.2d at 1138. While the discussion is brief, the insurance agent's licensure appears to be key to the Superior Court's decision. *Id.* The *Presley* court also noted that consumers look at insurance agents as possessing expertise in a complicated area and reasonably rely on the representations of insurance agents as experts. *Id.* at 1140. Likewise, the *Wisniski* court allowed a professional negligence claim to proceed against an insurance agent. *Wisniski*, 852 A.2d at 1212. *Wisniski* simply cites to *Pressley* and provides no other analysis. *Id.* Therefore, while the weight of these two cases is reduced due to their silence on Rule 1042.1, both cases permitted a professional negligence claim against an "unlisted" profession to proceed without any indication that such a claim is problematic, disfavored, or disallowed.

Lastly, in regard to Pennsylvania county courts, the Lackawanna County Court of Common Pleas—applying *Pressley*, *Wisnicki*, and the Restatement—allowed a claim to proceed against an insurance agency and applied a professional standard of care. *See Ratchford v. Florey Ins. Co.*, No. 00-CIV-2121, 2005 WL 3106478, at *9 (Pa. Ct. Com. Pls. Mar. 8, 2005). The Allegheny County Court of Common Pleas—pre-*Pressley* and pre-*Wisniski*—faced the issue of whether a professional negligence claim is cognizable against a computer consultant. *See Rapidigm, Inc. v.*

*ATM Mgmt. Servs., LLC*, 63 Pa. D. & C.4th 234, 241-42 (Pa. Ct. Com. Pls. 2003). The *Rapidigm* court wrote:

> To date, the Pennsylvania courts have allowed professional negligence actions to be maintained only against certain licensed professionals. However, the parties did not cite and the research of my staff did not produce any Pennsylvania appellate court case law that addresses the issue of whether a professional negligence action should be restricted [to exclude computer consultants].

*Id.* (footnote omitted). While the court cited to Rule 1042.1, it did not consider whether the Rule constitutes an exhaustive list. *Id.* at 241 n.4. Instead, the Court looked to Restatement (Second) of Torts § 299A and concluded that computer consultants, at least in 2003, could not be subject to professional negligence claims because "[c]ontract law provides sufficient protection to customers/clients of service provides whose services are capable of being evaluated through the guarantee of a defined outcome. *Id.* at 244. In reaching this decision, the *Ratchford* court cited a number of decisions from other jurisdictions that looked to the Restatement for guidance and, because these cases were not applying Pennsylvania law, did not consider Pennsylvania Rule of Civil Procedure Rule 1042.1.

In sum, to the extent that Pennsylvania state decisions provide guidance, they suggest that the Rule 1042.1 list cannot truly be exclusive because claims can be brought against the "unlisted" profession of insurance agents and that the Restatement provides guidance as to those areas that constitute a "profession."

### ii. Federal Court Decisions[11]

#### a. Federal Decisions Holding that Rule 1042.1 is an Exclusive List

---

[11] This section performs "step three." *See Ill. Nat'l.*, 653 F.3d at 231. In the present case, the Court does not perform "step four" of the *Illinois National* approach because Rule 1042.1 is a Pennsylvania-specific rule of civil procedure on which decisions from other states' courts, if any exist, would naturally have little bearing.

CBIZ's briefs and the Court's independent research have unearthed at least five federal district court opinions from the Third Circuit which hold that Rule 1042.1 is an exhaustive and exclusive list that precludes professional negligence claims against all professions not listed therein.[12] However, the Court's review of these five cases reveals that none of these cases offers significant analysis. In fact, all of these cases appear to assume, without explanation, that Rule 1042.1, despite being within the Pennsylvania Rules of Civil *Procedure* and not including any language to suggest that it is exhaustive, is a substantive rule that precludes all professional negligence claims except for those brought against the thirteen professions listed in the Rule. Moreover, those cases that include citations to bolster their conclusion about the effect of Rule 1042.1 simply cite to earlier federal cases that provided minimal explanation or analysis. None of these cases acknowledge the Superior Court's decisions in *Pressley* or *Wisniski*. The Court will examine each of these decisions in chronological order.

First, the Eastern District of Pennsylvania granted a motion to dismiss in regard to a professional negligence action brought against providers of estate, asset, and tax planning advice. *Gilmour v. Bohmueller*, No. Civ. A. 04-2535, 2005 WL 241181, at *16 (E.D. Pa. Jan. 27, 2005). Without any explanation or discussion, the *Gilmour* court concluded that Rule 1042.1 "can be maintained only against persons licensed in Pennsylvania or another state" who fall into one of the thirteen categories of Rule 1042.1. *Id.* The court's only citation for this proposition is Rule 1042.1 itself. *Id.* Because the plaintiff's complaint did not allege that the defendants were one of these thirteen licensed professionals, the court dismissed the professional negligence claim. *Id.*

---

[12] Three of these decisions arise from the U.S. District Court for the Eastern District of Pennsylvania, one arises from the Middle District of Pennsylvania, and one arises from the Western District of Pennsylvania.

Second, the Eastern District of Pennsylvania denied a motion to dismiss a professional negligence claim against attorneys. *In re Am. Inv'rs Life Ins. Co. Annuity Mktg. & Sales Practices Litig.*, MDL Docket No. 1712, 2007 WL 2541216, at *32 (E.D. Pa. Aug. 29, 2007). In *American Investors*, whether the defendant attorneys were within the scope of Rule 1042.1 was not at issue because "attorney at law" is one of the thirteen listed professions in Rule 1042.1. *Id.* The issue before the court was whether the attorneys were within a professional relationship with the clients such that a professional negligence claim was viable. *Id.* However, as part of this discussion, the *American Investors* court states, in passing, that professional negligence claims can be brought against only the thirteen professions listed in Rule 1042.1. *Id.* As in *Gilmour*, the court cites only to Rule 1042.1 and provides no reasoning or analysis for this conclusion.

Third, the Western District of Pennsylvania held that a real estate property manager cannot be subject to a professional negligence claim under Pennsylvania law because that profession is not included within Rule 1042.1. *Greenwood Land Co. v. Omnicare, Inc.*, Civil Action No. 09-686, 2011 WL 33027, at *4 (W.D. Pa. Jan. 5, 2011). As with *Gilmour* and *American Investors*, the *Greenwood* court does not acknowledge the Pennsylvania Superior Court's decisions in *Pressley* or *Wisiski*, consider that Rule 1042.1 may be a procedural rule, or perform any analysis except to conclude that real estate property managers are not on the Rule 1042.1 list. *See id.* Unlike the prior federal cases, *Greenwood* does cite to the Allegheny County Court of Common Plea's 2003 decision in *Rapidigm*. *Id.* The *Greenwood* court references footnote 4 of *Rapidigm*—which appears to be the only authority to support the *Greenwood* court's decision other than citations to Rule 1042.1 itself. The *Greenwood* court quotes *Rapidigm*: "'The Rules of Civil Procedure governing professional liability actions are applicable to attorneys and other persons who are licensed

pursuant to an Act of Assembly. Pa R. Civ. P. 1042.1.'" *Id.* (quoting *Rapidigm*, 63 Pa. D. & C.4th at 242 n.4). From this quotation, the *Greenwood* court concludes that professional negligence claims can be brought against only the thirteen enumerated professions. *Id.* However, this Court determines that this quotation from *Rapidigm* conveys a much more modest proposition; this quotation simply states that the portions of the Pennsylvania Rules of Civil Procedure governing professional liability are applicable to those thirteen professions. *Rapidigm* does not assert that professional negligence claims may be brought only against the listed professions; it explains that certain procedural rules that follow Rule 1042.1 apply only to negligence claims brought against those thirteen professions. *See Rapidigm*, 63 Pa. D. & C.4th at 242.

Fourth, the Eastern District of Pennsylvania twice-dismissed a professional negligence claim against an insurance broker. *See Hirsch v. Schiff Benefits Grp., LLC*, Civil Action No. 10-2574, 2011 WL 1166127, at *4 (E.D. Pa. Mar. 28, 2011) (dismissing the professional negligence claim in the original complaint); *Hirsch v. Schiff Benefits Grp., LLC*, Civil Action No. 10-2574, 2011 WL 2471535, at *4 (E.D. Pa. June 21, 2011) (dismissing the virtually identical claim in the amended complaint). The *Hirsch* court simply cited to *Gilmour* and *Greenwood* without performing any independent analysis, *see Hirsch*, 2011 WL 1166127, at *4, and stated that Rule 1042.1 "set[s] forth an exhaustive list of licensed professionals" against whom a plaintiff may bring a negligence action, *Hirsch*, 2011 WL 2471535, at *4.

Finally, the Middle District of Pennsylvania dismissed a professional negligence claim against correctional officers. *See Hatten v. Bledsoe*, Civil Action No. 1:13-CV-00209, 2014 WL 5473571, at *8 (M.D. Pa. Aug. 4, 2014). The *Hatten* court cited only *American Investors* and provided

no other explanation or analysis for why Rule 1042.1 acts as a substantive bar to professional negligence claims against all professions not include therein.

In sum, none of these cases provided compelling rationale for their stance on Rule 1042.1 such that they persuade the Court to deviate from its own interpretation of the rule, the weight of the state cases cited *supra* and *infra*, and the reasoning of the federal decisions taking the opposing view discussed next.

> **b. Federal Decisions Holding That Rule 1042.1 is Not an Exclusive List and Allowing Professional Negligence Claims Against "Unlisted" Professions to Proceed**

A number of decisions by federal district courts within the Third Circuit have permitted professional negligence claims to proceed against professions not included within the Rule 1042.1 list. Looking first to decisions by the Eastern District of Pennsylvania, the Court has identified at least three relevant cases.

First, in granting a motion to remand in a case involving a professional negligence claim against an insurance company, the Eastern District of Pennsylvania, in dicta, observed that Pennsylvania courts have allowed professional negligence claims against insurance agents and applied Restatement (Second) of Torts §299A in such cases. *See PNC Bank v. AmerUs Life Ins. Co.*, No. Civ. A. 04-5015, 2005 WL 226075, at *1 (Pa. E.D. Jan. 31, 2005) (citing *Pressley*, 817 A.2d at 1138; *Wisniski*, 852 A.2d at 1212).

Second, in partially denying the defendant's motion for summary judgment, the Eastern District of Pennsylvania permitted two counts of professional negligence to proceed against an actuary and his employer. *See I.B.E.W. Local Union 380 Pension Fund v. Buck Consultants*, Civil Action No. 03-4932, 2008 WL 269476, at *6 (E.D. Pa. Jan. 30, 2008). The opinion repeatedly labels

the defendants as actuaries and never indicates that the defendants are accountants or any of the other thirteen professions listed in Rule 1042.1.  *Id.*  Despite these striking similarities to the present case, the persuasive value of *I.B.E.W.* is somewhat diminished because the defendants evidently did not raise and the court did not consider or even reference Rule 1042.1 or whether an actuary could be subject to a professional negligence claim under Pennsylvania law.  The basic viability of a professional negligence claim against an actuary is not challenged.  Instead, the issue considered in *I.B.E.W.* is whether the actuaries breached their professional standard of care and proximately caused the harm.  *Id.*

Third, in a more recent decision, the Eastern District of Pennsylvania provided a lengthier, but still relatively brief, analysis as to the professions subject to professional negligence claims under Pennsylvania law.  *See Chetty Holdings, Inc. v. NorthMarq Capital, LLC*, No. Civ. A. 11-4640, 2013 WL 1721733, at *7 (E.D. Pa. Apr. 22, 2013), *aff'd*, 556 F. App'x 118 (3d Cir. 2014).  In deciding whether a complaint alleged sufficient facts to show that the defendants—providers of commercial real estate financing and brokerage services—owed a duty to the plaintiffs for the purposes of a negligence claim, the court wrote:

> I find convincing, however, plaintiffs' argument that [the defendants] were subject to a duty as licensed professionals pursuant to Section 299A of the Restatement (Second) of Torts . . . .  *Swantek v. Prudential Property & Casualty Insurance Co.*, 48 Pa. D. & C.3d 42 (Pa. Ct. Com. Pl., Erie Cnty. 1988), a case cited by plaintiffs and which held that Section 299A imposed a duty of care on insurance agents, supports the imposition of a duty on defendants.  In *Swantek*, the Court noted that "in order to sell insurance in [Pennsylvania], [an insurance] agent must obtain a license, and if he or she does not, then the agent who continues to sell insurance without a license is subject to certain sanctions including a monetary penalty."  *Id.* at 46.  In reaching its holding that Section 299A imposed a duty on insurance agents, the Court remarked that "[i]t is obvious from the statutes that the commonwealth deems an insurance agent to be a professional skilled in the business of insurance matters."  *Id.* at 47.  Plaintiffs have alleged that [the defendants] were subject to

> similar licensing requirements in Pennsylvania for their conduct as mortgage
> brokers. Defendants have not argued that they were exempt from the cited
> licensing requirements. Accordingly, I find that plaintiffs have sufficiently alleged
> that defendants owed them a duty to "to exercise the skill and knowledge
> normally possessed by members of [their] profession or trade in good standing in
> similar communities." Restatement (Second) of Torts § 299A.

*Id.* (footnote omitted). Thus, based on *Swantek* and the Restatement, the Eastern District of

Pennsylvania denied defendants' motion for summary judgment as to the professional

negligence claims against the mortgage brokers because of their licensure under state law. The

court did not refer to Rule 1042.1 or any decisions other than *Swantek* in making this

determination.

Beyond these relatively brief discussions of the issue in opinions by the Eastern District of

Pennsylvania, one opinion authored by Judge Mannion of the Middle District of Pennsylvania

and one opinion authored by Judge Cohill of the Western District of Pennsylvania provide

considerably more extensive analysis. *See Hults v. Allstate Septic System, LLP*, Civil Action No.

4:06-0541, 2007 WL 2253509, at *6 (M.D. Pa. Aug. 3, 2007); *Sherman v. John Brown Ins. Agency, Inc.*,

38 F. Supp. 3d 658, 664 (W.D. Pa. 2014). The Court finds the analysis and rationale articulated by

these two opinions to be particularly thorough and persuasive as to the effect of Rule 1042.1.

In *Hults*, the defendant—a limited liability partnership that designed, inspected, installed,

and repaired septic systems—moved for summary judgment with respect to, among other claims,

a professional negligence claim. *Hults*, 2007 WL 2253509, at *1-*3. The defendant argued that it

cannot be subject to a professional negligence claim because it is "an unlicensed service provider"

that does not fall within the "traditionally recognized and specifically enumerated licensed

professionals" of Rule 1042.1. *Id.* at *6. Judge Mannion did not agree with the defendant's assessment. *Id.*

For the purposes of the present case, the *Hults* court made two key observations. First, the court looked at the actual text of Rule 1042.1 and concluded:

> Upon review, the scope of Pa.R.C.P. 1042.1 provides that "[t]he rules of this chapter govern a civil action in which a professional liability claim is asserted against a licensed professional." It does not provide that a professional negligence claim cannot be maintained against an individual not enumerated in that Rule, but only that the Rule will be applied in those cases where a professional liability claim is asserted against one of the licensed professionals listed.

*Id.* Second, the *Hults* court reviewed Section 299A of the Restatement (Second) of Torts and noted:

> [T]he list of "professions" contained in § 299A are the same as those enumerated in Pa.R.C.P. 1042.1. However, § 299A also applies to certain "skilled trades," which are noted to include airplane pilots, precision machinists, electricians, carpenters, blacksmiths, and plumbers. With the exception of airplane pilots, who are regulated and licensed under federal law, the remaining "skilled trades" are not required to be licensed under Pennsylvania state law. See Purdon's Pennsylvania Statutes and Consolidated Statutes Annotated, Title 63, Professions and Occupations (State Licensed). In fact, the requirements of each of the skilled trades are regulated by municipal law, which may or may not require licensing. Therefore, the court finds that it is not necessary that [the defendant] be licensed in order to be subject to a claim based upon § 299A. Section § 299A simply provides the standard duty of care applicable in a business setting.

*Id.* The Court agrees with these conclusions and the accompanying analysis by the *Hults* court.

In *Sherman*, a building contractor filed, among other claims, a professional negligence claim against insurance agencies and their employees. *Sherman*, 38 F. Supp. 3d at 660. The defendants moved to dismiss on the exact same theory raised by CBIZ in the present case. Namely, the defendants asserted that Rule 1042.1 is an exclusive list of enumerated professionals

against whom professional liability actions may be initiated and, because insurance agencies and brokers are not on the list, the plaintiff's claim is not cognizable. *Id.* at 663.

Judge Cohill, citing *Pressley* and *Rapidigm*, concluded that Rule 1042.1 "only imposes the requirement of obtaining a certificate of merit when bringing a professional liability claim against one of the professional listed under the rule" and does not speak to a plaintiff's ability to bring a professional negligence claim in accordance with Restatement (Second) of Torts §299A. *Id.* Judge Cohill denied the defendant's motion to dismiss and directly stated, "[I]nsurance brokers or agents not being listed under Rule 1042 is not dispositive of Plaintiff's ability to bring a professional negligence claim against Defendants." *Id.* The Court agrees with *Sherman*'s reasoning and conclusion.[13]

### iii. Rule 1042.1 is a Procedural Rule

*Hults* and *Sherman*, unlike all of the contrary decisions, persuasively conclude that Rule 1042.1 is a procedural rule that requires certain procedures to be followed when filing a professional negligence claim against the listed profession. *See Hults*, 2007 WL 2253509, at *6; *Sherman*, 38 F. Supp. 3d at 663. As discussed *supra*, the Court agrees with this conclusion and the accompanying rationale, but the Court also offers a few additional reasons beyond those offered

---

[13] The Court also recognizes Chief Judge Conti's decisions rejecting the validity of a professional negligence claim brought against non-engineers who installed a sprinkler system. *Ins. Co. of Greater N.Y. v. Fire Fighters Sales & Servs. Co.*, 93 Fed. R. Serv. 3d 638 (W.D. Pa. 2015); *Ins. Co. of Greater N.Y. v. Fire Fighter Sales & Servs. Co.*, 120 F. Supp. 3d 449 (W.D. Pa. 2015). These two opinions do not address Rule 1042.1, instead focusing on the gist of the action doctrine and on the factual issue of whether a professional engineer was involved or was required by law to be involved in the design or installation of the sprinkler system. These opinions cite favorably to *Sherman, Hult,* and *Rapidigm. See Ins. Co.*, 93 Fed. R. Serv. 3d at 397-98; *Ins. Co.*, 120 F. Supp. 3d at 462-63.

by *Hults* and *Sherman* to show that Rule 1042.1 does not substantively bar claims by those professions not included with its thirteen-profession list.

First, the language and context of Rule 1042.1 prompts this conclusion. Rule 1042.1, appropriately entitled "Professional Liability Actions. Scope. Definition," defines terms and establishes the scope of the chapter's rules regarding professional liability claims. Pa. R. Civ. P. No. 1042.1(a). The list of thirteen professions within Rule 1024.1 is a basic scope and definition provision; it details those professions to which the remaining rules in the chapter apply. *See* Pa. R. Civ. P. No. 1042.1(c) ("As used in this chapter, 'licensed professional' means…"). Nothing in the text of the Rule states that it is an exhaustive list, nor does the Rule indicate or imply that it acts as a substantive bar to professional negligence claims for "unlisted" professions. Moreover, the provisions within the Pennsylvania Rules of Civil Procedure that follow Rule 1042.1 and use the definitions provided therein are unmistakably procedural requirements. *See* Pa. R. Civ. P. No. 1042.2 (requiring that complaints identify each defendant in a professional liability claim and providing a suggested template for complaints); Pa. R. Civ. P. No. 1042.3 (requiring that a certificate of merit be filed within 60 days of the filing of the complaint); Pa. R. Civ. P. No. 1042.4 (requiring that responsive pleadings be filed according to Rule 1026 or within 20 days after service of the certificate of merit, whichever is later); Pa. R. Civ. P. No. 1042.5 (stating that discovery cannot be sought prior to the filing of the certificate of merit without leave of court); Pa. R. Civ. P. No. 1042.6-1042.7 (providing non pros procedures in the event that a certificate of merit is not filed); Pa. R. Civ. P. No. 1042.8 (allowing for 20 days to file a corrected certificate of merit in the event of noncompliance); Pa. R. Civ. P. No. 1042.9 (providing for sanctions for noncompliance); Pa. R. Civ. P. No. 1042.10-1042.12 (providing suggested forms for the certificate of merit, non pros

filings, and non pros judgments). All of these provisions to which the definitions established in Rule 1042.1 apply are clearly procedural in nature.[14]

Furthermore, the Court also recognizes the broader context of Rule 1042.1 as a rule within the Pennsylvania Rules of Civil *Procedure*. While such a label is not determinative, the Court considers this context to be a relevant consideration. This categorization is particularly relevant because, contrary to CBIZ's claim,[15] the Pennsylvania Supreme Court—with the assistance and advice of the Civil Procedural Rules Committee established by the Pennsylvania Supreme Court—promulgates the Pennsylvania Rules of Civil Procedure. *See* Pa. Const. art. 5, § 10 (establishing the Pennsylvania Supreme Court's rule-making authority); 42 Pa. Cons. Stat. § 1722; *Womer*, 908 A.2d at 275-76 (stating that "we," i.e., the Pennsylvania Supreme Court, adopted Rules 1042.1-1042.8 in accordance with the court's rule-making authority). Given that the Court's task is to predict how the Pennsylvania Supreme Court would decide the present issue, the Pennsylvania Supreme Court's categorization of a rule as procedural bears some weight. Consequently, the language and context of Rule 1042.1 makes the procedural nature of Rule 1042.1's thirteen-profession list evident to the Court.

Second, a recent decision by the Pennsylvania Supreme Court strongly prompts the Court's conclusion as to Rule 1042.1. In *Bruno v. Erie Insurance Company*, the plaintiffs filed a professional negligence claim against engineers hired by Erie Insurance Company for allegedly

---

[14] The Pennsylvania Supreme Court discussed the origins and purpose of this set of rules in a 2006 decision. *See Womer*, 908 A.2d at 275-76. The court made it clear that the primary purpose of the court's promulgation of these rules was to require a certificate of merit in hopes of creating an orderly procedure to dispose of non-meritorious professional liability claims early in the life the case. *Id.*

[15] CBIZ's Reply in Support of Their Motion to Dismiss argues that the Court should "accept the *legislature's* judgment as to which professions are subject to tort claims for economic damages" as represented in Rule 1042.1 and should "trust the *legislature's* judgment over Altoona's." (ECF No. 32 at 2-3) (emphasis added).

representing that mold in the plaintiffs' home was harmless.[16] *Bruno v. Erie Ins. Co.*, 106 A.3d 48, 50, 71-72 (Pa. 2014). The defendants argued that, because the plaintiffs did not file a certificate of merit as provided for by Rule 1042.3, the plaintiffs claim must be dismissed. *Id.* To resolve this dispute, the Pennsylvania Supreme Court delved into a thorough analysis of Rule 1042.1 and Rule 1042.3. *Id.* The *Bruno* court eventually concludes that the certificate of merit need not have been filed because the plaintiffs were not patients or clients of the engineers (because Erie Insurance Company hired the engineers) and that Rule 1042.1 limits the requirement of filing a certificate of merit to only those professional liability claims which are asserted "by or on behalf of a patient or client of the licensed professional." *Id.* (citing Pa. R. Civ. P. No. 1042.1).

While this specific holding is of little importance to the present case, *Bruno* offers important guidance on Rule 1042.1 through its result and discussion. As an initial matter, the language of *Bruno* makes it clear that the Pennsylvania Supreme Court views Rule 1042.1 as a procedural rule, not a rule with substantive force to bar claims. *See id.*

More importantly, the *Bruno* court established that professional negligence claims can proceed even if they fall outside of the scope of Rule 1042.1. Rule 1042.1 begins by stating: "The rules of this chapter govern a civil action in which a professional liability claim is asserted by or on behalf of a patient or client of the licensed professional against." Pa. R. Civ. P. No. 1042.1(a) (footnote omitted). The claim in *Bruno* fell outside of the scope of this provision because the plaintiffs were not, as required by Rule 1042.1(a), patients or clients of the engineer. *See Bruno*, 106 A.2d at 70-71. Nevertheless, the Pennsylvania Supreme Court allowed the claim to proceed.

---

[16] Engineers are on the Rule 1042.1 list. *See* Pa. R. Civ. P. No. 1042.1(c)(vi).

*Id.* This suggests that, under Pennsylvania law, professional negligence claims that fall outside the scope of Rule 1042.1—such as professional negligence claims brought by non-patients/non-clients or against "unlisted" professions—are not barred simply because they do not fit within the scope of these procedural rules.[17]

### 4. Actuaries, Including CBIZ, Constitute a Profession Subject to Professional Negligence Claims Under Pennsylvania Common Law

Now that the Court has established that Rule 1042.1 is not a preclusive list, the Court must assess whether actuaries are professionals subject to professional negligence claims under the operative common law. All of the cases cited *supra* that went beyond Rule 1042.1 looked to Restatement (Second) of Torts § 299A (Am. Law. Inst. 1965) ("Section 299A") for guidance as to those jobs that constitute a "profession" for the purposes of professional liability claims. *See, e.g., Pressley*, 817 A.2d at 1138; *Wisniski*, 852 A.2d at 1212; *Sherman*, 38 F. Supp. 3d at 664-65; *Hults*, 2007 WL 2253509, at *6. The Court will do likewise and concludes that an actuary, including CBIZ, constitutes a professional for the purposes of a professional negligence claim.

Section 299A reads:

> Unless he represents that he has greater or less skill or knowledge, one who undertakes to render services in the practice of a profession or trade is required to exercise the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities.

---

[17] In CBIZ's Reply in Support of Their Motion to Dismiss, CBIZ, without citation, asserts that the "exhaustive list" interpretation of Rule 1042.1 is the majority view. (ECF No. 32 at 2-3.) CBIZ also argues that this so-called majority view promotes good public policy by furthering contracts as guarantees of sufficient performance and is better law. (*Id.*) The Courts' research found a lack of consensus in case law on this issue; however, as the cases cited above suggest, if anything, CBIZ's position would appear to be the minority view. As for considerations of public policy, the Court relies on its interpretation of the language of Rule 1042.1 and the guidance of the case law cited above. However, the Court fails to see how allowing actuaries to be immune from negligence suits is good policy, especially given that accountants and other similar professions with similarly complex responsibilities are subject to professional negligence claims and must adhere to professional standards of care.

Restatement (Second) of Torts § 299A.  This test establishes the standard of care that applies to professionals.  More important here, Comment b to Section 299A provides:

> *b. Profession or trade.* This Section is thus a special application of the rule stated in § 299.  It applies to any person who undertakes to render services to another in the practice of a profession, such as that of physician or surgeon, dentist, pharmacist, oculist, attorney, accountant, or engineer.  It applies also to any person who undertakes to render services to others in the practice of a skilled trade, such as that of airplane pilot, precision machinist, electrician, carpenter, blacksmith, or plumber.  This Section states the minimum skill and knowledge which the actor undertakes to exercise, and therefore to have.  If he has in fact greater skill than that common to the profession or trade, he is required to exercise that skill, as stated in § 299, Comment e.

*Id.* § 299A cmt. b.

Clearly, an actuary falls within the scope of this rule due to the specialized skill, education, and certification/licensure of the profession.  The Complaint unequivocally alleges the complexity and expertise required to be an actuary; the specialized skill, education, and certification possessed by Ketzner; and the existence of professional standards of competence and care within the actuarial profession.  (ECF No.1 ¶ 7) (stating that Ketzner is an Enrolled Actuary, a Member of the American Academy of Actuaries, a Fellow of the Conference of Consulting Actuaries, and a Member of the American Society of Pension Professional and Actuaries' College of Pension Actuaries who is bound to follow and uphold actuarial standards of professional conduct and competence).  The U.S. Supreme Court, albeit in a substantially different context, has discussed the expertise required to be an actuary and the difficulty and importance of their calculations. *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 632 (1993). The U.S. Supreme Court went so far as to directly state that "actuaries are trained professionals subject to regulatory standards."  *Id.* (citing 29 U.S.C. §§ 1241, 1242; 26 U.S.C. § 7701(a) (35)).

Even in the five federal cases discussed *supra* Part VI.B.3.ii.a that viewed Rule 1042.1 as an exhaustive list with substantive effect, the professions in all but one of these cases varied significantly from an actuary. *See Gilmour*, 2005 WL 241181, at \*16 (claim against provider of asset advice was dismissed); *Am. Inv'rs*, 2007 WL 2541216, at \*32 (claim against attorney was not dismissed); *Greenwood*, 2011 WL 33027, at \*4 (claim against real estate property manager was dismissed); *Hatten*, 2014 WL 5473571, at \*8 (claim against correctional officer was dismissed). *Hirsch* dismissed a professional liability claim against an insurance broker—the only one of these five federal cases to dismiss a claim against a defendant with some form of licensure. *See Hirsch*, 2011 WL 1166127, at \*4. However, the Court finds it significant that, in contrast, the Pennsylvania Superior Court has twice allowed professional liability claims to proceed against insurance agents, *see Pressley*, 817 A.2d at 1138; *Wisniski*, 852 A.2d at 1212, and the *Sherman* court allowed a professional negligence claim to proceed against an insurance broker, *Sherman*, 38 F. Supp. 3d at 664-65.

From a functional approach, actuarial services and auditing services performed by accountants have been held to be professional services subject to professional negligence claims. *See Koken v. Steinberg*, 825 A.2d 723, 725 (Pa. 2003) (allowing a professional negligence claim against an accounting firm that was performing actuarial and auditing services to proceed);[18]

---

[18] UPMC's Brief in Opposition to Defendants' Motion to Dismiss asserts that *Koken v. Steinberg*, 825 A.2d 723 (Pa. 2003) allowed "a claim for professional negligence in the performance of actuarial services to proceed." (ECF No. 29 at 13.) This statement is true, but, without clarification, it overstates this case's significance. In *Koken*, the defendant was Deloitte & Touched, L.L.P.—a defendant that does not pose even a potential conflict with Rule 1042.1 because accountants are one of the thirteen professions listed in Rule 1042.1. *Koken*, 825 A.2d at 725. Accordingly, the Pennsylvania Supreme Court never cited to Rule 1042.1 or discussed Rule 1042.1's potential role as a substantive and exhaustive list. Instead, the issue in *Koken* was whether professional negligence and other claims could be brought against Deloitte by the Insurance Commissioner of the Commonwealth of Pennsylvania on behalf of the policyholders and creditors despite

*Tekman v. Berkowitz*, 639 F. App'x 801, 804 (3d Cir. 2016) (same); *Avangard Financial Group, Inc. v.*

*Raich Ende Malter & Co., LLP*, 2015 WL 1808549 (E.D. Pa. Apr. 17, 2015) (same); *see also I.B.E.W.*,

2008 WL 269476, at *6 (allowing a professional negligence claim to proceed against an actuary

and his employer, albeit without the "professional" nature of actuaries being raised or

considered). Although accountants are on the Rule 1024.1 list, limiting the import of these cases,

*Koken*, *Tekman*, and *Avangard* still stand for the proposition that actuaries perform "professional"

tasks comparable to those performed by the "professional" job of an accountant.

Looking at the theory underlying professional negligence actions, the *Rapidigm* court

concluded:

> The apparent purpose of professional negligence actions is to provide protection
> to those service providers who are not likely to be guaranteeing the outcome of
> their services. Ordinarily, the lawyer, the physician, and the accountant are not
> guaranteeing a result that can be described in a contract. Instead, they are
> agreeing to exercise skill and knowledge normally possessed by members of the
> profession in an effort to achieve goals for the clients that cannot be guaranteed.
> The expert testimony at trial is not based on whether or not the goals were
> achieved but rather whether appropriate skill and knowledge was exercised.

*Rapidigm*, 63 Pa. D. & C.4th at 243. Applying this "contractual sufficiency" approach, the Court

views contract law as insufficient protection for those relying on the services of actuaries.

Reviewing the many cases from other jurisdictions cited by *Rapidigm*, *see id.* at 244-47, the Court

notes that the level of formal training, expertise, trust, and professional standards of conduct of

actuaries aligns very closely with that of accountants and other such professions.

---

the Insurance Commissioner not being in privity with Deloitte. *Id.* at 726. The Pennsylvania Supreme
Court allowed this claim to proceed because Article V of the Insurance Department Act specifically allows
an insurance regulator to represent the interests of policyholders and creditors. *See id.* (citing 40 P.S. §§
221.1-221.63). Therefore, *Koken* has some significance in demonstrating that actuarial services are
professional in nature, but *Koken* cannot fairly be taken to mean that the Pennsylvania Supreme Court held
that professional negligence claims may be brought against professions not listed in Rule 1042.1.

In regard to the *Rapidigm* court's view that "[c]ontract law provides sufficient protection to customers/clients of service providers whose services are capable of being evaluated through the guarantee of a defined outcome," *id.*, the Court generally agrees. However, this "outcome-guarantee" approach should not be overstated. The "outcome" of a professional's services is certainly evidence of whether that professional adhered to professional standards. For example, a fatality following a routine surgery or a dismissal with prejudice of a meritorious cause of action would be relevant evidence of a surgeon or an attorney's negligence or demonstrate the harm suffered by the plaintiff. The "outcome" of an inaccurate accounting, audit, tax calculation, or financial plan performed by a certified public accountant would be evidence of whether that accountant adhered to professional standards because such a flawed "outcome" would generally be unexpected if professional norms were followed. The evidentiary value of a "bad" outcome does not mean that a professional negligence claim against an actuary is "capable of being evaluated through the guarantee of a defined outcome." *See id.*

No decisions located by the parties or the Court have questioned whether accountants are "professionals" subject to professional negligence claims. The Court does not believe that contract law adequately protects those who use the services of actuaries any more than it does for the clients of accountants. Likewise, the Court does not believe that actuarial services are "capable of being evaluated through the guarantee of a defined outcome," *id.*, any more than the services of accountants, doctors, or attorneys. Just like accountants and members of other professions, actuaries must adhere to professional standards by exercising the skill and knowledge normally possessed by members of a profession in performing their services. The key

is not whether certain outcomes or goals were achieved, but whether the actuary complied with the professional standard of care and caused harm because of the failure to do so.

In sum, under Section 299A and the most germane case law, the Court finds that actuaries are "professionals" for the purpose of a professional negligence action under Pennsylvania law. Because the Complaint sufficiently alleges that Ketzner is an actuary who negligently performed work within the scope of that profession, the Court denies CBIZ's motion to dismiss Count 1 of the Complaint.

### C. Count 3 Will Not Be Dismissed for Failure to Allege Duty and Justifiable Reliance

#### 1. Overview

CBIZ argues that UPMC's claim of negligent misrepresentation in Count 3 should be dismissed under the economic loss doctrine. (ECF No. 13 at 9.)

The economic loss doctrine "provides that no cause of action exists for negligence that results solely in economic damages unaccompanied by physical or property damage." *Brand Mktg. Grp. LLC v. Intertek Testing Servs.*, 801 F.3d 347, 354 (3d Cir. 2015) (quoting *Adams v. Copper Beach Townhome Cmtys., L.P.*, 816 A.2d 301, 305 (Pa. Super. Ct. 2003)). Notwithstanding this general rule, the Pennsylvania Supreme Court has recognized an exception specifically for negligent misrepresentation claims. *See Bilt-Rite Contractors, Inc. v. Architectural Studio*, 866 A.2d 270 (Pa. 2005). In *Bilt-Rite*, the court expressly adopted the Restatement (Second) of Torts § 552 (Am. Law. Inst. 1977) ("Section 552"). *Bilt-Rite*, 866 A.2d at 287. Section 552 provides:

> (1) One who, in the course of his business . . . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the

information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) [This liability] is limited to loss suffered

    (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

    (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

Restatement (Second) of Torts § 552.

CBIZ acknowledges this *Bilt-Rite* exception to the economic loss doctrine, but asserts that UPMC has failed to satisfy any of the elements to this "narrowly restricted" exception. (ECF No. 13 at 9.) In particular, CBIZ believes that UPMC has failed to allege that CBIZ owed a duty to UPMC and that CBIZ failed to allege justifiable reliance. The Court, however, disagrees because the Complaint adequately alleges facts to satisfy all of the elements necessary to sustain a negligent misrepresentation claim falling under the exception to the economic loss doctrine.

### 2. Duty

#### i. The Parties' Arguments

UPMC—not Altoona—asserts Count 3 against CBIZ. Therefore, because the Complaint does not allege that UPMC was in privity with CBIZ at the time of the alleged negligent misrepresentation, CBIZ argues that UPMC is a third party to which CBIZ did not owe a duty, as required by Section 552. (ECF No. 13 at 10.)

The parties do not disagree that CBIZ must owe a duty to UPMC in order for UPMC to succeed on a negligent misrepresentation claim. However, the parties' briefs extensively disagree

as to what is required to establish a duty and whether the Complaint's allegations meet the relevant standard. (ECF No. 13 at 10-16; ECF No. 29 at 16-18; ECF No. 32 at 4-10; ECF No. 45 at 2-4; ECF No. 46 at 1-4.) To summarize the parties' lengthy arguments on this matter, CBIZ interprets *Bilt-Rite* and Section 552 to require that a complaint allege that a professional-defendant had "actual knowledge"/"manifest awareness" of reliance by the third-party plaintiff on the information provided by the professional-defendant. (ECF No. 13 at 10-16; ECF No. 32 at 4-10; ECF No. 46 at 1-4.) UPMC, on the other hand, argues that a lesser standard applies under which "liability is imposed under § 552(2) upon an information supplier like CBIZ to anyone in a foreseeable class of persons, whose reliance upon the information supplied is also foreseeable." (ECF No. 29 at 14.) The proper standard lies somewhere in between these two interpretations, albeit likely closer to CBIZ's formulation.

### ii. The Restatement's Standard and its Application to the Present Case

The appropriate standard is addressed by Section 552(2) and Comment h to Section 552. *See Bilt-Rite*, 866 A.2d at 275 (quoting Comment h). Section 552(2)(a) makes it clear that a plaintiff in a negligent misrepresentation case must be a "person or one of a limited group of persons for whose benefit and guidance [the defendant] intends to supply the information or knows that the recipient intends to supply it." Restatement (Second) of Torts § 552(2)(a). The Complaint's allegations satisfy this requirement.

On this point, the Complaint alleges that:

(1) "[U]pon information and belief, CBIZ and Ketzner . . . were aware of Altoona's financial position and were further aware that Altoona was looking for a financial partner, such as UPMC." (ECF No. 1 ¶ 37.)

-40-

(2) "Upon information and belief, both before and during the due diligence period, defendants were aware that UPMC, or other entities focused on a transaction with Altoona, would rely and did rely on CBIZ's GAAP Valuations." (*Id.* ¶ 50.)

(3) "Defendants knew that UPMC relied on the actuarial valuation report prepared for the plan year ending June 30, 2012, certified as accurate by Defendant Ketzner on September 17, 2012, before the Altoona acquisition, in evaluating the Altoona Plans' benefit obligations and liabilities." (*Id.* ¶ 28.)

CBIZ disputes that these are sufficient allegations by arguing that they are mere conclusory allegations and points out that the Complaint, dealing in nothing more than rumors, refers to the "word on the street" being that Altoona was interested in being acquired and would be "doing something with somebody."[19] (ECF No. 1 ¶ 38.) However, the totality of the allegations in the Complaint and the reasonable inferences therefrom sufficiently state that CBIZ knew that Altoona was seeking to be acquired by UPMC or another similarly positioned entity and that Altoona would give CBIZ's reports to UPMC or another similarly positioned entity to assess Altoona's pension liabilities in the acquisition process.

At the motion-to-dismiss stage, the Court must accept all factual allegations in the Complaint and draw all inferences from the alleged facts in the light most favorable to the non-moving party. *Phillips v. County of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008) (citing *Worldcom,*

---

[19] The Court notes that the Complaint's allegation that Ketzner was the "lead and sole actuary" for Altoona's Plans for at least 13 years (ECF No. 1 ¶ 7) leads to the reasonable inference that UPMC's allegations of CBIZ and Ketzner's awareness have more basis than simply "word on the street" and are more than mere conclusory allegations.

*Inc. v. Graphnet, Inc.*, 343 F.3d 651, 653 (3d Cir. 2003)).  Here, although the Complaint may reference "word on the street" and might theoretically fail under some higher standard of pleading, the Complaint nevertheless presents sufficient factual content for the Court to draw the reasonable inference that UPMC was a "person or one of a limited group of persons for whose benefit and guidance [the defendant] intends to supply the information or knows that the recipient intends to supply it."  Restatement (Second) of Torts § 552(2)(a).

Comment h to Section 552 further confirms this conclusion.  Comment h discusses this issue at great length.[20]  Most relevant here, Comment h makes it clear that CBIZ need not have

---

[20] In its entirety, Comment h reads:

> *h. Persons for whose guidance the information is supplied.*  The rule stated in this Section subjects the negligent supplier of misinformation to liability only to those persons for whose benefit and guidance it is supplied.  In this particular his liability is somewhat more narrowly restricted than that of the maker of a fraudulent representation (see § 531), which extends to any person whom the maker of the representation has reason to expect to act in reliance upon it.
>
> Under this Section, as in the case of the fraudulent misrepresentation (see § 531), it is not necessary that the maker should have any particular person in mind as the intended, or even the probable, recipient of the information.  In other words, it is not required that the person who is to become the plaintiff be identified or known to the defendant as an individual when the information is supplied.  It is enough that the maker of the representation intends it to reach and influence either a particular person or persons, known to him, or a group or class of persons, distinct from the much larger class who might reasonably be expected sooner or later to have access to the information and foreseeably to take some action in reliance upon it.  It is enough, likewise, that the maker of the representation knows that his recipient intends to transmit the information to a similar person, persons or group. It is sufficient, in other words, insofar as the plaintiff's identity is concerned, that the maker supplies the information for repetition to a certain group or class of persons and that the plaintiff proves to be one of them, even though the maker never had heard of him by name when the information was given.  It is not enough that the maker merely knows of the ever-present possibility of repetition to anyone, and the possibility of action in reliance upon it, on the part of anyone to whom it may be repeated.
>
> Even when the maker is informed of the identity of a definite person to whom the recipient intends to transmit the information, the circumstances may justify a finding that the name and identity of that person was regarded by the maker, and by the recipient, as important

known that UPMC was the intended or probable recipient of CBIZ's report. *Id.* § 552 cmt. h. Knowledge that Altoona sought an acquisition partner and intended to provide CBIZ's report to that partner is clearly sufficient. As just shown via quotation, the Complaint adequately alleges such knowledge.

### iii. "Actual Knowledge" vs. "Reasonable Foreseeability"

The heart of the parties' dispute, at least in their early briefs, is whether Pennsylvania law uses an "actual knowledge" standard or "reasonable foreseeability" standard to gauge the existence of duty for the purposes of a third-party negligent misrepresentation claim. Supporting UPMC's reasonable foreseeability argument to some extent, the Pennsylvania Supreme Court once-summarized, without correction, a lower court's discussion of *Bilt-Rite* by writing that the *Bilt-Rite* court "recognized that [a professional] may be found professionally liable to third parties when it is foreseeable that the information [the professional] provide[s] to a client will be used

---

only because the person in question was one of a group whom the information was intended to reach and for whose guidance it was being supplied. In many situations the identity of the person for whose guidance the information is supplied is of no moment to the person who supplies it, although the number and character of the persons to be reached and influenced, and the nature and extent of the transaction for which guidance is furnished may be vitally important. This is true because the risk of liability to which the supplier subjects himself by undertaking to give the information, while it may not be affected by the identity of the person for whose guidance the information is given, is vitally affected by the number and character of the persons, and particularly the nature and extent of the proposed transaction. On the other hand, the circumstances may frequently show that the identity of the person for whose guidance the information is given is regarded by the person supplying it, and by the recipient, as important and material; and therefore the person giving the information understands that his liability is to be restricted to the named person and to him only. Thus when the information is procured for transmission to a named or otherwise described person, whether the maker is liable to another, to whom in substitution the information is transmitted in order to influence his conduct in an otherwise identical transaction, depends upon whether it is understood between the one giving the information and the one bringing about its transmission, that it is to be given to the named individual and to him only.

Restatement (Second) of Torts § 552 cmt. h.

and relied on by the third party." *Bruno*, 106 A.3d at 55 (citing *Bilt-Rite*, 866 A.2d at 286). If taken

as a pronouncement of applicable law going forward, rather than passing dictum summarizing a

lower court's soon-to-be-reversed opinion, this remark by the *Bruno* court would likely be an

articulation of a lower and broader standard than that given by Section 552 and by *Bilt-Rite* itself.[21]

However, this *potential* deviation from Section 552 and *Bilt-Rite* in *Bruno* is of little consequence

in the present case.

Even if the Court fully endorsed CBIZ's "actual knowledge" standard, the Complaint's

allegations are sufficient under this higher standard because the Complaint alleges that CBIZ was

aware that Altoona sought an acquisition partner, like UPMC, and that UPMC or an equivalent

entity would and did rely on CBIZ's reports. (ECF No. ¶¶ 28, 37, 50.) The Complaint's

articulation of CBIZ's knowledge is not perfect, but it is sufficient under federal pleading

standards. Additionally, at least based on the potential implication of *Bruno*, the Pennsylvania

Supreme Court may view its own pronouncements in *Bilt-Rite* to mean "that [a professional] may

be found professionally liable to third parties when it is foreseeable that the information [the

professional] provide[s] to a client will be used and relied on by the third party." *Bruno*, 106 A.3d

at 55 (citing *Bilt-Rite*, 866 A.2d at 286). The Complaint's allegations also satisfy this lower

standard.

---

[21] The Court observes that language in *Bilt-Rite* could arguably be construed to promote a reasonable
foreseeability standard. In adopting Section 552, the Pennsylvania Supreme Court explained:

> Accordingly, we hereby adopt Section 552 as the law in Pennsylvania in cases where
> information is negligently supplied by one in the business of supplying information, such
> as an architect or design professional, and where it is *foreseeable* that the information will
> be used and relied upon by third persons, even if the third parties have no direct
> contractual relationship with the supplier of information.

*Bilt-Rite*, 866 A.2d at 287 (emphasis added). Yet, Section 552 and the entirety of *Bilt-Rite* does not overtly
endorse a reasonable foreseeability approach as to the existence of a professional's duty to third parties.

Regardless of potential ambiguity in the exact parameters and outer limits of *Bilt-Rite* and Section 552, a comparison of the allegations made in the complaint in *Bilt-Rite*—which the Pennsylvania Supreme Court held to be sufficient—to the allegations of UPMC's Complaint in the present case leaves little doubt as to whether the Complaint satisfies Pennsylvania's substantive law regarding the duty required for a negligent misrepresentation claim.  In the second-to-last paragraph of *Bilt-Rite*, the Pennsylvania Supreme Court wrote:

> Accepting the allegations in Bilt–Rite's complaint as true for purposes of the demurrer, TAS provided plans and specifications for the school project to the school district with full knowledge that those plans and specifications would be included in a bid package supplied to prospective bidders, and relied upon by those bidders.  Bilt–Rite received the plans from the school district and, according to its complaint, relied upon them in calculating its bid, suffering economic damage as a result of alleged misrepresentations in the plans. This case falls precisely within the framework of Section 552, and therefore, it is cognizable under Pennsylvania law.

*Bilt-Rite*, 866 A.2d at 288.  Likewise, accepting the allegations of UPMC's Complaint as true for the purposes CBIZ's Motion to Dismiss, CBIZ provided its valuations and reports on the pension plans to Altoona with knowledge that UPMC or a similarly positioned entity would be provided with its valuations and reports and rely upon them in the acquisition process.[22]  The Complaint may not perfectly present the source of CBIZ's knowledge or a clear timeline of when CBIZ acquired this knowledge, but, when all reasonable inferences from the alleged facts are made in the light most favorable to UPMC, *see Phillips*, 515 F.3d at 338, the Complaint sufficiently alleges duty under *Bilt-Rite*.

---

[22] The Court also notes that, unlike in *Bilt-Rite* where Pennsylvania's fact pleading standard applied, the less stringent, federal notice pleading standard as clarified in *Twombly* and *Iqbal* applies in the present case.

### 3. Justifiable Reliance

#### i. CBIZ's Argument and the Basic Standard for Justifiable Reliance

CBIZ next argues that a negligent misrepresentation claim requires "justifiable reliance" and that UPMC has failed to allege that it was reasonable for UPMC to rely on CBIZ's report for the purposes of acquiring Altoona. (ECF No. 13 at 16.) In support of this argument, CBIZ contends that a so-called "disclaimer" on its report made it unreasonable for UPMC to rely on its report and that the Complaint failed to allege "specific facts demonstrating that [UPMC] exercised the due diligence that a reasonable person under all the circumstances would have exercised to protects [its] interests." (ECF No. 13 at 18.)

The Court agrees that Pennsylvania law requires that UPMC allege that it acted in justifiable reliance upon CBIZ's misrepresentation. *See Bilt-Rite*, 866 A.2d 270, 273 n.1; *Bortz v. Noon*, 729 A.2d 555, 561 (Pa. 1999); *Luther v. Kia Motors America, Inc.*, 676 F. Supp. 2d 408, 418-19 (W.D. Pa. 2009). The Court also agrees that, to be "justifiable," reliance upon the representation of another must be reasonable. *See Porreco v. Porreco*, 811 A.2d 566, 570 (Pa. 2002) (citing *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 178 (3d Cir. 1992)). However, the Court disagrees with CBIZ's claim that the Complaint's allegations fail to meet this standard for justifiable reliance.

#### ii. Application of this Standard to the Allegations of the Complaint

The Complaint clearly alleges that UPMC relied on CBIZ's report—a report that CBIZ certified as a full and fair disclosure of the pension plans' actuarial position that was prepared using reasonable methods and assumptions. (ECF No. ¶¶ 27, 28, 50.) The Complaint also clearly alleges the extensive credentials of Ketzner, that Ketzner had performed actuarial services on Altoona's pension plans for at least 13 years, and that CBIZ represented itself as experienced,

qualified, and capable of providing the requested actuarial services and valuations. (*Id.* ¶¶ 7, 22, 24.) With these allegations, the Complaint easily and directly establishes that UPMC relied on the accuracy of the report in its acquisition of Altoona and that such reliance was reasonable because of CBIZ and Ketzner's expertise, experience, and assurances to Altoona.

Additionally, in deciding whether reliance on an alleged misrepresentation is justified, the Pennsylvania Supreme Court puts particular weight on whether the recipient knew or should have known that information supplied was false. *Porreco*, 811 A.2d at 570 (citing *Scaife Co. v. Rockwell-Standard Corp.*, 285 A.2d 451 (Pa. 1971)). The Complaint specifically addresses this consideration, alleging that CBIZ did not disclose Ketzner's underlying mistaken assumptions until March 2015 and that "[n]either Altoona nor UPMC could have discovered the errors because those errors were the result of erroneous assumptions and methodologies undisclosed in the GAAP and Funding Reports prepared by Defendants." (ECF No. 1 ¶¶ 31-32.) These allegations demonstrate that UPMC neither knew nor should have known that CBIZ's reports were inaccurate.

In essence, the Complaints alleges that UPMC relied on reports authored by an experienced and well-credentialed actuary who had worked for Altoona, seemingly without issue, for at least 13 years and who was employed by a large professional services corporation with numerous subsidiaries—all of which represented themselves as experienced, qualified, and capable in the actuarial valuation of pension benefit plans and neither of which gave any indication that the reports were inaccurate, untrustworthy, or based on mistaken underlying assumptions. (*See* ECF No. 1 ¶¶ 4-5, 7, 10, 22, 24, 27-28, 50.) Despite CBIZ, perhaps somewhat surprisingly, arguing that it was unjustifiable and unreasonable as a matter of law for UPMC to

rely on CBIZ's own work product, the Court easily holds that the Complaint adequately alleges

that UPMC relied on the report and that such reliance was justifiable and reasonable.

### iii. The "Disclaimer"

In an effort to detract from the reasonableness of UPMC's reliance on CBIZ's report, CBIZ

attempts to construe a purported notation on the first page of the report that "CBIZ had prepared

the Report 'for the purposes of fulfilling the employer [Altoona] financial accounting

requirements'" as a disclaimer. (ECF 13 at 17.) CBIZ argues that, under the Restatement and

assorted case law, this notation qualifies as a disclaimer, making it unreasonable as a matter of

law to rely on the report for anything other than the report's specifically stated purpose. (*Id.*)

CBIZ seeks to narrow the reasonable application of its report such that "[a]ny reliance by UPMC

as a non-employer third party in a single year for its own different purpose was at its own risk."

(*Id.* at 18.)

As a threshold issue, the Court must determine whether it can properly consider this

"disclaimer" at all. The "disclaimer" statement is not included with or attached to the Complaint.

Instead, CBIZ first referenced the "disclaimer" in its Brief in Support of Motion to Dismiss (ECF

No. 13 at 13-16) and, then, included what CBIZ purports to be this "disclaimer" as an attachment

to its brief (ECF No. 13-1 at 3). As a general matter, a district court ruling on a motion to dismiss

may not consider matters extraneous to the pleadings. *In re Burlington Coat Factory Securities*

*Litigation*, 114 F.3d 1410, 1426 (3d Cir. 1997) (citing *Angelastro v. Prudential-Bache Securities, Inc.*,

764 F.2d 939, 944 (3d Cir. 1985)). "However, an exception to the general rule is that a 'document

*integral to or explicitly relied* upon in the complaint' may be considered 'without converting the

motion to dismiss into one for summary judgment.'" *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir.

2014) (quoting *Burlington*, 114 F.3d at 1426). "The rationale underlying this exception is that the primary problem raised by looking to documents outside the complaint—lack of notice to the plaintiff—is dissipated '[w]here the plaintiff has actual notice . . . and has relied upon these documents in framing the complaint." *Id.* (quoting *Burlington*, 114 F.3d at 1426). "[W]hat is critical is whether the claims in the complaint are 'based' on an extrinsic document and not merely whether the extrinsic document was explicitly cited." *Id.* (quoting *Burlington*, 144 F.3d at 1426). In the present case, neither party briefed or otherwise discussed the Court's ability to consider CBIZ's attachments. Yet, because the Court views CBIZ's report to be "integral to" the Complaint, the Court will consider the "disclaimer" contained within CBIZ's attachment to its brief.

This purported "disclaimer" fails to undermine the reasonableness of UPMC's reliance, primarily because, as UPMC points out, this "disclaimer" is not a disclaimer at all. Unlike those non-binding cases cited by CBIZ, which contain unequivocal statements of limitation for specific purposes, the "disclaimer" simply states that the report was prepared "for the purposes of fulfilling the employer financial accounting requirements." (ECF No. 13-1 at 3.) It does not contain any words of limitations or indicate that the report can be used "solely" or "only" for a particular purpose. *Cf. Ellis v. Grant Thornton LLP*, 530 F.3d 280, 285 (4th Cir. 2008) (directly stating that the report "should not be used by third parties for any other purpose"); *SC&E Admin. Servs., Inc. v. Deloitte*, No. A-05-CA-929-SS, 2006 WL 6747974, at *10 (W.D. Tex. July 25, 2006) (directly stating that the report is "solely for the use of, and only to be relied upon by" the defendant). When all reasonable inferences from the alleged facts are made in the light most favorable to UPMC, *see Phillips*, 515 F.3d at 338, this broad and generic statement that the report

is for "financial accounting requirements" scarcely makes it unreasonable to rely on the report to judge the extent of the pension liabilities for which the report was created to calculate.

In fact, when the entire "disclaimer" is read in the light most favorable to UPMC, it has quite the opposite effect of that CBIZ seeks to attribute to it. The "disclaimer," which appears to be signed and dated by Ketzner, is entitled "Actuary's Disclosure Statement." (ECF No. 13-1 at 3.) It states that the report's actuarial computations comply with appropriate GAAP standards, indicates that Ketzner is competent to perform those calculations, and confirms that CBIZ has no financial interest in Altoona. (ECF No. 13-1 at 3.) If anything, under federal pleading standards, this "disclaimer" would make it *more* reasonable for UPMC to rely on the report.

### iv. "Due Diligence"

Lastly, CBIZ argues that "UPMC must set forth 'specific facts demonstrating that [it] exercised the due diligence that a reasonable person under all the circumstances would have exercised to protect [its] own interests.'" (ECF No. 13 at 18) (quoting *Fulton Fin. Advisors, Nat. Ass'n v. NatCity Investments, Inc.*, Civil Action No. 09-4855, 2013 WL 5635977, at *13 (E.D. Pa. Oct. 15, 2013)). Because UPMC is a sophisticated party with hospital acquisition experience, CBIZ contends that it was unreasonable for UPMC to rely on CBIZ's report in determining Altoona's pension obligation. (*Id.*) In essence, CBIZ takes the position that UPMC acted unreasonably as a matter of law because UPMC chose to trust CBIZ's calculations as to Altoona's pension liabilities rather than independently investigating and calculating Altoona's pension liability. The Court does not find this argument compelling.

To the contrary, the Court agrees with UPMC that, if the Court accepted CBIZ's argument, Section 552 and *Bilt-Rite* would be rendered a virtual nullity. If it is considered

-50-

unreasonable as a matter of law for a third party to rely on a professional's services and work product under these allegations, then Section 552 and *Bilt-Rite*'s extension of liability to third parties would be nothing more than an illusion. The Court also agrees with UPMC that the cases cited by CBIZ are, by in large, simply persuasive authorities and are distinguishable because of higher pleading standards, different procedural posture, or dissimilar facts.[23] (*See* ECF No. 29 at 21-22.)

CBIZ asks the Court to impose a "due diligence" requirement on UPMC. But, neither Section 552 nor *Bilt-Rite* use the term "due diligence." "Due diligence" could be viewed as nothing more than a reasonableness requirement, which Section 552 and *Bilt-Rite* clearly require in the form of justifiable reliance. Yet, depending on the context and precise usage of the term, "due diligence" can take on different meanings and impose a higher affirmative duty of thorough investigation.[24] CBIZ's definition of "due diligence" would evidently require that UPMC

---

[23] In particular, CBIZ emphasizes the Pennsylvania Supreme Court's decision in *Porreco*, 811 A.2d 566 at 571-72. CBIZ represents that *Porreco* stands for the proposition that, even for unsophisticated parties, it is unreasonable to rely on valuations by opposing parties. (ECF No. 13 at 19.) Yet, the holding in *Porreco* was in a different factual and legal context; the *Porreco* court held that a wife's reliance on her husband's misrepresentation of the value of her engagement ring was not reasonable for the purposes of determining whether their prenuptial agreement could be voided under the contract theory of fraudulent misrepresentation when the wife had possession of the ring when the prenuptial agreement was made and had sufficient opportunity to obtain an appraisal. *See id.* Even beyond this distinction, the *Porreco* court specifically stated that "[w]e find [the wife's] failure to do this *simple* investigation to be unreasonable." *Id.* at 572 (emphasis added). The simple investigation of appraising a single engagement ring which was fully within the wife's possession pales in comparison to the complex recalculation of an acquisition target's multimillion dollar pension obligations that were allegedly miscalculated from at least July 1, 2008 through February 2015. (ECF No. 1 ¶ 11.) The Court also notes that *Porreco* inspired great disagreement among the Pennsylvania Supreme Court Justices; three justices authored concurring opinions and three justices dissented.

[24] *See Diligence, Black's Law Dictionary* (10th ed. 2014) ("**due diligence (18c) 1.** The diligence reasonably expected from, and ordinarily exercised by, a person who seeks to satisfy a legal requirement or to discharge an obligation. — Also termed *reasonable diligence; common diligence*. **2.** *Corporations & securities*. A prospective buyer's or broker's investigation and analysis of a target company, a piece of property, or a newly issued security. A failure to exercise due diligence may sometimes result in liability, as when a

independently recalculate and perform all of Altoona's actuarial valuations without any meaningful reliance on CBIZ's 13 years (at minimum) of valuations of Altoona's pension obligations. While the Court will not embark on a linguistic or semantic inquiry into "due diligence," for the purposes of Section 552 and the relevant case law, the diligence that is "due" is defined as acting reasonably under the circumstances. And, as discussed *supra*, the Complaint sufficiently alleges that UPMC's reliance on the report was reasonable under the circumstances.

Ultimately, "the issue of whether reliance on a representation is reasonable (or justifiable) is generally a question of fact that should be presented to the jury." *Luther*, 2008 WL 2397331, at *4 (quoting *Dilworth v. Metro. Life Ins. Co.*, 418 F.3d 345, 354 (3d Cir. 2005); *Trans v. Metro. Life. Ins. Co.*, 408 F.3d 130, 139 (3d Cir. 2005)). Reasonableness of reliance is "rarely susceptible of summary disposition." *Williams Controls, Inc. v. Parente, Randolph, Orlando, Carey & Associates*, 39 F. Supp. 2d 517 (M.D. Pa. 1999) (quoting *In re Atlantic Fin. Management, Inc. Sec. Litig.*, 718 F. Supp. 1003, 1008 (D. Mass. 1988)). The present case is not one of these rare instances, and Count 3 will not be dismissed for failure to allege duty or justifiable reliance.

## VII.    Conclusion

Count 1 and Count 2 will not be dismissed because the Complaint sufficiently alleges damages. Count 2 will not be dismissed because the Complaint pleads a cognizable cause of action of professional negligence by an actuary. Count 3 will not be dismissed because the Complaint adequately alleges duty and justifiable reliance.

---

broker recommends a security without first investigating it adequately. **3.** *Criminal law.* The prosecutorial burden of meeting all speedy-trial requirements in bringing a criminal defendant to justice.").

In sum, the presumptively true factual allegations of the Complaint plausibly give rise to entitlement to relief on all three counts.  Thus, Defendants' Motion to Dismiss (ECF.  No. 12) will be denied in its entirety

A corresponding order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UPMC d/b/a UNIVERSITY OF** | ) | **Case No. 3:16-cv-204** |
| **PITTSBURGH MEDICAL CENTER, and** | ) | |
| **UPMC ALTOONA f/k/a ALTOONA** | ) | **JUDGE KIM R. GIBSON** |
| **REGIONAL HEALTH SYSTEM,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **CBIZ, INC., CBIZ BENEFITS &** | ) | |
| **INSURANCES SERVICES, INC., and** | ) | |
| **JON S. KETZNER,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

**NOW**, this <u>29th</u> day of September 2017, upon consideration of Defendants' Motion to Dismiss (ECF No. 12) and all briefs filed by the parties, and for the reasons set forth in the accompanying Memorandum Opinion, it is **HEREBY ORDERED** that Defendants' Motion to Dismiss is **DENIED**. Thus, pursuant to Federal Rule of Civil Procedure 12(a)(4)(A), Defendants shall file an answer **on or before October 20, 2017.**

**BY THE COURT:**

**KIM R. GIBSON**
**UNITED STATES DISTRICT JUDGE**