## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UPMC d/b/a UNIVERSITY OF** | ) | **Case No. 3:16-cv-204** |
| **PITTSBURGH MEDICAL CENTER, and** | ) | |
| **UPMC ALTOONA f/k/a ALTOONA** | ) | **JUDGE KIM R. GIBSON** |
| **REGIONAL HEALTH SYSTEM,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **CBIZ, INC., CBIZ BENEFITS &** | ) | |
| **INSURANCES SERVICES, INC., and** | ) | |
| **JON S. KETZNER,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

### I.    Introduction

This case arises from Plaintiff UPMC's acquisition of Plaintiff Altoona Regional Health

System ("Altoona")—an acquisition which, according to Plaintiffs, resulted in over $100 million

in damages from Defendants' negligent understatement of Altoona's pension plan liabilities.

Pending before the Court is Defendants' Motion for Summary Judgment (ECF No. 177). The

Motion is fully briefed (ECF Nos. 178, 201, 220) and ripe for disposition. For the reasons that

follow, the Court **DENIES** Defendants' Motion.

### II.    Jurisdiction and Venue

This Court has subject-matter jurisdiction because the parties are diverse and the amount

in controversy exceeds $75,000. 28 U.S.C. § 1332(a). Venue is proper because a substantial part

of the events giving rise to Plaintiffs' claims occurred in the Western District of Pennsylvania. 28

U.S.C. § 1391(b)(2).

## III.   Factual Background

The following facts are undisputed unless otherwise noted.[1]

### A.   UPMC's Acquisition of Altoona

In November 2012, UPMC and Altoona officially announced to the public that UPMC planned to acquire Altoona. (ECF No. 221 ¶ 153.) The deal closed on July 1, 2013, when UPMC became the parent and sole corporate member of Altoona, which became UPMC Altoona, on that date. (*Id.* ¶¶ 9–10.) UPMC Altoona operates health-care facilities in Blair County, Pennsylvania and the surrounding area. (ECF No. 221 ¶ 1.) UPMC operates health-care facilities in and around Pittsburgh, Pennsylvania. (*Id.* ¶ 2.)

### B.   Altoona's Retirement Benefit Plans

Altoona sponsored two qualified defined benefit pension plans,[2] known as the Retirement Plan for the Bargaining Unit Employees of the Altoona Regional Health System ("BU Plan") and the Retirement Plan for the Non-Bargaining Unit Employees of the Altoona Regional Health System ("NBU Plan") (collectively, the "Plans"). (*Id.* ¶ 6.) The Plans are governed by the Employee Retirement Income Security Act ("ERISA"), which specifies the amount that a pension plan sponsor must contribute to its pension plan on a yearly basis. (*Id.* ¶ 8.)

---

[1] The Court derives these facts from a combination of Defendants' Local Rule 56(b)(1) Statement of Undisputed Material Facts (ECF No. 179), Plaintiffs' Local Rule 56(c) Response to Defendants' Statement of Facts and Plaintiffs' Statement of Facts (ECF No. 200), and Defendants' Reply Regarding Local Rule 56(b)(1) Statement of Material Undisputed Facts and Response to Plaintiffs' Statement of Facts (ECF No. 221).

[2] A defined benefit plan promises to pay a set benefit to an employee once the employee reaches normal retirement age. A defined contribution plan promises to make a set contribution for the employee's benefit, which may be withdrawn at normal retirement age.

On July 1, 2013, the BU Plan and NBU Plan merged to form the Retirement Plan for Employees of the Altoona Regional Health System. (*Id.* ¶ 11.) As of July 1, 2013, UPMC Altoona became the Plans' sponsor. (*Id.* ¶ 12.) As of December 31, 2014, UPMC merged the Plans into UPMC's own defined benefit pension plan known as the UPMC Basic Retirement Plan. (*Id.* ¶ 14.)

Altoona's average contribution to the Plans was $8.17 million for plan years 2008, 2009, and 2010.[3] (*Id.* ¶ 335.) For plan years 2008 through 2011, Altoona made an average actual contribution to the Plans of $10.06 million each year. (*Id.* ¶ 336.) From June 30, 2012, until the December 2014 merger of the Plans, UPMC Altoona contributed a total of $16.75 million into the Plans. (*Id.* ¶ 141.) UPMC made all contributions to the Plans after June 30, 2013. (*Id.* ¶ 142.)

## C. Altoona's Financial Troubles

Altoona began experiencing financial troubles in 2008 due to multiple factors; CBIZ, as Altoona's actuary, proposed a "soft freeze"[4] of Altoona's Plans. (*Id.* ¶ 282.) Altoona's Finance Committee and Board of Directors both voted unanimously to adopt CBIZ's recommendations to: (1) implement a soft freeze, which took effect on June 30, 2008; and (2) migrate new employees into a defined contribution plan, specifically a 403(b) plan. (*Id.* ¶ 283.) In 2008, Altoona's Finance Committee considered a distress termination of the Plans, but decided against it for several reasons, one of which was because CBIZ told the Board that Altoona would have to shoulder the entire $40 million cost of the termination immediately. (*Id.* ¶ 285.) Altoona never implemented a hard freeze of the Plans, but Plaintiffs assert that in October 2012, the Finance Committee

---

[3] A plan year runs from July 1 of that year until June 30 of the following year. For example, plan year 2008 ran from July 1, 2008, to June 30, 2009.

[4] In a "soft freeze," new participants are not permitted to join the plan, but the current participants continue to accrue benefits under the plan. By contrast, a "hard freeze" is a freeze of all benefit accruals under the plan, in addition to prohibiting new participants.

responded to an increase in accrued pension liability by considering a hard freeze of the Plans and paying off the liability. (*Id.* ¶¶ 34, 286.) Altoona never sought a distress termination of the Plans and Altoona's management never discussed seeking a distress termination of the Plans. (*Id.* ¶¶ 35–36.)

Altoona reported approximately $11.5 million in cumulative operating losses from fiscal year 2009 to 2013. (*Id.* ¶ 263.) Altoona's average annual expenses from 2009 to 2013 were approximately $471 million, of which approximately $440 million, or 92%, were from salaries, benefits, physician fees, purchased services, and supplies. (*Id.* ¶¶ 89, 317.) Due in part to Altoona's operating losses, Plaintiffs assert that Altoona missed at least eight quarterly pension contributions from 2009 to 2012 and was in a funding deficit. (*Id.* ¶¶ 275, 278)

In May 2009, Standard & Poor's ("S&P") lowered its rating on Altoona's revenue bonds to BBB+[5] due in part to Altoona's increasing operation losses. (*Id.* ¶ 269.) In December 2011, S&P affirmed Altoona's BBB+ bond rating but revised its outlook on Altoona from stable to negative, indicating potential future financial challenges for Altoona. (*Id.* ¶ 270.) Plaintiffs assert that as of December 2011, S&P recognized that Altoona had weak liquidity because Altoona had only 70 days cash on hand, a measure of liquidity and a common metric for assessing a business's health. (*Id.* ¶¶ 295–96, 298.) Altoona's cash on hand dropped from 200 days in 2004, to 90 days in 2010, to 69 in 2011. (*Id.* ¶ 301.) Altoona's accountants cautioned Altoona that 100 days of cash on hand was required to be in a strong position. (*Id.* ¶ 303.)

---

[5] An obligation rated "BBB" exhibits adequate protection parameters. However, adverse economic conditions or changing circumstances are more likely to weaken the obligor's capacity to meet its financial commitments on the obligation. (ECF No. 221 ¶ 269.)

For plan years 2009, 2010, and 2011, S&P reported that Altoona had "Unrestricted cash and investments" of $106.646 million, $90.488 million, and $104.902 million, respectively. (*Id.* ¶ 64.) Most of these assets were in a category of Altoona's balance sheet labeled "Assets Limited as to Use." (*Id.* ¶ 307.) As of June 30, 2011, about $30 million out of $88 million of Altoona's Assets Limited as to Use was either restricted by donors to specific uses, reserved to pay malpractice claims, or required to be segregated for payment of Altoona's bond debt. (*Id.* ¶ 308.) As of June 30, 2011, about $58 million out of the $88 million of Altoona's Assets Limited as to Use had been designated in "funded depreciation accounts" by Altoona's Board "for future renovations and replacements or expansion of Health System facilities as needed." (*Id.* ¶ 309.) Defendants assert that when the acquisition of Altoona closed, Altoona had approximately $95.7 million in unrestricted cash and investments that Altoona could have used to fund the Plans. (*Id.* ¶ 65.) Plaintiffs assert that Altoona only had $74.6 million total cash and investments when the acquisition closed, of which only $9.4 million of it was cash and equivalents without any restriction or limitation as to use. (*Id.*)

## D. CBIZ's Actuary Services for Altoona

Until his retirement in early 2015, Defendant Jon Ketzner was an actuary employed by Defendant CBIZ Benefits & Insurance Services, Inc. ("CBIZ B&I"), in Cumberland, Maryland. (*Id.* ¶ 15.) Defendant CBIZ, Inc., wholly owns CBIZ Operations, Inc., which in turn wholly owns CBIZ B&I. (*Id.* ¶ 16.) Ketzner provided actuarial services related to the Plans to Altoona from the early 1990s through July 1, 2013, and to UPMC Altoona from July 1, 2013, until his retirement in January 2015. (*Id.* ¶ 17.) Upon Ketzner's retirement, another CBIZ B&I actuary named Al Winters took over responsibility for the UPMC Altoona client relationship. (*Id.* ¶ 18.)

CBIZ, Inc., is a publicly traded holding company. (*Id.* ¶ 227.) Defendants assert that CBIZ, Inc., conducts no business operations, does not contract with clients to provide services., and has no employees. (*Id.* ¶¶ 228–30.) Plaintiffs assert that Ketzner's resume lists him as "Executive VP/Chief Actuary" for "CBIZ (NYSE: CBZ)," which describes the national, diversified company. (*Id.* ¶ 485.) Plaintiffs assert that CBIZ's website identified Ketzner as both a principal in CBIZ B&I and CBIZ, Inc., in 2015. (*Id.* ¶ 486.) Plaintiffs assert that at Ketzner's office in Maryland, Ketzner's fellow pension consultants identified themselves as agents or employees of CBIZ, Inc. (*Id.* ¶ 484.) Ron Devine, a CBIZ insurance representative, testified that he was an employee of CBIZ, Inc., working in Johnstown, Pennsylvania. (*Id.* ¶ 482.) Devine's email signature refers to him as both a CBIZ B&I employee and as a Senior Vice President of "CBIZ, Inc. NYSE Listed: CBZ." (*Id.* ¶ 483.) Plaintiffs assert that in November 2011, Ketzner prepared a written contract for Altoona's execution pertaining to additional proposed benefit consulting work for Altoona. (*Id.* ¶ 479.) Ketzner sent the contract under a cover email bearing the CBIZ, Inc., corporate logo and identified CBIZ, the entity performing the work, as a nationwide service provider that is publicly traded on the New York Stock Exchange. (*Id.* ¶ 479.) The contract identified Ketzner as part of the "CBIZ Staff" working on the project. (*Id.* ¶ 480.) Plaintiffs assert that Altoona and UPMC, in signing the contract, relied on the fact that "CBIZ" was a publicly traded, national actuarial firm. (*Id.* ¶ 489.)

One of the services that Ketzner provided to Altoona was preparing an annual accounting report, or GAAP report, which estimated Altoona's pension funding obligations for a particular plan year. (*Id.* ¶ 149.) On September 17, 2012, CBIZ issued an accounting report to Altoona for plan year 2011 (the "Ketzner Report"). (*Id.* ¶ 151.) Actuarial standards of practice required Ketzner to disclose all of his material methods and assumptions in his reports. (*Id.* ¶ 421.)

### E. UPMC's Alleged Reliance on the Ketzner Report

UPMC alleges that it acquired Altoona in reliance on the Ketzner Report. (*Id.* ¶ 157.) Defendants assert that Ketzner and other CBIZ employees did not know of any potential acquisition of Altoona prior to the public announcement in November 2012. (*Id.* ¶¶ 182–86.)

#### 1. CBIZ's Work on the Plans Before the Acquisition Announcement

Plaintiffs assert that Altoona's CFO Charlie Zorger disclosed a potential affiliation to Defendants in an email on August 16, 2012, prior to the public announcement of UPMC's potential acquisition of Altoona in November 2012. (*Id.* ¶ 175.) In the email, Zorger asked CBIZ employee Mike Miller: "The auditors that are doing a pro-forma for an affiliation wanted to know if you had the unfunded liability for 6/12?" (*Id.* ¶ 200.) The "affiliation" referred to in the email did not refer to a potential acquisition of Altoona by UPMC, but instead referred to a potential affiliation called the Three or Four Corners strategy in which Altoona would have affiliated with Conemaugh Health System, Du Bois Regional Medical Center, and Mount Nittany Medical Center. (*Id.* ¶¶ 203, 206.) Plaintiffs assert that, like the affiliation with UPMC, the Three or Four Corners strategy affiliation would have involved financial risk-sharing, including sharing the risk for Altoona's pension liability. (*Id.* ¶ 447.) Defendants assert that the Three or Four Corners strategy was confidential and that Ketzner was not aware of it. (*Id.* ¶¶ 211, 213.)

Defendants assert that neither Ketzner nor any other CBIZ employee heard that UPMC was considering acquiring Altoona. (*Id.* ¶¶ 225–26.) Plaintiffs assert that at least as early as January 15, 2012, Defendants had an electronic alert in place for all news related to "Altoona Regional Health System" and that Ketzner was forwarded Altoona press coverage. (*Id.* ¶¶ 435–36.) Plaintiffs assert that CBIZ's files include multiple newspaper articles, published before the

November 2012 announcement and the Ketzner Report, referring to Altoona's potential affiliation with two other hospitals, or describing Altoona's potential partnership with, or acquisition by, UPMC, Geisinger, or Highmark. (*Id.* ¶ 437.)

## 2. CBIZ's Role in UPMC's Due Diligence

UPMC began its formal due diligence on its acquisition of Altoona in January 2013. (*Id.* ¶ 415.) Plaintiffs assert that Ketzner testified that, as part of UPMC's due diligence, he submitted a written certification that the Plans had no operational defects or other compliance issues. (*Id.* ¶ 448.) Ketzner testified that Altoona asked him to provide information to UPMC in January 2013; specifically, the latest actuarial reports on funding liabilities for all employee benefit plans. (*Id.* ¶ 452–53.) Plaintiffs assert that Ketzner testified that he knew that all such requested documents would go to UPMC. (*Id.* ¶ 454.)

On March 26, 2013, Altoona uploaded the Ketzner Report to a Share Point site that Altoona and UPMC used to collect documents in the course of due diligence on the acquisition. (*Id.* ¶ 456.) Altoona provided copies of spreadsheets and other UPMC due diligence materials to CBIZ and asked CBIZ to fill in any missing information. (*Id.* ¶ 462.) On April 11, 2013, Altoona's Vice President of Human Resources, Gary Naugle, emailed Ketzner seeking funding information for the Plans to place in a spreadsheet summarizing Altoona's retirement plan information. (*Id.* ¶ 464.) Plaintiffs assert that, as part of this process, Miller filled in a series of open cells in the UPMC spreadsheet for plan year 2011 pension funding numbers that Ketzner had given him to complete. (*Id.* ¶¶ 465–66.)

On April 15, 2013, CBIZ prepared the plan year 2011 Form 5500[6] for each Plan and sent them to Altoona for electronic filing with the IRS. (*Id.* ¶ 471.) On April 16, 2013, Naugle told Galley that the Form 5500s for plan year 2011 had been uploaded to the SharePoint site. (*Id.* ¶ 472.) Plaintiffs assert that those documents, the 2011 BU Plan 5500 and 2011 NBU Plan 5500, understated the Plans' funding obligation by $52.5 million. (*Id.* ¶ 473.) Plaintiffs assert that the two documents falsely certified that Ketzner's actuarial assumptions were complete, accurate, and reasonable. (*Id.* ¶ 474.)

### F. Winters Recalculates the Pension Funding Obligation

In February 2015, Winters began to calculate, according to UPMC's funding policy, UPMC Altoona's funding obligation regarding the Plans for plan year 2013. (*Id.* ¶ 19.) Winters calculated this amount to be greater than Ketzner's 2014 estimate. (*Id.* ¶ 20.) Winters disclosed this discrepancy to UPMC within a week of his preliminary calculation. (*Id.* ¶ 21.) At UPMC's request, Winters recalculated the funding requirements that Ketzner had provided to Altoona and UPMC for plan years 2008 to 2012. (*Id.* ¶ 22.) Winters's revised calculations showed increased ERISA funding requirements (the "Revised Pension Funding Obligation"). (*Id.* ¶ 23.)

### G. The Pension Benefit Guarantee Corporation

#### 1. The Statutory Framework

A "distress termination" is a type of defined benefit pension plan termination under ERISA. (*Id.* ¶ 37.) The Pension Benefit Guarantee Corporation ("PBGC") administers the distress termination statute and regulations. (*Id.* ¶ 38.) In a distress termination, the PBGC assumes the

---

[6] A plan sponsor files a Form 5500 annually with the IRS to report on a retirement plan's financial conditions, investments, operations, and compliance.

plan sponsor's pension plan, including all assets and liabilities. (*Id.* ¶ 39.) In exchange, the PBGC receives a statutory claim against the plan sponsor for a termination premium plus the amount by which the plan is underfunded. (*Id.* ¶ 40.) The amount by which the plan is underfunded is based on the purchase price of an annuity sufficient to pay the liability into the future. (*Id.*)

There are four statutory provisions under which the PBGC may grant a distress termination of a pension plan: (1) liquidation in bankruptcy or insolvency proceedings; (2) reorganization in bankruptcy or insolvency proceedings; (3) termination required to enable payment of debts while continuing in business; and (4) termination required to avoid unreasonably burdensome pension costs caused by a declining workforce. (*Id.* ¶¶ 46–47.) Plaintiffs' proposed PBGC experts, John Spencer and Joshua Gotbaum, plan to testify that Altoona would have applied for the third type of distress termination, which they label the "business continuation test." (*Id.* ¶ 48.) Under the business continuation test, the PBGC may terminate a pension plan outside of bankruptcy if the plan sponsor demonstrates to the PBGC that, "unless a distress termination occurs, such person will be unable to pay such person's debts when due and will be unable to continue in business." (*Id.* ¶ 346.)

### 2. The Distress Termination Application

To obtain a distress termination, Altoona would have had the burden of proof to convince the PBGC that it qualified for a distress termination under the business continuation test. (*Id.* ¶ 56.) Altoona would have been required to complete the PBGC's Form 600 and Form 601 and attendant schedules, which require information on a sponsor's projected finances and funding contributions, available cash, and restructuring efforts. (*Id.* ¶ 57.)

### a. Projected Finances and Funding Contributions

The PBGC's distress termination application requires the applicant to submit five years of projected financial statements along with five years of projected Minimum Funding Contributions. (*Id.* ¶ 362.) Financial projections for Altoona show that from 2011 to 2015, the hospital would have generated negative net cash flow of $31 million. (*Id.* ¶ 363.) Combined with Altoona's pension obligations of approximately $100 million in the same five-year period, Gotbaum stated that the net effect—a hole of roughly $130 million—would make Altoona "certifiably in distress." (*Id.* ¶¶ 364–65.)

Plaintiffs assert that the additional cash Altoona required to fund the Plans for plan years 2011 to 2015 would have totaled $66.38 million. (*Id.* ¶ 337.) This figure includes a combination of the projected five-year minimum required contribution for the Altoona Plans, post January 1, 2010 freeze with a longer amortization period, and the estimated cost for replacing the Plans with a 403(b) plan, minus the amount Altoona contributed to the Plans, on average, for the plan years 2008 to 2010. (*Id.*) Plaintiffs assert that if a shorter amortization period is assumed instead, the total additional cash required increases to $75.217 million. (*Id.* ¶ 345.)

Plaintiffs assert that Altoona would have offered a 403(b) plan to replace the Plans after a hard freeze in order to attract and retain employees. (*Id.* ¶ 332.) Plaintiffs assert that the PBGC would have recognized the need for Altoona to pay for a replacement 403(b) plan and that the cost for the 403(b) plan would have totaled $30 million. (*Id.* ¶¶ 333–34.)

### b. Available Cash

The PBGC considers what resources, including unrestricted cash, an applicant has available to satisfy ERISA's funding requirements. (*Id.* ¶ 61.) Defendants assert that Altoona had

unrestricted cash available to fund the Plans; Plaintiffs assert that Altoona did not have cash and investments available to fund the Plans because most of Altoona's liquid assets were designated as Assets Limited as to Use. (*Id.* ¶ 64.)

### c. Restructuring Efforts

The PBGC application also requires the applicant to describe all financial and operational restructuring actions the applicant has taken to address financial distress. (*Id.* ¶ 62.) Spencer testified that the PBGC would have found Altoona's cost-cutting efforts to be sufficient and Gotbaum testified that Altoona could not have undertaken any measures sufficient to close a $100 million-plus pension gap. (*Id.* ¶ 330, 372.) Plaintiffs assert that Altoona had little room for further cost-cutting and specifically ruled out a 1–3% additional cut in expenses. (*Id.* ¶¶ 319, 327.)

### d. Other Considerations

The parties disagree about other factors the PBGC considers. Gotbaum testified that the PBGC, in assessing Altoona's application, would have considered the fact that Altoona was a health care provider, a non-profit, a major employer, and an innocent party; Defendants assert that the PBGC would not have taken these facts into account. (*Id.* ¶ 373, 375–77.)

Plaintiffs contend that Altoona would not have to provide information on prospective purchasers because the PBGC's distress termination application does not request such information and that even if Altoona disclosed its discussions about affiliating with UPMC, the PBGC would still have granted a distress termination. (*Id.* ¶¶ 392, 396.) UPMC alleges that had it known of the revised pension liability, it would not have purchased Altoona, or would have completed the purchase on substantially different terms. (*Id.* ¶ 74.)

Defendants assert that the PBGC also considers union objections to the requested termination of a pension plan. (*Id.* ¶ 84.) Defendants assert that if a union objects to the termination under a collective bargaining agreement, the PBGC must suspend the termination proceedings. (*Id.* ¶ 86.) Plaintiffs assert that the PBGC considers only formal challenges to the termination under an existing collective bargaining agreement. (*Id.* ¶ 84.) Gene Connors, Altoona's long-time labor attorney, testified that he would have secured the unions' acceptance of a hard freeze and replacement with a 403(b) plan. (*Id.* ¶ 289.) Plaintiffs assert that no union consent was necessary to implement the hard freeze. (*Id.* ¶ 259.)

### 3. The PBGC's Review of a Distress Termination Application

At the PBGC, a "case team" composed of professionals within two PBGC departments—the Department of Insurance Supervision and Compliance and the Office of the Chief Counsel—evaluates a distress termination application to determine whether the application satisfies the requirements for a distress termination. (*Id.* ¶ 96.) If the case team decides that the application does not meet the standard, the PBGC denies the application. (*Id.* ¶ 97.) However, in cases where the PBGC's claim against a plan sponsor would be for more than $100 million, or which presents a novel or significant policy issue, the Deciding Official ultimately has decision-making authority. (*Id.*) The Deciding Official during the relevant time period was the PBGC's Director, Joshua Gotbaum. (*Id.* ¶ 102.)

If the case team believes that the PBGC should grant the termination, it prepares a recommendation for the Trusteeship Working Group (the "TWG"). (*Id.* ¶ 98.) Barring certain exceptions, all applications proceed through TWG review. (*Id.* ¶ 99.) However, when time is of the essence and facts and circumstances make it impractical to convene a meeting of the TWG,

the Chief Insurance Program Officer and the Chief Operating Officer may propose that the PBGC terminate a plan by forwarding their recommendation to the PBGC Director, who may approve the recommendation. (*Id.*) If the TWG approves the case team's recommendation to terminate the plan, the case team sends the application for concurrences and for review and decision by the Deciding Official. (*Id.* ¶ 104.) Defendants assert that for cases in which the unfunded liability exceeds $100 million on a PBGC termination basis, at least eight PBGC officials must concur in a recommendation to grant a termination. (*Id.* ¶ 105.)

#### 4. The Extent of PBGC Relief

The PBGC's claim against Altoona would have consisted of the amount of the unfunded liability associated with the Plans, calculated on a termination basis pursuant to PBGC regulations, plus a termination premium, which is also calculated pursuant to PBGC regulations. (*Id.* ¶ 109.) The amount of the PBGC's claim against Altoona would vary depending on when Altoona applied for and received the distress termination. (*Id.* ¶ 117.) Spencer opines that the PBGC would have settled its statutory claims against Altoona for 15 percent of the total amount of the claims; Gotbaum opines that the settlement would have been for 6 percent. (*Id.* ¶¶ 108, 116.)

Plaintiffs' proposed actuarial expert witness, John Lin, initially calculated the amount of the Plans' PBGC unfunded liability as of July 1, 2012 to be $225.7 million. (*Id.* ¶ 110.) Lin has since lowered this amount to $175.3 million in supplemental reports. (*Id.* ¶ 111.) Spencer calculated the termination premium to equal $13.5 million. (*Id.* ¶ 112.) Therefore, the PBGC's statutory claim against Altoona would have been approximately $188.8 million.

-14-

Plaintiffs' proposed damages expert, Neil Demchick, intends to testify that UPMC Altoona suffered damages because Altoona lost its opportunity to receive a distress termination from the PBGC. (*Id.* ¶ 41.) To calculate UPMC Altoona's damages, Demchick provides a comparison of the hypothetical case in which Altoona received assistance to what actually happened, where Altoona did not. (*Id.* ¶ 42.) Demchick compares a hypothetical settlement with the PBGC to the pension liability that the PBGC would have assumed as of a specific termination date. (*Id.* ¶ 43.) Demchick uses two dates for this comparison, June 30, 2012 and June 30, 2013, and calculates damages ranging from $93.5 to $190.7 million. (*Id.* ¶¶ 44–45.)

When calculating future pension liability, a discount rate is applied to measure the present value of future pension payments. (*Id.* ¶ 124.) Lin testified that the appropriate discount rate depends on the purpose of the measurement. (*Id.* ¶ 409.) Plaintiffs assert that GAAP standards are used to measure Altoona's balance sheet savings produced by terminating the Plans and replacing them with a debt owed to the PBGC in a lesser amount; Defendants assert that ERISA supplies the correct standard. (*Id.* ¶¶ 8, 410.) As of July 1, 2013, Altoona's ASC 960 liability was approximately $185 million, while the equivalent GAAP liability was over $258 million. (*Id.* ¶ 127.) During the relevant period, ERISA prescribed a discount rate between the GAAP and ASC 960 rates. (*Id.* ¶ 128.)

## IV. Procedural Background

On September 16, 2016, Plaintiffs filed their three-count Complaint (ECF No. 1) with the Court, alleging claims of (1) professional negligence, (2) breach of contract, and (3) negligent misrepresentation against Defendants. On September 10, 2019, Defendants moved for summary judgment. (ECF No. 177.) Plaintiffs responded in opposition to the Motion on October 21, 2019

(ECF No. 201), to which Defendants replied on November 27, 2019. (ECF No. 220.) The Court held argument on the Motion for Summary Judgment on January 16, 2020.

## V. Legal Standard

This Court will grant summary judgment "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Melrose, Inc. v. Pittsburgh*, 613 F.3d 380, 387 (3d Cir. 2010) (quoting *Ruehl v. Viacom, Inc.*, 500 F.3d 375, 380 n.6 (3d Cir. 2007)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). There is a genuine issue of fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). Material facts are those that affect the outcome of the trial under governing law. *Anderson*, 477 U.S. at 248. The Court's role is "not to weigh the evidence or to determine the truth of the matter, but only to determine if the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 581 (3d Cir. 2009). In deciding a summary judgment motion, this Court "'must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor.'" *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000) (quoting *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994)).

The moving party bears the initial responsibility of stating the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party meets this burden, the party opposing summary judgment "may not rest upon the mere allegations or denials" of the pleading, but "must set forth specific facts showing that there is a genuine issue for trial." *Saldana v. Kmart*

-16-

*Corp.*, 260 F.3d 228, 232 (3d Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 n.11 (1986)). "For an issue to be genuine, the nonmovant needs to supply more than a scintilla of evidence in support of its position—there must be sufficient evidence (not mere allegations) for a reasonable jury to find for the nonmovant." *Coolspring Stone Supply v. Am. States Life Ins. Co.*, 10 F.3d 144, 148 (3d Cir. 1993); *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (noting that a party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue").

## VI.    Discussion

### A.  Pennsylvania Law Applies to Plaintiffs' Claims

In federal diversity cases, a federal court must apply the conflict of law rules of the forum state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 497 (1941). Pennsylvania uses a "hybrid" choice of law approach that combines the "governmental interest analysis" with the "most significant relationship" test. *Carrick v. Zurich–Am. Ins. Grp.*, 14 F.3d 907, 909 (3d Cir. 1994) (citing *Griffith v. United Air Lines, Inc.*, 203 A.2d 796 (Pa. 1964)). This approach requires the Court to first determine whether there is a relevant difference between the law of the jurisdictions whose laws potentially apply. *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 230 (3d Cir. 2007). If the laws of the jurisdictions are the same, there is no conflict at all, making a choice of law analysis unnecessary, and the court may refer interchangeably to the laws of the states whose laws potentially apply. *Id.*; *Huber v. Taylor*, 469 F.3d 67, 74 (3d Cir. 2006).

Here, the laws of either Pennsylvania or Maryland could apply to this case because the Altoona acquisition took place in Pennsylvania and Ketzner performed his work in Maryland. However, both parties cite to Pennsylvania law throughout their briefing and assert that there is

no real conflict between the laws of these states. (*See* ECF No. 178 at 15; ECF No. 201 at 19.) The Court agrees with the parties and finds that there is no real or actual conflict between Pennsylvania and Maryland law. Therefore, because both parties focus their briefing on Pennsylvania law and the Court finds no actual conflict between Pennsylvania and Maryland law, the Court applies Pennsylvania law to Plaintiffs' claims.

## B. The Court Denies Defendants' Motion for Summary Judgment as to Plaintiffs' Malpractice and Lost Opportunity Claims

Defendants have moved for summary judgment on Plaintiffs' malpractice and lost opportunity claims. Defendants assert that these claims fail because: (1) they are too speculative; (2) Altoona had sufficient funds to meet its increased funding obligation; (3) UPMC Altoona suffered no damages as a result of Defendants' calculations; and (4) the claims are preempted by ERISA. The Court addresses each in turn.

### 1. Plaintiffs' Malpractice and Lost Opportunity Claims Are Not Speculative

#### a. The Parties' Arguments

Defendants argue that the Court should dismiss Plaintiffs' malpractice and lost opportunity claims because they are based on improper speculation. (ECF No. 178 at 22.) Plaintiffs rely on improper lay witness testimony to show that the PBGC would have granted relief if Altoona applied for a distress termination. (*Id.* at 23.) Defendants assert that the testimony from these witnesses lacks foundation and is not based on the witnesses' perceptions. (*Id.* at 24–26.) Plaintiffs' witnesses have no factual basis or experience to support their opinion because they never discussed or contemplated a distress termination for Altoona at any time. (*Id.* at 27.)

-18-

Defendants assert that if a jury relies on Plaintiffs' witnesses' testimony, the jury will have to improperly speculate as to whether the PBGC would have granted Altoona relief. (*Id.* at 27.) Specifically, Defendants contend that Plaintiffs ask the jury to improperly decide, based on speculation, that: (1) Altoona would have pursued the application in the first place; (2) Altoona could not have undertaken restructuring or cost cutting measures in order to fund its increased pension obligation; (3) no third parties would have acquired Altoona and assumed any portion of the pension liability; (4) Altoona's two unions would have consented to the termination of their pension benefits; and (5) the PBGC would have granted the bailout. (*Id.* at 28, 29, 31, 33, 35.) Defendants argue that Plaintiffs have not presented sufficient evidence from which a reasonable jury could conclude, without improperly speculating, that all of these decisions would have led to PBGC relief. (*Id.*)

Defendants argue that even if Plaintiffs can show they would have obtained PBGC relief, the extent of the relief would be speculative because the amount Plaintiffs claim as damages—85 percent of Altoona's pension liability—is only a guess. (*Id.* at 37–38.) Plaintiffs' experts do not provide the jury with sufficient information to arrive at an amount of damages because the amount would change depending on the date Altoona applied for and received a distress termination. (*Id.*) Plaintiffs' experts only calculated the termination amount for two days over a four-year period, which does not provide the jury with a sufficient basis to calculate damages if Altoona would have obtained the relief on another date. (*Id.*)

Plaintiffs respond that the Court should not dismiss their malpractice and lost opportunity claims because their damages are non-speculative and provable to a reasonable degree of certainty. (ECF No. 201 at 47.) Plaintiffs' damages stem from Defendants' malpractice,

which prevented Altoona from pursuing and obtaining PBGC relief. (*Id.* at 31.) Plaintiffs assert

that had Altoona been presented with accurate information about its pension liability, it would

have terminated the Plans and sought PBGC relief. (*Id.*) In fact, Altoona weighed termination of

the Plans in both 2008 and 2012. (*Id.* at 32.) Plaintiffs assert that Altoona would have placed a

hard freeze on the Plans in early 2010 and replaced them with a 403(b) plan after securing the

union's acceptance. (*Id.* at 33.)

Plaintiffs next assert that they have produced sufficient evidence to show that the PBGC

would likely have granted Altoona's application. (*Id.* at 50.) Specifically, the testimony of both

Spencer and Gotbaum support Plaintiffs' assertion that the PBGC would have granted Altoona

relief. (*Id.* at 50–51.) Plaintiffs contend that Altoona would not have needed to prove to the PBGC

that it was on the verge of liquidation to receive a distress termination. (*Id.* at 52.) Plaintiffs assert

that they can show that Altoona's unions would have consented to the bailout because the likely

alternative of bankruptcy would have been far worse. (*Id.* at 53.) The PBGC would have still

provided relief, even in the face of a possible third-party acquisition of Altoona. (*Id.* at 55.)

Additionally, had UPMC known of Altoona's true pension liabilities, UPMC would have waited

for Altoona to receive a distress termination from the PBGC before proceeding with an

acquisition. (*Id.*) Finally, Plaintiffs argue that Defendants' disagreement with Plaintiffs' experts'

estimates of the terms of the distress termination between Altoona and the PBGC is a factual

dispute that precludes summary judgment. (*Id.* at 52.)

## b. Plaintiffs Can Show that They Suffered Non-Speculative Damages

Under Pennsylvania law, a plaintiff cannot recover damages that are "too speculative, vague or contingent." *Spang & Co. v. U.S. Steel Corp.*, 545 A.2d 861, 866 (Pa. 1988). Additionally, a plaintiff cannot recover damages beyond those which can be established with "reasonable certainty." *Id.* Some speculation regarding damages is permissible, as evidence of damages may consist of probabilities and inferences and need not be "completely free of all elements of speculation" or proved with "mathematical certainty." *Delahanty v. First Pa. Bank, N.A.*, 464 A.2d 1243, 1257 (Pa. Super. Ct. 1983). Damages are improperly speculative only if the uncertainty concerns the existence of damages rather than the amount of damages. *Rizzo v. Haines*, 555 A.2d 58, 68 (Pa. 1989). A plaintiff must show a "reasonable basis" for the amount of damages claimed. *Id.*

Here, Plaintiffs have shown that the damages they claim are not speculative and that they can establish them with reasonable certainty. Plaintiffs claim that Defendants' errors in reporting its true pension liabilities harmed them because the errors prevented Altoona from seeking and obtaining PBGC relief, which caused Plaintiffs to pay off liabilities they could have avoided. A claim of this nature cannot be entirely free of speculation on the part of the jury because the claim requires them to assess the "case within a case:" but for the malpractice, the plaintiff would have been successful in its underlying action, which here is Altoona's distress termination application. *See Kituskie v. Corbman*, 714 A.2d 1027, 1030 (Pa. 1998). The speculation with which Defendants take issue is the fact-finding function of the jury. Determining what would have happened had

-21-

Altoona been provided accurate pension liability numbers necessarily involves determining questions of fact that cannot be answered as a matter of law.

Plaintiffs have introduced sufficient evidence to meet their burden of production to show a jury that but for Defendants' malpractice, Altoona would have applied for and received PBGC relief. The extent of the damages Plaintiffs allege is not speculative and can be established through both expert and lay witness testimony. Plaintiffs provide a reasonable basis for their damages calculation and it will be up to the jury to determine the terms on which the PBGC would have granted relief and the damages Plaintiffs suffered as a result.

### 2. Plaintiffs Can Show that Altoona Did Not Have Sufficient Funds to Meet the Revised Pension Funding Obligation

#### a. The Parties' Arguments

Defendants argue that Plaintiffs' lost opportunity claim fails because Altoona had sufficient funds available to meet the Revised Pension Funding Obligation without resort to a PBGC bailout. (ECF No. 178 at 42.) Defendants assert that no reasonable jury could conclude that the PBGC would have granted Altoona a distress termination by June 30, 2013, because Altoona could afford to pay the Revised Pension Funding Obligation from 2009 through 2013. (*Id.* at 42–43.) The Revised Pension Funding Obligation would not have caused Altoona to cease operations because Altoona contributed more in pension funding from 2009 through 2013 than what it would have owed under the Revised Pension Funding Obligation during that period. (*Id.* at 43.) Defendants assert that under an ERISA measure of pension liability, Altoona had sufficient cash on hand to meet its funding obligations. (*Id.* at 47.) Altoona made actual contributions to its pension plan from 2008 to 2012 in an amount millions of dollars greater than ERISA required

-22-

under the Revised Pension Funding Obligation with a plan freeze. (*Id.* at 48.) Plaintiffs cannot show that the Revised Pension Funding Obligation would have forced Altoona into liquidation or induced the PBGC to grant a bailout because Altoona could make its payments under the Revised Pension Funding Obligation. (*Id.*) Moreover, Defendants assert that Altoona could have used its millions of dollars in unrestricted cash in its accounts to pay pension obligations and could also have reduced its annual expenses to create millions of dollars in savings to put into its pension fund. (*Id.* at 48–49.) Therefore, the PBGC would not have granted a distress termination and Plaintiffs' claim fails. (*Id.* at 49.)

Plaintiffs first respond that ERISA measures do not govern their claims for damages because that measure applies only to plan participants bringing claims under ERISA and Plaintiffs are neither plan participants nor bringing claims under ERISA. (ECF No. 201 at 62–63.) Instead, Plaintiffs' damages stem from claims of malpractice and breach of contract outside of ERISA. (*Id.* at 65.) Plaintiffs assert that, like any other case, the determination of damages is for the jury and the jury must decide whether ERISA or GAAP measures are the appropriate standard to value the Plans' liabilities. (*Id.*) If the jury accepts GAAP measures, then Plaintiffs' damages and liabilities would be higher than they would be under ERISA measures. (*Id.* at 63.) Plaintiffs contend that regardless of the measure of damages used, Plaintiffs would be able to show that Altoona could not afford to pay its debts and would qualify for PBGC relief. (*Id.* at 65.)

Plaintiffs assert that Defendants' calculation of Altoona's pension liabilities after a hard freeze understates Altoona's actual liability because Defendants have ignored the cost of implementing the 403(b) replacement plan. (*Id.* at 42.) Altoona would have implemented the 403(b) plan to replace the Plans; the 403(b) plan would add approximately $30 million to

Altoona's pension obligation for the relevant time period. (*Id.* at 43.) Adding the 403(b) plan to the pension liabilities calculation makes it even less likely that Altoona would have been able to survive without PBGC relief because Altoona was already in serious financial distress. (*Id.* at 45.) Plaintiffs also assert that a jury should resolve the numerous analytical disputes about the extent of Altoona's liabilities. (*Id.* at 46.)

Finally, Plaintiffs assert that whether Altoona could have survived without PBGC relief is a question of fact for the jury to decide. (*Id.* at 36.) Plaintiffs assert that Altoona did not have sufficient unrestricted cash to cover the increased pension liability resulting from Defendants' malpractice and that Altoona could not afford to pay its debts, as evidenced by Standard & Poor's rating of Altoona's liquidity as "weak" in December of 2011. (*Id.* at 37.) Altoona could not use any material portion of its unrestricted cash to fund its pension plans because diverting substantial funds to the Plans would have required drastic cuts to its hospital operating budget, crippling Altoona's ability to function as a hospital. (*Id.* at 38.) Additionally, Plaintiffs assert that most of Altoona's liquid assets were already restricted to other specific uses and could not be used to fund pensions. (*Id.*) Plaintiffs contend that Altoona could not feasibly take cost-cutting and restructuring measures, as evidenced by the fact that Altoona reduced expenses in 2009 and 2010 and these cuts were still not enough to overcome its operating losses in 2011. (*Id.* at 40–41.) Plaintiffs argue that further cost cutting would have led to a spiraling downward effect and eventual bankruptcy. (*Id.* at 41–42.)

### b. Genuine Disputes of Fact About Altoona's Financial Health Preclude Summary Judgment

As a preliminary matter, Plaintiffs are not restricted to ERISA measures for measuring their damages. Defendants assert that *Perelman v. Perelman*, 793 F.3d 368 (3d Cir. 2015) stands for the proposition that ERISA measures govern the measure of damages in this case. It does not. *Perelman* was a case in which a plan participant alleged an injury under ERISA and sought to use a non-ERISA measure of damages. *Id.* at 375. The Third Circuit held that the plaintiff was bound to ERISA measures for his damages claim because he was a plan participant and brought a claim under ERISA. *Id.* Plaintiffs in this case are neither bringing statutory claims under ERISA nor are they plan participants. Plaintiffs' damages arise from claims of malpractice and breach of contract outside of ERISA, for which ERISA does not mandate a specific measure by which to calculate damages. ERISA may provide a measure of damages in this case, but that measurement is not the only possible one and a jury need not accept it. A jury could find that ERISA measures understate the alleged harm to Plaintiffs and choose to adopt another measure.

For an ERISA plan sponsor to obtain relief from the PBGC, the sponsor must show that it would have been unable to pay its debts when due and unable to continue in business. 29 U.S.C. § 1341(c)(2)(B)(iii)(I). Here, Plaintiffs can show that Altoona did not have sufficient funds to meet its funding obligations. Plaintiffs can show that Altoona was already operating at a loss, even with understated pension liability and that Altoona would have been unable to make increased pension funding payments. Plaintiffs assert that had Altoona known of its true liabilities, the downward spiral at Altoona would have accelerated and caused Altoona to freeze the Plans and seek PBGC relief.

The Court holds that numerous factual disputes about Altoona's financial situation preclude summary judgment on these grounds. For example, Defendants say that Altoona could have made additional budget cuts to fund its pensions; Plaintiffs say this was not feasible. Defendants state that Altoona had unrestricted cash that it could repurpose to fund its pensions; Plaintiffs state that the funds were restricted. Plaintiffs also assert that Defendants' calculations ignore the cost of a 403(b) replacement plan, which would have added further financial stress to Altoona. The Court holds that these facts are both disputed and material and that summary judgment is therefore improper.

### 3. UPMC Altoona Can Show that It Suffered Damages

#### a. The Parties' Arguments

Defendants argue that the Court must dismiss Plaintiffs' malpractice and lost opportunity claims because UPMC Altoona did not suffer any actual damages. (ECF No. 178 at 50.) When UPMC assumed Altoona's pension liability at closing on July 1, 2013, UPMC Altoona did not have to pay the pension liability the PBGC would have assumed because UPMC assumed that liability. (*Id.* at 50–51.) UPMC Altoona therefore received the very same relief from UPMC that it would have received from the PBGC—third party assumption of its pension liability. (*Id.*) UPMC Altoona cannot recover the monies contributed to the Plans by its parent UPMC as damages. (*Id.*) If the PBGC assumed 85 percent of Altoona's pension liability, the amount UPMC Altoona would have been responsible for before the plans merged is more than what UPMC Altoona actually paid during that time without PBGC relief. (*Id.* at 52.)

Plaintiffs respond that the Court should not dismiss their claims because the Court has already rejected Defendants' argument that UPMC Altoona suffered no damages in denying

Defendants' motion to dismiss. (ECF No. 201 at 66.) Plaintiffs assert that Defendants' malpractice caused damages to both UPMC Altoona and UPMC. (*Id.* at 67.) Specifically, UPMC Altoona suffered damages from the increase in pension liability caused by not freezing the Plans and applying for PBGC relief (Counts One and Two). (*Id.*) UPMC suffered damages from the added direct pension liability or, alternatively, the decreased value of Altoona (Count Three). (*Id.*) Plaintiffs argue that the fact that UPMC Altoona paid more in pension contributions than it would have if it had obtained PBGC relief is irrelevant because Defendants do not account for the fact that UPMC would not have acquired Altoona had it known the true measure of its pension liabilities. (*Id.* at 68.) If UPMC had not acquired Altoona, then Altoona would have applied for PBGC relief, which is what UPMC Altoona claims as damages. (*Id.*)

### b. UPMC's Acquisition of Altoona Did Not Eliminate UPMC Altoona's Damages Claim

For a plaintiff to sustain a malpractice damages claim, the plaintiff must introduce proof of actual loss. *Kituskie*, 714 A.2d at 1030. For example, in legal malpractice actions, actual losses are measured by the judgment the plaintiff lost in the underlying action because of the defendant lawyer's malpractice. *Id.* In this case, the "judgment" Plaintiffs allege that they lost was a distress termination from the PBGC.

Here, UPMC Altoona can show that it suffered actual losses as a result of Defendants' alleged negligence. Plaintiffs allege that UPMC Altoona suffered damages from the increased pension liability caused by not freezing the plans and applying for PBGC relief. This is an allegation of actual loss because Plaintiffs allege that, if not for Defendants' alleged malpractice, Altoona would not have had to fund the Plans for a period that they actually did. The fact that

-27-

UPMC acquired Altoona does not preclude UPMC Altoona's damages claim because those damages are independent of UPMC's actions and Altoona would have suffered them had UPMC not acquired Altoona. Plaintiffs allege that had Altoona and UPMC known the true extent of Altoona's liabilities, UPMC would not have acquired Altoona on the terms it actually did, if at all. UPMC Altoona's lost opportunity to have Altoona's pension liability avoided is an actual loss UPMC Altoona suffered. As discussed above, *supra* Section VI.B.1.b, Plaintiffs can show that they suffered damages and these damages are provable with reasonable certainty.

### 4. ERISA Does Not Preempt Plaintiffs' Malpractice and Lost Opportunity Claims

#### a. The Parties' Arguments

Defendants argue that the Court should dismiss Plaintiffs' malpractice and lost opportunity claims because ERISA preempts them. (ECF No. 178 at 53.) Defendants assert that Plaintiffs' claims are preempted because they "relate" to an ERISA benefit plan, meaning that the claims require an analysis and application of ERISA's statutory test for distress termination and an interpretation of Altoona's ERISA plans. (*Id.* at 55.) Because applying an ERISA analysis could implicate funding, benefits, reporting, and administration of an ERISA plan, Plaintiffs' claims relate to ERISA and are therefore preempted. (*Id.* at 56.)

Plaintiffs respond that ERISA does not preempt their claims because ERISA does not generally apply to professional malpractice actions brought by a plan sponsor. (ECF No. 201 at 59.) Plaintiffs contend that preemption does not apply simply because an ERISA plan is involved in the case. (*Id.* at 60.) Plaintiffs' malpractice claim that Defendants, as service providers to the Plans, were negligent does not "relate" to the Plans because the claim looks at Defendants'

conduct independent of ERISA. (*Id.* at 61.) The lost opportunity claim also does not relate to ERISA because it does not require extensive analysis of the Plans and instead relies on testimony concerning Altoona's willingness and ability to obtain a distress termination from the PBGC. (*Id.*) Plaintiffs assert that Defendants miss the distinction between claims brought by plan sponsors and claims brought by beneficiaries; while ERISA preempts beneficiary claims, it does not preempt plan sponsor claims. (*Id.* at 62.) Additionally, Plaintiffs assert that preempting their claims serves no ERISA purpose because state law malpractice claims filed by an ERISA plan sponsor do not undermine the congressional policies that underlie ERISA. (*Id.* at 60.) Instead, Defendants' interpretation of ERISA preemption would only immunize Defendants because ERISA does not provide a remedy that would replace the state law malpractice remedy based on these facts. (*Id.*)

### b. Plaintiffs' Claims Do Not Relate to an Employee Benefit Plan

ERISA preempts all state laws insofar as they "relate to any employee benefit plan" that the statute covers. *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 651 (1995) (quoting 29 U.S.C. § 1144(a)). However, a state law does not relate to an ERISA plan if the connection is "too tenuous, remote, or peripheral." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 100 n.21 (1983). In assessing the strength of a connection to an ERISA plan, courts consider: (1) whether the state law represents a traditional exercise of state authority; (2) whether the state law affects relations among the principal ERISA entities—the employer, the plan, the plan fiduciaries, and the beneficiaries—rather than relations between one of these entities and an outside party, or between two outside parties with only an incidental effect on the plan; and (3)

whether the effect of the state law upon the ERISA plan is direct or merely incidental. *Travitz v. Ne. Dep't ILGWU Health & Welfare Fund*, 13 F.3d 704, 709–10 (3d Cir. 1994).

ERISA does not preempt professional malpractice actions brought by a plan sponsor because such actions are unlikely to interfere with plan administration and do not implicate the funding, benefits, reporting, or administration of an ERISA plan. *Kollman v. Hewitt Assocs., LLC*, 487 F.3d 139, 148 (3d Cir. 2007) (citing *Painters of Phila. Dist. Council No. 21 Welfare Fund v. Price Waterhouse*, 879 F.2d 1146, 1153 n. 7 (3d Cir. 1989). However, ERISA preempts malpractice claims brought by plan beneficiaries because ERISA itself contains a civil enforcement scheme for plan beneficiaries. *Id.* at 150 (citing 29 U.S.C. § 1132(a)).

Here, ERISA does not preempt Plaintiffs' malpractice and lost opportunity claims because they do not relate to the administration of an ERISA benefit plan. The mere fact that an ERISA plan is a part of Plaintiffs' claim is not enough to trigger ERISA preemption. Plaintiffs' malpractice claim focuses on Defendants' conduct as actuarial service providers and does not involve the administration of an ERISA plan. Plaintiffs' lost opportunity claim also does not relate to ERISA because it does not require extensive analysis of the Plans; instead it focuses on how the PBGC would have assessed Altoona's distress termination application. Plaintiffs' claims are between an ERISA plan sponsor and a third-party actuary; they do not affect how ERISA plans are administered. Plaintiffs' lost opportunity claim is brought under state contract law, a separate area of law from that which ERISA was intended to regulate. Therefore, ERISA does not preempt Plaintiffs' malpractice and lost opportunity claims.

## C. The Court Denies Defendants' Motion for Summary Judgment as to Plaintiffs' Negligent Misrepresentation Claim

### 1. The Parties' Arguments

Defendants argue that Plaintiffs' negligent misrepresentation claim fails because Defendants lacked actual knowledge that UPMC intended to rely on the Ketzner Report when acquiring Altoona. (ECF No. 178 at 61.) Defendants assert that Pennsylvania law rejects a foreseeability standard, instead requiring a defendant to have actual knowledge of a plaintiff's intended reliance. (*Id.* at 71.) Defendants assert that they lacked actual knowledge of any pending acquisition of Altoona by a third party prior to the public announcement in November 2012 — two months after Defendants issued the Ketzner Report. (*Id.* at 61.) Defendants also maintain that they were unaware that any party other than Altoona would rely on the Ketzner Report. (*Id.* at 63, 74.) Defendants argue that the existence of rumors about Altoona's possible acquisition do not constitute actual knowledge and that there is also no evidence that Defendants heard any rumors about the acquisition before they issued the Ketzner Report. (*Id.* at 70.)

Plaintiffs respond that the Court should not dismiss their negligent misrepresentation claim because they can meet the knowledge burden by showing that Defendants knew that any one of several entities might affiliate with Altoona. (ECF No. 201 at 73.) Plaintiffs contend that Pennsylvania law does not require actual knowledge as part of a negligent misrepresentation claim and that Pennsylvania courts have rejected this requirement for such claims. (*Id.* at 73–74.) Plaintiffs assert that the record shows that there is substantial evidence that Defendants knew of a potential affiliation by Altoona before the public announcement. (*Id.* at 80.) For example, in January 2012, Defendants had an electronic alert for all news related to "Altoona Regional Health

System" and Defendants forwarded press coverage of Altoona to Ketzner. (*Id.* at 81.) Defendants'

files included newspaper articles from March 2012 regarding Altoona's potential affiliation with

two other hospitals and a potential partnership with, or acquisition by, UPMC, Geisinger, or

Highmark. (*Id.* at 82.) In August 2012, Zorger emailed Ketzner and asked for CBIZ actuarial

numbers to be used for a pro forma financial statement to be prepared in connection with "an

affiliation" with Altoona. (*Id.* at 83.) Moreover, Plaintiffs assert that disputed questions of CBIZ's

knowledge of Altoona's affiliation are for the trier of fact. (*Id.* at 72.)

Plaintiffs argue that Defendants' role in UPMC's due diligence in 2013 is an independent

basis for liability because Ketzner was required to be truthful to UPMC and he was not truthful

because he failed to disclose his methodology in the Ketzner Report. (*Id.* at 78.) Plaintiffs assert

that Defendants supplied false information to UPMC because, as part of UPMC's due diligence,

Ketzner submitted the Ketzner Report to UPMC with a written certification that there were no

defects in the Altoona plans, although there were defects in it. (*Id.* at 84-85.) Plaintiffs contend

that Defendants are liable for UPMC's damages because, after UPMC announced the acquisition

November 2012, Defendants did not correct the Ketzner Report before the transaction closed

seven months later. (*Id.* at 78.)

## 2. Plaintiffs Can Show that Defendants Knew Others Outside of Altoona Would Rely on the Ketzner Report

The Pennsylvania Supreme Court has expressly adopted Section 552 of the Restatement

(Second) of Torts ("Section 552") for negligent misrepresentation claims. *See Bilt-Rite Contractors,*

*Inc. v. Architectural Studio*, 866 A.2d 270, 287 (Pa. 2005). To establish liability under Section 552,

a plaintiff must show that: (1) the defendant is in the business of supplying information for the

guidance of others and the information provider has a pecuniary interest in the transaction; (2) the information provided is false; (3) the plaintiff justifiably relied upon the information; and (4) the defendant failed to exercise reasonable care in obtaining or communicating the information. *Excavation Techs., Inc. v. Columbia Gas Co. of Pa.*, 936 A.2d 111, 115–16 (Pa. Super. Ct. 2007), *aff'd*, 985 A.2d 840 (Pa. 2009). The information provider can only be liable to those persons who: (1) the information provider knows exist; (2) are contemplating a specific commercial transaction the information provider knows about; and (3) the information provider intends to influence that transaction by using the provider's information. *Id.* However, an information supplier's liability for negligent misrepresentation does not depend on the supplier's knowledge of the recipient's identity. *Brand Mktg. Grp. LLC v. Intertek Testing Servs., N.A., Inc.*, 801 F.3d 347, 354–55 (3d Cir. 2015) (citing *Bilt-Rite*, 866 A.2d at 286). A plaintiff needs to show only that the information provider knew someone aside from the contracted party would rely on the information. *Id.* at 355. An information provider is liable "where it is foreseeable that the information will be used and relied upon by third persons, even if the third parties have no direct contractual relationship with the supplier of information." *Bilt-Rite*, 866 A.2d at 287.

Here, Plaintiffs have introduced sufficient evidence to show that Defendants knew that Altoona intended to supply the Ketzner Report to other entities and that those other entities would rely on the report's information. Plaintiffs do not need to show that Defendants knew of the UPMC affiliation specifically, but instead only that Defendants knew Altoona was planning an affiliation and that the affiliating party would rely on the Ketzner Report in that transaction. Plaintiffs allege two courses of conduct that make up their negligent misrepresentation claim. First, Plaintiffs assert that Defendants knew that Altoona was planning an affiliation and that a

third party in connection with the affiliation would rely on their report. Specifically, Plaintiffs can show that before the Ketzner Report was issued, and before the UPMC affiliation was officially announced, Altoona asked Ketzner for CBIZ actuarial numbers to be used for a financial statement to be prepared in connection with "an affiliation" with Altoona. Under Section 552, it does not matter that this affiliation discussed was not the UPMC affiliation. Instead what matters is that Plaintiffs can show that Defendants knew that an entity other than Altoona would rely on their actuarial numbers. This evidence is sufficient to satisfy Plaintiffs' burden of production for the knowledge requirement of Plaintiffs' negligent misrepresentation claim.

Second, Plaintiffs assert that Defendants directly provided UPMC with false information when Ketzner sent UPMC the Ketzner Report in connection with its due diligence as part of the Altoona acquisition and certified that it was accurate. Although no contract existed between the parties, Defendants had a duty under Section 552 to not provide UPMC with false information. Plaintiffs can show that Defendants knew that UPMC would use the Ketzner Report in performing its due diligence and that Defendants failed to correct any errors in the Ketzner Report before the UPMC transaction closed. Plaintiffs' evidence of Defendants' knowledge during the due diligence period is also sufficient to satisfy Plaintiffs' burden of production for their negligent misrepresentation claim.

Defendants dispute Ketzner's knowledge of the affiliation and assert that none of the facts Plaintiffs point to can establish his knowledge. However, a party's knowledge is a question of fact for the jury to determine. For the purposes of the Motion, the Court assesses the sufficiency of the evidence introduced by Plaintiffs, not its weight. The Court holds that a jury could find that Defendants knew that entities other than Altoona would rely on the Ketzner Report.

## D. The Court Denies Defendants' Motion for Summary Judgment as to CBIZ, Inc.

### 1. The Parties' Arguments

Defendants argue that CBIZ, Inc., should not be a party in this case because Ketzner was not an agent or employee of CBIZ, Inc., and Plaintiffs do not allege that CBIZ, Inc., took any improper actions. (ECF No. 178 at 78.) Defendants assert that Plaintiffs offer no evidence that CBIZ, Inc., controlled the issuance of Ketzner's actuarial reports. (ECF No. 220 at 55.) CBIZ B&I, not CBIZ, Inc., issued the reports and the contract identified only CBIZ B&I as the contracting entity. (*Id.*)

Plaintiffs respond that CBIZ, Inc., is liable because Ketzner was an agent of both CBIZ B&I and CBIZ, Inc. (ECF No. 201 at 90.) The contract between Altoona and CBIZ, under which Ketzner performed his actuarial work, shows that the "CBIZ" in the contract referred to CBIZ, Inc., because it described the "CBIZ" in the contract as a publicly traded company and CBIZ, Inc., not CBIZ B&I, is a publicly traded company. (*Id.* at 91.) Moreover, representatives of CBIZ, Inc., prepared the contract and received it after it was executed. (*Id.* at 91–92.) The terms of the contract lead to the inference that Ketzner, as part of the "CBIZ Staff," was acting as an agent for CBIZ, Inc. (*Id.*) Plaintiffs assert that there is evidence that Ketzner was an agent of CBIZ, Inc., under three theories of agency: actual authority, apparent authority, and agency by estoppel. (*Id.* at 92–93.) For example, numerous documents authored by both Ketzner and Defendants identify him as being part of CBIZ, Inc., including his personnel files and his bio on the CBIZ website. (*Id.* at 93.) Plaintiffs assert that Altoona and UPMC relied on the fact that CBIZ held itself out as a nationwide, publicly traded company, a characteristic of CBIZ, Inc., not CBIZ B&I. (*Id.* at 94.)

Plaintiffs assert that neither CBIZ, Inc., nor CBIZ B&I supervised Ketzner or provided the peer review of his work that industry standards require. (*Id.*) Even if CBIZ, Inc., did not employ Ketzner, CBIZ, Inc., still had a duty and obligation to ensure that Ketzner's services met basic industry standards. (*Id.* at 95.)

## 2. Plaintiffs Can Show that Ketzner Was an Agent of CBIZ, Inc.

Under Pennsylvania law, the liability of a principal to third parties for the acts of its agent can be established based on either: "(1) express authority, or that which is directly granted; (2) implied authority, to do all that is proper, usual and necessary to the exercise of the authority actually granted; (3) apparent authority, as where the principal holds one out as agent by words or conduct, and (4) agency by estoppel." *Apex Fin. Corp. v. Decker*, 369 A.2d 483, 485 (Pa. Super. Ct. 1976). Whether an agency relationship exists is a question of fact for the jury. *Bolus v. United Penn Bank*, 525 A.2d 1215, 1221 (Pa. Super. Ct. 1987).

Here, a reasonable jury could conclude that Ketzner was an agent of CBIZ, Inc., under a theory of either express authority, apparent authority, and agency by estoppel. Plaintiffs have introduced evidence from which a jury could find that Ketzner had authority to act on behalf of CBIZ, Inc., or that Defendants held him out to Altoona or UPMC as an agent of CBIZ, Inc. The existence of an agency relationship between Ketzner and CBIZ, Inc., is a question of fact for which Plaintiffs have introduced sufficient evidence from which a jury could find a relationship to exist. Because the parties dispute the facts concerning Ketzner's relationship with CBIZ, Inc., the Court cannot grant summary judgment.

## VII. Conclusion

For the forgoing reasons, the Court denies Defendants' Motion.

An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UPMC d/b/a UNIVERSITY OF** | ) | **Case No. 3:16-cv-204** |
| **PITTSBURGH MEDICAL CENTER, and** | ) | |
| **UPMC ALTOONA f/k/a ALTOONA** | ) | **JUDGE KIM R. GIBSON** |
| **REGIONAL HEALTH SYSTEM,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **CBIZ, INC., CBIZ BENEFITS &** | ) | |
| **INSURANCES SERVICES, INC., and** | ) | |
| **JON S. KETZNER,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

AND NOW, this 30th day of January, 2020, upon consideration of Defendants' Motion for

Summary Judgment (ECF No. 177), and for the reasons set forth in the accompanying

Memorandum Opinion, it is **HEREBY ORDERED** that said Motion is **DENIED**.

**BY THE COURT:**

**KIM R. GIBSON
UNITED STATES DISTRICT JUDGE**