IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UPMC d/b/a UNIVERSITY OF PITTSBURGH MEDICAL CENTER, and UPMC ALTOONA f/k/a ALTOONA REGIONAL HEALTH SYSTEM, | ) ) ) ) ) | Case No. 3:16-cv-204 |
| | ) | JUDGE KIM R. GIBSON |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| CBIZ, INC., CBIZ BENEFITS & INSURANCES SERVICES, INC., and JON S. KETZNER, | ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION

### I.    Introduction

This case arises from Plaintiff UPMC's acquisition of Plaintiff Altoona Regional Health System ("Altoona")—an acquisition which, according to Plaintiffs, resulted in millions of dollars in damages from Defendants' negligent understatement of Altoona's pension plan liabilities. Pending before the Court are Defendants' Motion to Exclude Certain Expert Opinions Proffered by Messrs. Galante and Campbell (ECF No. 203), Motion to Exclude Proposed Expert Testimony of Eugene Connors (ECF No. 205), Motion to Exclude Proposed Expert Testimony of John Spencer III and Joshua Gotbaum (ECF No. 207), and Motion to Exclude Proposed Expert Testimony of Neil Demchick (ECF No. 209). The Motions are fully briefed (ECF Nos. 204, 206, 208, 210, 225–28, 241–44) and ripe for disposition. For the reasons that follow, the Court **DENIES** Defendants' Motions.

II.     **Jurisdiction and Venue**

This Court has subject-matter jurisdiction because the parties are diverse and the amount in controversy exceeds $75,000. 28 U.S.C. § 1332(a). Venue is proper because a substantial part of the events giving rise to Plaintiffs' claims occurred in the Western District of Pennsylvania. 28 U.S.C. § 1391(b)(2).

III.    **Factual Background[1]**

A.  **UPMC's Acquisition of Altoona**

In November 2012, UPMC and Altoona officially announced that UPMC planned to acquire Altoona. (ECF No. 252 at 2.) The deal closed on July 1, 2013, when UPMC became the parent and sole corporate member of Altoona, which became UPMC Altoona. (*Id.*) UPMC Altoona operates health-care facilities in Blair County, Pennsylvania and the surrounding area. (*Id.*) UPMC operates health-care facilities in and around Pittsburgh, Pennsylvania. (*Id.*)

B.  **Altoona's Retirement Benefit Plans**

Altoona sponsored two qualified defined benefit pension plans,[2] known as the Retirement Plan for the Bargaining Unit Employees of the Altoona Regional Health System ("BU Plan") and the Retirement Plan for the Non-Bargaining Unit Employees of the Altoona Regional Health System ("NBU Plan") (collectively, the "Plans"). (*Id.*) The Plans are governed by the Employee Retirement Income Security Act ("ERISA"), which specifies the amount that a pension plan sponsor must contribute to its pension plan on a yearly basis. (*Id.*)

---

[1] The Court recites these facts from its Memorandum Opinion and Order Denying Summary Judgment. (ECF No. 252.) A more detailed description of the factual background of this case can be found there.
[2] A defined benefit plan promises to pay a set benefit to an employee once the employee reaches normal retirement age. In contrast, a defined contribution plan promises to make a set contribution for the employee's benefit, which may be withdrawn at normal retirement age.

On July 1, 2013, the BU Plan and NBU Plan merged to form the Retirement Plan for Employees of the Altoona Regional Health System. (*Id.* at 3.) On July 1, 2013, UPMC Altoona became the Plans' sponsor and on December 31, 2014, UPMC merged the Plans into UPMC's own defined benefit pension plan known as the UPMC Basic Retirement Plan. (*Id.*)

### C. CBIZ's Actuary Services

Until his retirement in early 2015, Defendant Jon Ketzner was an actuary employed by Defendant CBIZ Benefits & Insurance Services, Inc. ("CBIZ B&I"), in Cumberland, Maryland. (*Id.* at 5.) Ketzner provided actuarial services related to the Plans to Altoona from the early 1990s through July 1, 2013, and to UPMC Altoona from July 1, 2013, until his retirement in January 2015. (*Id.*) Upon Ketzner's retirement, another CBIZ B&I actuary named Al Winters took over responsibility for the UPMC Altoona client relationship. (*Id.*)

One of the services that Ketzner provided to Altoona was preparing an annual accounting report, or GAAP report, which estimated Altoona's pension funding obligations for a particular plan year.[3] (*Id.* at 6.) On September 17, 2012, CBIZ issued an accounting report to Altoona for plan year 2011 (the "Ketzner Report"). (*Id.*)

In February 2015, Winters began to calculate, according to UPMC's funding policy, UPMC Altoona's funding obligation regarding the Plans for plan year 2013. (*Id.* at 9.) Winters calculated this amount to be greater than Ketzner's 2014 estimate. (*Id.*) Winters disclosed this discrepancy to UPMC within a week of his preliminary calculation. (*Id.*) At UPMC's request, Winters recalculated the funding requirements that Ketzner had provided to Altoona and UPMC for plan

---

[3] A plan year runs from July 1 of that year until June 30 of the following year. For example, plan year 2008 ran from July 1, 2008, to June 30, 2009.

years 2008 to 2012. (*Id.*) Winters's revised calculations showed increased ERISA funding requirements (the "Revised Pension Funding Obligation"). (*Id.*)

## IV.    Procedural Background

On September 16, 2016, Plaintiffs filed their three-count Complaint (ECF No. 1) with the Court, alleging claims of (1) professional negligence, (2) breach of contract, and (3) negligent misrepresentation against Defendants.  On September 10, 2019, Defendants moved for summary judgment (ECF No. 177), which the Court denied on January 30, 2020.  (ECF No. 252.)

On October 24, 2019, Defendants filed four Motions to exclude trial testimony: Motion to Exclude Certain Expert Opinions Proffered by Messrs. Galante and Campbell (ECF No. 203), Motion to Exclude Proposed Expert Testimony of Eugene Connors (ECF No. 205), Motion to Exclude Proposed Expert Testimony of John Spencer III and Joshua Gotbaum (ECF No. 207), and Motion to Exclude Proposed Expert Testimony of Neil Demchick (ECF No. 209).  Plaintiffs responded in opposition to the four Motions on December 5, 2019 (ECF Nos. 225–28), to which Defendants replied on January 9, 2020.  (ECF Nos. 241–44.)  The Court held argument on the Motions to Exclude the Expert Testimony of Gotbaum and Spencer and Demchick on February 12, 2020.  (ECF No. 257.)

## V.    Legal Standard

Under the Federal Rules of Evidence, a trial judge acts as a "gatekeeper" to ensure that "any and all expert testimony or evidence is not only relevant, but also reliable." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008) (quoting *Kannankeril v. Terminex Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997)).  Therefore, when a party seeks to admit expert testimony, the Court must make a preliminary determination that the proffered expert meets the requirements of Rule 702.

*Magistrini v. One Hour Martinizing Dry Cleaning*, 68 F. App'x 356, 356 (3d Cir. 2003) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993)).  After the proffered expert has been found by the Court to qualify as an expert, the expert is permitted under Rule 702 to testify in the form of an opinion if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702(a).

The Third Circuit has interpreted Rule 702 as having three major requirements.  *Pineda*, 520 F.3d at 244.  First, the proffered witness must be qualified as an expert.  *Id.*  Second, the expert must testify about matters requiring scientific, technical, or specialized knowledge and base his or her opinions on reliable processes and techniques.  *Id.*  Third, the expert's testimony must assist the trier of fact.  *Id.*  The party offering the expert must prove each of these requirements by a preponderance of the evidence.  *Mahmood v. Narciso*, 549 F. App'x 99, 102 (3d Cir. 2013) (citing *In re TMI Litig.*, 193 F.3d 613, 663 (3d Cir. 1999)).

Rule 702 has "a liberal policy of admissibility."  *Pineda*, 520 F.3d at 243 (citing *Kannankeril*, 128 F.3d at 806).  Exclusion of expert testimony is the exception rather than the rule because "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  Fed. R. Evid. 702 advisory committee's note to 2000 amendment (citing *Daubert*, 509 U.S. at 595).

## VI.    Discussion

Defendants primarily challenge Plaintiffs' proposed experts on the basis of their opinions' reliability.  The test of an expert opinion's reliability is "flexible" and the trial court has "broad latitude" in deciding both how to determine whether an opinion is reliable and whether it is, in fact, reliable.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 142 (1999).  Generally, courts examine whether the expert testimony is based upon the "methods and procedures of science" rather than on "subjective belief or unsupported speculation" and that the expert has "good grounds" for his opinion.  *Calhoun v. Yamaha Motor Corp.*, 350 F.3d 316, 321 (3d Cir. 2003).  The reliability standard under Rule 702 is not a "merits standard of correctness," meaning that the Court should not exclude an expert opinion solely because the Court identifies some flaws in the expert's methodology.  *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 83 (3d Cir. 2017).  Rather, the Court should exclude an expert's opinion if the Court finds "too great an analytical gap between the data and the opinion proffered."  *I.B.E.W. Local Union 380 Pension Fund v. Buck Consultants*, No. 03-cv-4932, 2008 WL 2265269, at *2 (E.D. Pa. June 3, 2008).

### A.    The Court Denies Defendants' Motion to Exclude the Testimony of Daniel Galante and Robert Campbell

#### 1.    Galante and Campbell's Backgrounds and Proposed Testimony

Plaintiffs offer Daniel Galante as an expert in due diligence.  (ECF No. 226 at 3.)  Galante has more than 25 years of experience as an advisor in more than 700 buy or sell-side transactions. (*Id.*)  He is a Certified Public Accountant ("CPA") and currently a Managing Director for Berkley Research Group.  (*Id.*)  Galante has performed due diligence on hundreds of occasions, including numerous transactions involving defined benefit pension plans.  (*Id.* at 4.)

Galante will testify that: (1) UPMC used reasonable and appropriate procedures when conducting its due diligence of Altoona's pension plans in general, and specifically related to its pension liabilities; (2) the "red flags" Defendants' experts identify were either properly addressed by UPMC in its due diligence process or not red flags at all; and (3) the expanded due diligence procedures Defendants' experts suggest—namely, the buyer doing an independent valuation of the seller's pension plan—are procedures that he has not seen actuaries perform in practice. (*Id.*)

Plaintiffs offer Robert Campbell as an actuarial and due diligence expert. (*Id.*) Campbell has 35 years of professional experience as a senior pension actuary with Aon Hewitt and has served as the lead actuary in performing due diligence services for approximately 100 mergers and acquisitions for a variety of pension plan sponsors. (*Id.* at 4–5.)

Campbell will testify that: (1) the work CBIZ did for the Altoona Plans while Ketzner was the lead actuary was materially incorrect and fell below the applicable standards of the industry; (2) by not disclosing Ketzner's true assumptions and methods used to produce the valuation results, CBIZ prevented UPMC from discovering the errors in the reports through reasonable means and this failure gave UPMC no reason to question the information published in the reports; (3) because of CBIZ's failure to disclose the true assumptions and methods employed, it would not have been reasonable for UPMC to identify the errors in Altoona's actuarial reports; and (4) UPMC met industry standards in its due diligence on the Altoona Plans. (*Id.* at 5.)

## 2. The Parties' Arguments

Defendants argue that the Court should exclude Galante and Campbell's opinions that an acquirer like UPMC would accept Altoona's actuarial report as fact because their opinions are unreliable. (ECF No. 204 at 2.)  Galante is not qualified to offer an expert opinion because he has

no due diligence experience upon which to base his opinion; he has not been involved in any due diligence involving a defined benefit plan since 2016 and has no recollection of the scope of due diligence usually performed by an acquirer like UPMC. (*Id.* at 4–5.)

Campbell's opinion is unreliable because his opinion that an acquirer usually takes the pension liability amount from the seller's actuarial report as fact contains too many exceptions. (*Id.* at 6.) Although Campbell bases his opinion on personal experience, he does not explain how that experience is a sufficient basis for his opinion. (*Id.*) Campbell provides no criteria for when buyers should perform their own independent valuations instead of relying on the seller's actuary's report. (*Id.* at 7–8.) Instead, Campbell categorizes instances of independent valuations as non-exhaustive exceptions to his opinion. (*Id.*) This kind of methodology is unreliable because it allows Campbell to provide a biased, results-oriented opinion by casting contrary evidence aside as an exception to his method. (*Id.* at 9.)

Additionally, Galante and Campbell's opinions are unreliable because they are premised on a condition that did not occur in this case. (*Id.* at 10.) Both Galante and Campbell assume in their opinions that Altoona's auditor brought in a separate actuary to check Ketzner's calculation, which Altoona did not do, making Galante and Campbell's opinions unreliable. (*Id.* at 11.)

Plaintiffs respond that the Court should not exclude Galante and Campbell's opinions because they are reliable. (ECF No. 226 at 2.) Galante's opinion is reliable because he based it on transactions he was involved in and his experience as a CPA and auditor. (*Id.* at 9.) Galante worked on defined benefit pension plans in 2013, the same time that UPMC's due diligence was performed in this case, and therefore has experience from the relevant time period. (*Id.*)

Campbell's opinion is reliable because it is firmly supported by his experience. (*Id.* at 11.) Campbell's opinion that an independent valuation of Altoona's pension liability was not necessary in this case is a matter of weight to be given to the opinion, not its admissibility, because there are no formal standards for due diligence; it is instead tailored to the particular facts and circumstances of a transaction. (*Id.* at 12.)  Campbell will explain that additional diligence was unwarranted in Altoona's case because the material assumptions and methods disclosed in CBIZ's actuarial reports appeared reasonable. (*Id.* at 13.)

Finally, Plaintiffs assert that Galante's and Campbell's opinions do not rest on a non-existent precondition—that Altoona's auditor brought in a separate actuary to check Ketzner's calculation—because they did not make that assumption. (*Id.* at 15.)  Bringing in another actuary is a procedure for analyzing pension liabilities, not for performing due diligence. (*Id.*)  The fact that Altoona did not bring in another actuary to conduct due diligence in this case is a matter of the testimony's weight, not its admissibility. (*Id.* at 16.)

### 3. Galante and Campbell's Opinions Are Admissible Because They Are Qualified to Offer Expert Opinions and Those Opinions Are Reliable

The Court holds that Galante and Campbell are qualified to offer expert opinions and that their opinions are reliable.  Galante and Campbell's specialized knowledge in due diligence qualifies them to offer expert opinions.  Galante has 25 years of experience as an advisor in hundreds of acquisitions and Campbell has 35 years of experience as a pension actuary who performed due diligence services for approximately 100 acquisitions.  Both Galante and Campbell have developed specialized knowledge in due diligence over the years and this experience is an adequate basis upon which they could form expert opinions.  *See Houston v. Smith*, No. 3:09-cv-

190, 2010 WL 4628442, at *2 (W.D. Pa. Nov. 5, 2010) (holding that a proposed expert's years of practical experience in the trucking industry qualified him to offer expert opinions in that field).

Galante and Campbell reliably applied their methodologies to the facts of the case because their opinions are reliably based on their specialized knowledge in due diligence. Courts examine the reliability of expert opinions based on specialized knowledge differently from those that are based on scientific knowledge. *Id.* at *4. For example, expert opinions based on specialized knowledge need not be based on testing or experiments. *Id.* Courts examine whether the proposed opinion would be reliable or trustworthy in light of the expert's practical background and training. *Id.* Both Galante and Campbell reliably explain how their opinions stem from their experience in the field of due diligence. Their experience provides an adequate foundation for their opinions to be reliable. *See, e.g., Lauria v. Nat'l R.R. Passenger Corp.*, 145 F.3d 593, 597–98 (3d Cir. 1998) (holding that a railroad foreman's years of experience in railroad maintenance provided a reliable foundation for him to offer an expert opinion about a railroad company's maintenance and inspection duties and procedures). Because Galante and Campbell reliably relied on their specialized knowledge, their methodology is reliable.

Defendants' objections to Galante and Campbell's opinions are not appropriate bases for exclusion. First, the fact that Campbell identified exceptions to his opinion does not render it unreliable. His exceptions were not "ad hoc adjustments" to his methodology that would warrant exclusion because he explained that the exceptions were in rare, unusual cases. *In re Zoloft (Sertraline Hydrochloride) Prod. Liab. Litig.*, 858 F.3d 787, 799 (3d Cir. 2017). Further examination of Campbell's exceptions can be accomplished through cross examination. Second, a factual dispute over whether Galante and Campbell premised their opinions on the fact that Altoona brought in

an outside auditor is not a basis for exclusion.  The factual basis of an expert opinion goes to the credibility of the testimony, not its admissibility.  *Guy Chem. Co., Inc. v. Romaco Inc.*, No. 3:06-cv-96, 2009 WL 10690008, at *3 (W.D. Pa. Oct. 26, 2009).  The parties will be able to examine which facts Galante and Campbell relied upon to form their opinions through direct or cross examination.

Accordingly, the Court denies Defendants' motion to exclude Galante and Campbell's testimony.

**B. The Court Denies Defendants' Motion to Exclude the Testimony of Eugene Connors**

### 1.  Connors' Background and Proposed Testimony

Plaintiffs offer Eugene Connors as an expert in labor negotiations.  (ECF No. 225 at 2.) Connors practiced labor law for 45 years and is a former partner of the law firm Reed Smith LLP. (*Id.*)  He has negotiated hundreds of collective bargaining agreements and multiple freezes of pension benefit plans.  (*Id.*)

Connors will testify that if Altoona had known the true extent of its pension funding obligations in 2009, Altoona's unions would have agreed: (1) not to contest a January 2010 hard freeze of the BU Plan; (2) to replace that defined benefit pension plan with an expanded defined contribution plan (also known as a 403(b) plan); and (3) to support a distress termination of their union defined benefit pension plan by the Pension Benefit Guaranty Corporation ("PBGC") to best protect their members' pension benefits.  (*Id.* at 3.)  Connors will also testify that Altoona and its unions would have reached an agreement in time for Altoona to file for a distress termination in the fall of 2011.  (*Id.*)

### 2.   The Parties' Arguments

Defendants assert that the Court should exclude Connors' testimony that Altoona's unions would have consented to a hard freeze of their members' pension benefits and a termination of the Plans because Connors is not qualified to offer an expert opinion and, even if he was qualified, his opinion is unreliable. (ECF No. 206 at 2.)  Connors is not qualified to offer an expert opinion because he is a fact witness testifying about the relationship between Altoona and its unions—a relationship in which he participated as Altoona's labor lawyer. (*Id.* at 4.)  His opinion is not admissible expert testimony because it is based solely on his own experience. (*Id.* at 7.)

Defendants also argue that Connors' opinion is unreliable because he employed no discernible methodology. (*Id.* at 8.)  Connors did not describe his methodology in his report and based his opinion solely on his own subjective view of the unions' mindset. (*Id.* at 8–9.)  Connors' experience negotiating on behalf of Altoona with the unions is an insufficient basis for him to speculate about what might have happened between Altoona and its unions. (*Id.* at 10–11.)

Finally, Defendants assert that Connors' opinion is unreliable because he has an impermissible bias in favor of Plaintiffs. (*Id.* at 12.)  As Altoona's former lawyer and advocate for 30 years, Connors is biased in favor of Plaintiffs and cannot be an objective expert witness. (*Id.*)  Connors' bias prevents him from being objective and disqualifies him from testifying because experts must be objective in order to give an expert opinion. (*Id.* at 13.)

Plaintiffs respond that Connors is qualified to offer an expert opinion because his testimony is based on his extensive experience in labor negotiations, beyond his experience working for Altoona. (ECF No. 225 at 2.)  Defendants do not dispute that Connors is an expert in

labor negotiations and he is therefore qualified to testify as an expert witness. (*Id.* at 8.) Connors' personal experience in this case does not preclude him from testifying as an expert because the Rules of Evidence allow an expert to form an opinion based on his own personal knowledge. (*Id.* at 9.)

Next, Connors' methodology supporting his opinion is reliable because it is based on his experience as a collective bargaining negotiator. (*Id.* at 11.)  Experts may answer hypothetical questions and hypotheticals are at the core of Connors' opinions. (*Id.* at 12.)  Connors relied on his years of experience negotiating hundreds of collective bargaining agreements and multiple pension benefit plan freezes to form his opinion about what was likely to happen if Altoona had implemented a hard freeze of its plans. (*Id.*)  Specifically, Connors bases his opinions on his analysis of the history of negotiations between Altoona and the unions, the contractual remedies and leverage available to the parties, and the parties' past practices in negotiations. (*Id.* at 13.)  In addition to his own personal knowledge and involvement with Altoona, Connors also relies on the reports of the other proposed experts to understand Altoona's financial situation. (*Id.* at 12.)

Finally, questions surrounding Connors' bias are issues of credibility to be determined by the jury and are not grounds for exclusion. (*Id.* at 15.)

### 3. Connors' Opinion Is Admissible Because He Is Qualified to Offer an Expert Opinion and that Opinion Is Reliable

The Court holds that Connors is qualified to offer an expert opinion through his specialized knowledge in labor negotiations and his opinion is reliable.  An expert may base his opinion on facts that the expert has been made aware of or personally observed. Fed. R. Evid. 703; *see also Haines v. Davies*, No. 1:07-cv-851, 2009 WL 331433, at *3 (M.D. Pa. Feb. 9, 2009) (noting

that a witness can provide both lay and expert testimony).  Connors practiced labor law for 45 years and served as Altoona's collective bargaining negotiator at the time of the UPMC affiliation and personally observed the relationship between Altoona and its unions.  Therefore, Connors can rely on his personal experience as a labor lawyer as a basis for his expert opinion.

The Court also holds that Connors employed a reliable methodology to form his opinion.  Connors used his specialized knowledge as a labor negotiator as the basis for his opinion.  He examined the relationship between Altoona and its unions and applied his experience as a labor negotiator to determine how Altoona and its unions might approach a plan termination scenario.  Connors' opinion is reliable in light of his practical background as a labor lawyer.  *Houston*, 2010 WL 4628442, at *4; *see also United States v. Long-Payton*, No. 3:08-cr-07, 2015 WL 2345615, at *5 (W.D. Pa. May 15, 2015) (holding that a government agent could offer expert testimony regarding drug trafficking operations based on his years of experience and training in narcotics investigation).  Defendants may explore whether Connors' opinion deserves any weight through cross examination.

Finally, the Court holds that any bias Connors may have for Plaintiffs is not a basis for exclusion.  Expert witnesses cannot be excluded solely on the basis of bias.  *In re Unisys Sav. Plan Litig.*, 173 F.3d 145, 166 n.11 (3d Cir. 1999).  Expert witnesses are not required to be objective and without bias in order to offer expert opinions.  *See* Fed. R. Evid. 702.  Objectivity is not a requirement for expert testimony because all experts have some form of bias, and the jury may take such bias into account when evaluating the credibility of the expert's testimony.  *Weirich v. Horst Realty Co., LLC*, No. 07-cv-871, 2009 WL 920960, at *3 (E.D. Pa. Mar. 30, 2009).  Defendants may explore Connors' bias through cross examination.

Accordingly, the Court denies Defendants' motion to exclude Connors' testimony.

### C. The Court Denies Defendants' Motion to Exclude the Opinions and Testimony of John Spencer and Joshua Gotbaum

Defendant argues that the Court should exclude four parts of Spencer and Gotbaum's expert opinions because those opinions are unreliable: (1) that the PBGC would have granted Altoona a distress termination; (2) that the PBGC would have granted Altoona that distress termination at any point between 2009 and 2013; (3) that the PBGC would have settled its claim against Altoona for 15 percent of the pension liability; and (4) general testimony regarding the PBGC's distress termination process. The Court addresses each in turn.

#### 1. Spencer and Gotbaum's Backgrounds and Proposed Testimony

Plaintiffs offer John Spencer and Joshua Gotbaum as PBGC experts. (ECF No. 227 at 8.) Spencer was the PBGC's Director of Corporate Finance from 1992 to 2006. (*Id.*) Since then, he has worked as an advisor to financially distressed companies, typically those with defined benefit pension plans, like Altoona's. (*Id.*) Gotbaum was the PBGC's Director and CEO from 2010 to 2014 and had previously worked in investment banking and business restructuring. (*Id.*)

Spencer and Gotbaum will testify that the PBGC would have granted Altoona's application for a distress termination if the true extent of Altoona's pension liabilities had been known before its 2013 affiliation with UPMC. (*Id.*) Spencer will also explain that, after granting Altoona a distress termination, the PBGC would have assumed Altoona's unfunded pension liability and then "settled" its statutory claim against Altoona for 15 percent of the unfunded liability. (*Id.*) This would result in a note payable to the PBGC (the "PBGC Note") of $28.3 million or $29.7 million if the Plans were terminated as of June 30, 2012, or June 30, 2013, respectively.

(*Id.*)  Gotbaum will also testify generally about the PBGC's distress termination process.  (*Id.* at 42.)

### 2.   Spencer and Gotbaum's Opinions that the PBGC Would Have Granted Altoona a Distress Termination Are Admissible

#### a.   The Parties' Arguments

Defendants assert that Spencer and Gotbaum's opinions that the PBGC would have granted a distress termination to Altoona are unreliable for four reasons.  (ECF No. 208 at 13.) First, Spencer and Gotbaum improperly offer a legal opinion that Altoona would have met ERISA's legal standard for a distress termination.  (*Id.* at 16.)  Specifically, they cannot testify about the PBGC's criteria for a distress termination, how the PBGC interprets and applies these criteria, or whether the PBGC would have granted Altoona's application for a distress termination because allowing this testimony would usurp the role of the Court and the jury.  (*Id.* at 17–18.)

Second, Defendants assert that Spencer and Gotbaum's opinions are unreliable because they considered factors that favored a distress termination for Altoona which are not listed in ERISA, its implementing regulations, or in PBGC guidance.  (*Id.* at 19.)  These factors include the fact that Altoona was a non-profit and a healthcare provider, as well as the fact that Altoona would have laid off employees without PBGC intervention.  (*Id.* at 18–19.)  Spencer and Gotbaum's opinions are unreliable and unhelpful to the jury because the PBGC would not have considered these factors.  (*Id.* at 20.)  For Altoona to receive PBGC relief, it must show that it would have been forced to liquidate but for the distress termination, and Spencer and Gotbaum's opinions do not support that Altoona would have liquidated.  (*Id.* at 19.)  Spencer and Gotbaum

do not provide support for applying their additional factors and their opinions are the result of "say-so" expert methodology. (*Id.* at 22–23.)

Third, Defendants argue that the methodology underlying the experts' opinions is not reliable because Spencer and Gotbaum's methodology in assessing a PBGC application is less rigorous than the PBGC's. (*Id.* at 31.) Specifically, the experts failed to analyze: (1) how each professional on the PBGC's application review team would have assessed the hypothetical application; (2) Altoona's capability to restructure and cut costs; and (3) how the existence of potential buyers would have affected the PBGC's assessment of Altoona's application. (*Id.* at 32–34.)

Fourth, Defendants contend that Spencer and Gotbaum's distress termination opinion is unreliable because it relies on a flawed cash-flow analysis. (*Id.* at 36.) This analysis, which shows that Altoona was in financial distress when it would have applied for a distress termination is not based on a reliable methodology because it ignores Altoona's available unrestricted cash and uses erroneous data. (*Id.* at 36.) Spencer and Gotbaum's data was erroneous because they relied on Plaintiffs' actuarial expert John Lin's data about Altoona's minimum pension funding contributions for a five-year period but failed to account for errors in Lin's projections—errors which Lin later admitted he made. (*Id.* at 38.) By relying on erroneous data that overstated the funding requirements, Spencer and Gotbaum improperly increased Altoona's projected pension funding liabilities. (*Id.* at 39.) Moreover, Spencer and Gotbaum did not compare Lin's required minimum contributions figure with Altoona's actual funding contributions over the same period. (*Id.*) The actual contributions show that Altoona contributed more into the Plans than what

Spencer and Gotbaum had calculated, rendering their opinion unbelievable and unreliable because it is contradicted by what actually occurred. (*Id.* at 40.)

Plaintiffs respond that Spencer and Gotbaum's opinions as to whether the PBGC would have granted Altoona a distress termination are reliable. (ECF No. 227 at 12.) Although statutes and regulations shape the PBGC's customs and practices, this does not mean that Spencer and Gotbaum's opinions as to those customs and practices are legal conclusions. (*Id.*) Spencer and Gotbaum will testify about the PBGC's custom and practice in evaluating a distress termination application and whether Altoona would have met the PBGC's criteria, which is a factual conclusion, not a legal one. (*Id.* at 14.) This testimony would be helpful to the jury, who would have to determine whether Altoona would have received PBGC relief. (*Id.*)

Next, Plaintiffs assert that Spencer and Gotbaum were not required to analyze whether Altoona would have liquidated without PBGC relief because liquidation is not a requirement for obtaining a distress termination. (*Id.* at 16.) No statute or regulation requires a showing that but for a distress termination, the applicant will have to liquidate to obtain PBGC relief; liquidation is a sufficient, but not a necessary, condition to obtaining relief. (*Id.* at 17.) The PBGC has broad discretion in determining whether a plan sponsor will be unable to continue in business but for termination of the plan and does not base its decision solely on a formulaic evaluation of an applicant's financials. (*Id.*) Spencer and Gotbaum both used their experience with the PBGC to opine that the PBGC would have weighed the fact that Altoona was a non-profit healthcare provider and that it would have had to lay off workers without relief in favor of granting relief. (*Id.* at 18.) Gotbaum has good grounds for his opinion that the PBGC would have considered these factors because of his experience as PBGC Director during the relevant time period and his

experience with pensions in the private sector. (*Id.* at 19.) Spencer and Gotbaum are not required to opine that Altoona would have liquidated absent the PBGC granting a distress termination. (*Id.* at 20–21.) Instead, they will testify that bankruptcy restructuring would have been the likely alternative without PBGC relief. (*Id.*)

Plaintiffs argue that it does not matter if Spencer and Gotbaum's methodology in assessing a distress termination application is "less rigorous" than the PBGC's methods because their opinions do not need to mirror a full PBGC review to be admissible. (*Id.* at 28.) Spencer and Gotbaum are familiar with the PBGC's operational practices and decision making and relied on Altoona's finances in forming their opinions. (*Id.* at 29.) Spencer and Gotbaum did not ignore the potential for Altoona to restructure or cut costs, as they both opined that Altoona could not take on additional debt, relying on business records that showed Altoona could not have resolved such a large financial deficit through corporate restructuring alone. (*Id.* at 30.)

Next, Plaintiffs assert that Spencer and Gotbaum's cash flow analysis is reliable and that Defendants' objections to two components of the cash flow analysis—Altoona's available cash and its required minimum pension contributions—are matters of weight not admissibility. (*Id.* at 32.) As to Altoona's available cash, Spencer and Gotbaum did not ignore Altoona's cash on hand and ability to raise cash through debt financing, as Defendants' assert, because Altoona did not have significant, available, unrestricted cash. (*Id.* at 33.) Spencer and Gotbaum concluded that the possibility of Altoona raising additional cash through bond issuances would not have affected the PBGC's decision to grant Altoona a distress termination. (*Id.* at 34.) Defendants simply disagree with Spencer and Gotbaum on how the PBGC would have evaluated Altoona's cash position, which is not a basis to exclude their testimony. (*Id.* at 35.) As to the pension

contributions, Lin's change in his calculations does not affect Spencer and Gotbaum's opinions because it did not alter the fact that the required minimum contributions would still have placed Altoona in financial distress. (*Id.* at 36.) The savings Lin calculated from the hard freeze of Altoona's pension plans are counterbalanced by the costs of the 403(b) replacement plan Altoona would have funded. (*Id.*) For their opinions to be reliable, Spencer and Gotbaum are not required to compare their required minimum pension contributions calculation to Altoona's actual funding contribution for that period; that is a matter of the opinion's weight. (*Id.* at 37–38.)

### b. Spencer and Gotbaum's Opinion that the PBGC Would Have Granted Altoona a Distress Termination Is Reliable

The Court holds that Spencer and Gotbaum's opinion that the PBGC would have granted Altoona a distress termination is reliable. Spencer and Gotbaum can offer expert opinions regarding the PBGC, even though their opinions are shaped by statutes. The mere fact that an expert's testimony is influenced by statutes or regulations does not render the testimony inadmissible. *Gallatin Fuels, Inc. v. Westchester Fire Ins. Co.*, 410 F. Supp. 2d 417, 421 (W.D. Pa. 2006). Expert witnesses may testify about business customs and practices and how regulatory schemes operate. *United States v. Leo*, 941 F.2d 181, 196 (3d Cir. 1991); *Rowland v. Novartis Pharm. Corp.*, 9 F. Supp. 3d 553, 561 (W.D. Pa. 2014). Spencer and Gotbaum's opinions attempt to answer a question of fact, not law—namely, would the PBGC have granted Altoona a distress termination—and are therefore not legal opinions. Spencer and Gotbaum will testify to a hypothetical that involves a statutory scheme, which is distinguished from whether a party violated a statute or regulation, which would be impermissible. *Hartle v. FirstEnergy Generation Corp.*, No. 08-cv-1019, 2014 WL 5089725, at *4 (W.D. Pa. Oct. 9, 2014). Rather than determining

whether Altoona complied with a statute, the jury, in assessing damages, must determine whether Altoona could have obtained a distress termination from the PBGC.

Spencer and Gotbaum also employ a reliable methodology for concluding that the PBGC would have granted Altoona a distress termination. According to Spencer and Gotbaum, the PBGC, in practice, does not rely on a formulaic recitation of an applicant's financials in determining whether to terminate a pension plan. Based on their experience with the PBGC, they conclude that the PBGC would have considered the fact that Altoona was a non-profit healthcare provider and that not granting a distress termination could lead to significant layoffs. A mere difference in opinion between Spencer and Gotbaum's opinion and Defendants' experts' opinion on this issue does not render Spencer and Gotbaum's opinion unreliable. Conflicting testimony between witnesses creates a question of fact for the jury—it does not render either witness's testimony inadmissible. *Leo*, 941 F.2d at 196. Additionally, even if it was incorrect for Spencer and Gotbaum to rely on these factors, their testimony would still be reliable. *See Buck Consultants*, 2008 WL 2265269, at *2 (holding that an expert's opinion was admissible even though the expert admitted that he relied on incorrect assumptions or made factual errors because these errors are properly the subject of cross examination). Whether Spencer and Gotbaum's methodology differs from Defendants' experts' methodology and therefore may deserve less weight is a subject for cross examination.

The fact that Spencer and Gotbaum did not employ a but for liquidation test has no impact on their methodology's reliability because Plaintiffs do not need to show that for Altoona to obtain a distress termination, Altoona would have to establish that but for a distress termination, Altoona would have been forced to liquidate. For an ERISA plan sponsor to obtain relief from

the PBGC, the sponsor must show that it would have been unable to pay its debts when due and unable to continue in business.  29 U.S.C. § 1341(c)(2)(B)(iii)(I).  This distress termination test does not impose a but for liquidation test on the plan sponsor.  Whether the PBGC applies a but for liquidation test is a factual issue to be determined by the jury.

Additionally, Spencer and Gotbaum's methodology does not need to mirror a full PBGC review to be admissible.  Whether Spencer and Gotbaum failed to account for all of the potential actors at the PBGC is a potential defect in the factual basis for an opinion, not its methodology. Disputes over the factual basis of an expert opinion go to the credibility of the testimony, not its admissibility.  *Guy Chem. Co.,* 2009 WL 10690008, at *3.  Differences between Spencer and Gotbaum's methodology and the PBGC review process can be explored on cross examination.

Nor does Spencer and Gotbaum's cash flow analysis render their opinions unreliable. Defendants' objections to Spencer and Gotbaum's cash flow analysis concern their opinions' weight, not their admissibility.  The question of whether an expert properly performed calculations or interpreted their results ordinarily goes to the weight of the evidence, not to its admissibility. *Karlo,* 849 F.3d at 83.  Therefore, even if Spencer and Gotbaum incorrectly ignored Altoona's cash position, which the parties dispute, their opinions would nevertheless be admissible.  Likewise, even if Spencer and Gotbaum did not account for Lin's changed calculations, which the parties also dispute, Lin's changes would not affect the admissibility of Spencer and Gotbaum's opinion.  *See Buck Consultants,* 2008 WL 2265269, at *2.  Defendants' objections to Spencer and Gotbaum's cash flow analysis concern the weight of their overall opinions, which can be explored through cross examination.

Accordingly, the Court denies Defendants' motion to exclude Spencer and Gotbaum's opinion that the PBGC would have granted Altoona a distress termination.

### 3. Spencer and Gotbaum's Opinion that Altoona Could have Received a Distress Termination Between 2009 and 2013 Is Admissible

#### a. The Parties' Arguments

Defendants argue that the Court should exclude Spencer and Gotbaum's opinion that the PBGC would have granted Altoona a distress termination at any point between 2009 and 2013 because this opinion is not tied to any analysis they performed and relies on Lin's erroneous calculations. (*Id.* at 25–26.) Spencer and Gotbaum, using data from 2011, originally opined that Altoona would have received PBGC relief on June 30, 2012; they then changed their opinion, saying that the PBGC would have granted Altoona relief from any time between 2009 and July 1, 2013 without providing any additional analysis. (*Id.*) The date when Altoona would have received a distress termination matters because Altoona's pension funding obligations varied during that period, impacting the amount of Altoona's damages. (*Id.* at 29.)

Plaintiffs respond that Spencer and Gotbaum's opinions on the date of the distress termination are reliable because they are based on assumptions fully supported by the record. (ECF No. 227 at 23.) The hypothetical timeline they evaluated is reasonably specific and fits the facts of the case. (*Id.*) Spencer and Gotbaum can testify to a range of possible outcomes regarding the termination date. (*Id.* at 24–25.) The fact that these dates affect the damages calculation does not render the opinions unreliable. (*Id.*) Defendants' objection to the assumptions on which Spencer and Gotbaum based their opinion is not a reason to exclude their opinion. (*Id.* at 26.)

      **b.  Spencer and Gotbaum's Opinion About the Timing of When the PBGC Would Have Granted Altoona a Distress Termination Is Reliable**

The Court holds that Spencer and Gotbaum's opinion that the PBGC would have granted Altoona a distress termination at any point between 2009 and 2013 is reliable. Spencer and Gotbaum looked at Altoona's financial records to determine that Altoona was struggling from 2009 to 2012, even not knowing of the full extent of its pension liabilities. They opine that if Altoona had discovered the increased pension liabilities during that period, it would have applied for a distress termination as soon as possible and received a distress termination as early as 2009 or as late as 2013. Experts are able to testify to a range of possible outcomes in their opinions because this is akin to answering hypothetical questions, which they are qualified to do. *Wilburn v. Maritrans GP Inc.*, 139 F.3d 350, 356 (3d Cir. 1998). Spencer and Gotbaum may therefore testify about a range of possibilities of when Altoona would have applied for and received a distress termination.

Accordingly, the Court denies Defendants' motion to exclude Spencer and Gotbaum's opinion that the PBGC would have granted Altoona a distress termination between 2009 and 2013.

      **4.  Spencer and Gotbaum's Opinion on the value of the PBGC Note Is Reliable**

      **a.  The Parties' Arguments**

Defendants argue that Spencer and Gotbaum's opinions regarding the value of the PBGC Note are unreliable because they employ no reliable methodology to support their opinions. (ECF No. 208 at 40, 42.) If Plaintiffs can show that Altoona would have received a distress termination,

they would next need to show the rate at which the PBGC would have settled its claim against Altoona. (*Id.*) Spencer and Gotbaum's opinions on the PBGC Note and its 15 percent settlement rate are simply their subjective viewpoints. (*Id.* at 42.)

Plaintiffs respond that Spencer and Gotbaum's opinions on the PBGC's hypothetical settlement rate are reliable because they each employed a reliable methodology. (ECF No. 227 at 38.) Spencer and Gotbaum employed a comparable analysis methodology, which involves looking to other, similar examples. (*Id.*) In concluding that the PBGC would have settled its claim against Altoona for 15 percent, the experts relied on two prior, similar nonprofit distress termination cases, which had settlement rates of less than 5 percent. (*Id.* at 39.) With that benchmark in place, Spencer relied on his experience negotiating settlement of PBGC claims both as an employee of the PBGC and as an advisor to private sector entities to arrive at a 15 percent settlement rate. (*Id.*) Both experts are knowledgeable and experienced in the field of distress termination settlement and used that knowledge and experience as the basis for their opinions in this case. (*Id.* at 40–41.)

### b. Spencer and Gotbaum's Opinion About the Value of the PBGC Note Is Admissible

The Court holds that Spencer and Gotbaum's opinion on the value and settlement rate of the PBGC Note is reliable. Courts have recognized, in various contexts, that an analysis of comparable situations is a reliable valuation methodology. *See, e.g., In re Emerge Energy Servs. LP*, No. 19-11563, 2019 WL 7634308, at *5 (Bankr. D. Del. Dec. 5, 2019) (comparable company analysis); *Harris v. Household Realty Corp. (In re Harris)*, No. 97-33412, 1998 WL 318724, at *1 (Bankr. E.D. Pa. June 12, 1998) (comparable sales analysis). Spencer and Gotbaum compared Altoona's

hypothetical distress termination to comparable real-world distress terminations of nonprofits—the Philadelphia Orchestra and B'nai B'rith International. Although there may be factual differences between these entities and Altoona, Spencer and Gotbaum may rely on them as a basis for their opinions about the PBGC's settlement rate with Altoona. Defendants can question Spencer and Gotbaum about these factual differences through cross examination.

Accordingly, the Court denies Defendants' motion to exclude Spencer and Gotbaum's opinion that the PBGC would have settled its claim against Altoona for 15 percent of the total claim.

### 5. Gotbaum's Testimony About the PBGC's Customs and Practices Is Admissible

#### a. The Parties' Arguments

Defendants argue that the Court should exclude Gotbaum's general testimony regarding the PBGC process because he has no firsthand experience with distress terminations. (ECF No. 208 at 44.) Gotbaum's opinion is based only on his own say so and not on personal experience or the PBGC's actual procedure during the relevant period. (*Id.*)

Plaintiffs respond that Gotbaum, as a former Director of the PBGC, is qualified to testify about its processes. (ECF No. 227 at 42.) He had firsthand experience with distress terminations while he was the Director of the PBGC and the views of the Director of the PBGC are critical to the agency's decision making. (*Id.*) His testimony on the PBGC's customs and practices would be helpful to the jury. (*Id.* at 43.)

### b. Gotbaum Has a Sufficient Basis to Testify About the PBGC's Customs and Practices

The Court holds that Gotbaum's general testimony regarding the PBGC process is admissible. Gotbaum's experience working at the PBGC as its Director is a sufficient basis to testify on its general customs and practices in assessing a distress termination application. Experts are permitted to rely on their own experience working at an agency to form an opinion about that agency's practices and procedures and may also testify as to the general practices and customs of that agency. *In re Flonase Antitrust Litig.*, 907 F. Supp. 2d 637, 645 (E.D. Pa. 2012). As the Director of the PBGC at the time Altoona would have filed a distress termination application, he can testify about how a distress application would be received and processed. Defendants may question Gotbaum about the factual basis of the PBGC's customs and practices through cross examination.

Accordingly, the Court denies Defendants' motion to exclude Gotbaum's testimony about the PBCG's customs and practices.

### D. The Court Denies Defendants' Motion to Exclude the Opinions and Testimony of Neil Demchick

Defendants argue that Demchick is not qualified to offer some of his opinions and perform certain calculations and that all of his damages models are unreliable. The Court addresses each of these arguments in turn.

### 1. Demchick's Background and Proposed Testimony

Plaintiffs offer Neil Demchick as a damages expert. (ECF No. 228 at 9.) He is a CPA and has accreditations in various valuation specialties. (*Id.*) Demchick has more than 30 years of experience providing financial advising and valuation services. (*Id.*) He is currently a member

of Verity, LLC, a financial advising and accounting firm, and has testified as a damages expert on

numerous occasions.  (*Id.*)  Demchick has a bachelor's degree in economics from the Wharton

School of the University of Pennsylvania and a master's degree in finance from New York

University's Graduate School of Business Administration.  (*Id.*)

Demchick will testify that UPMC Altoona suffered damages under Count 1 (professional

negligence) of between $100.5 million and $195.9 million and under Count 2 (breach of contract)

of between $102.3 million and $197.7 million.[4]  (*Id.* at 9–10.)  Demchick applies the same

methodology to his calculations for both counts (the "Malpractice and Lost Opportunity

Damages Models").  (*Id.*)  Demchick first reviewed Altoona's financial statements and concluded

that Altoona was in a distressed business condition.  (*Id.* at 41.)  Demchick then calculated the

total damages by combining freeze damages—the value Altoona lost by not freezing the Plans as

of January 1, 2010—and distress termination damages—the benefits Altoona would have

received as a result of a distress termination of the Plans.  (*Id.* at 10.)  The damages are calculated

both by reference to the impact on Altoona's balance sheet (the "Balance Sheet Method") and

Altoona's cash flow (the "Cash Flow Method").  (*Id.*)  Under the Balance Sheet Method, Demchick

calculated damages by subtracting the value of the PBGC Note from Altoona's actual pension

liability as of June 30, 2012.  (*Id.* at 11.)  Lin calculated Altoona's actual pension liability using two

different Generally Accepted Accounting Principles ("GAAP") measures of pension liability,

PBO and ABO.[5]  (*Id.*)  Under the Cash Flow Method, Demchick calculated damages by subtracting

---

[4] The only difference between the damages calculated for Counts 1 and 2 is the addition of $1.8 million in fees Altoona paid to CBIZ for its actuarial services. (*Id.* at 10.)

[5] PBO, projected benefit obligation, is an actuarial measurement of what a plan sponsor will need at the present time to cover future pension liabilities.  (*Id.*)  ABO, accumulated benefit obligations, refers to the present value of retirement benefits earned by employees using current compensation levels.  (*Id.*)  ABO is

what Altoona would have paid if it had received a distress termination (the PBGC Note plus the cost of the replacement 403(b) plan) from what Altoona actually paid for fiscal year 2013 and onward. (*Id.* at 11–12.)

Demchick will also testify that UPMC suffered damages under Count 3 (negligent misrepresentation) of either $94.074 million or $88.635 million. (*Id.* at 12.) Demchick prepared two models using GAAP to measure the Plans' pension liabilities (the "Negligent Misrepresentation Damages Models"). (*Id.*) The first model (the "552B Model") calculates UPMC's out-of-pocket loss at closing by subtracting the fair market value of Altoona, determined using a discounted cash flow model ($52.05 million) from its purchase price ($183.9 million). (*Id.* at 16.) As part of his discounted cash flow model, Demchick calculated the "service cost"[6] of the Plans. (*Id.* at 38.) Demchick calculated the service cost by breaking out the Plans' service cost from UPMC's Financial Model, as already calculated by UPMC's actuary, Aon Hewitt. (*Id.*) To calculate the future service cost, Demchick took the 2016 service cost, also calculated by Aon Hewitt, then rolled that cost forward based on the growth rate that UPMC used in its Financial Model. (*Id.* at 39.)

After subtracting the fair market value of Altoona from its purchase price, Demchick added consequential damages (-$37.7 million). (*Id.* at 16.) These consequential damages include the post-closing (from July 1, 2013 to December 31, 2014), unknown increase in the Plans'

---

estimated on the assumption that the pension plan is to be terminated immediately, while PBO assumes that the pension plan is ongoing and therefore accounts for future salary increases. (*Id.*)

[6] The service cost is the yearly expense the plan sponsor would incur for the increase in pension benefits employees accrued over the course of that year. (*Id.*)

projected liabilities ($28.3 million)[7] and the reduction in post-closing liabilities resulting from the December 31, 2014 Plan freeze (-$66 million).  (*Id.* at 14.)  The second model (the "Alternative Calculation") calculates UPMC's out-of-pocket loss at closing by calculating the difference in the pension liability UPMC assumed.  (*Id.*)  He did so by calculating the amount of the additional pension liability UPMC assumed as of June 30, 2013 (the difference between Ketzner's and Winters' calculations) ($104.2 million), plus the consequential damages, as calculated in the 552B Model (-$37.7 million).  (*Id.* at 15.)  Both models also account for the value of "transition credits"[8] that UPMC provided to Altoona employees in the plans to account for the change from transferring into UPMC's different retirement plan.  (*Id.*)  To estimate the cost of these credits, Demchick used UPMC's actual credited amounts for the first three years and then used information provided by UPMC to estimate the transition credits for the remaining years.  (*Id.* at 40.)

### 2.   Demchick Is Qualified to Offer Expert Opinions

#### a.   The Parties' Arguments

Defendants argue that the Court should preclude some of Demchick's opinions and calculations because he is not qualified to offer these opinions and calculations.  (ECF No. 210 at 36.)  Demchick is not an actuary and therefore cannot apply actuarial concepts and principles in his calculation of damages.  (*Id.*)  Specifically, Defendants seek to preclude Demchick from: (1) opining that pension liability under GAAP, rather than ERISA, is the more appropriate measure

---

[7] The Plan's projected liabilities post-closing increased by approximately $58.4 million; approximately $30.1 million of this increase was calculated by Ketzner and known to UPMC and the other $28.3 million was unknown to UPMC until Winters recalculated the Plan's liabilities in 2015.  (*Id.* at 14.)

[8] Transition credits are a part of the service cost and are additional pension contributions made by UPMC to lessen the impact of the employees' lower benefits under UPMC's cash balance plan.  (*Id.* at 15.)

for assessing damages; (2) calculating the service cost of Altoona's pension plans as part of his discounted cash flow model; and (3) calculating the value of transition credits provided to Altoona employees upon conversion to UPMC's cash balance plan. (*Id.* at 37.)

Although Demchick relies on the opinions of Lin and Campbell, who are actuaries, they do not opine that GAAP should be used instead of ERISA for measuring damages. (*Id.* at 38.) Because they do not opine that GAAP should be used, Demchick is offering his own opinion about the appropriate measure of pension liability, which he is not qualified to offer because he is not an actuary expert. (*Id.* at 39.)   Additionally, because Demchick is not an actuary, he is not qualified to perform the actuarial calculation of service cost or the valuation of transition credits and their impact on pension service cost. (*Id.* at 42, 46.)

Plaintiffs respond that Demchick is qualified to offer these opinions because he relies on the opinions and calculations of qualified actuaries. (ECF No. 228 at 34.) The rules of evidence do not require that, for an expert to offer an opinion that is formed in consultation with other experts, the other experts must also offer the same opinion in the case. (*Id.* at 35.) Although Demchick spoke with Lin and Campbell about various actuarial measures, he determined that GAAP was the most appropriate financial measure of Plaintiffs' loss based on his own expertise in preparing business valuations and damages models. (*Id.* at 37.) Demchick has not personally performed any actuarial calculations and instead relied on UPMC's actuaries' calculations of the service cost for UPMC's defined benefit plans to make his determination of the service cost for each plan for 2013. (*Id.* at 38.) He then applied standard valuation techniques to the actuaries' calculations to estimate projected growth, a calculation he is qualified to perform. (*Id.*) Demchick

also relied on UPMC's actuaries' calculations of transition credits as they are used in his damages models.  (*Id.* at 40.)

>    b.  **Demchick Is Qualified to Opine that GAAP Measures of Pension Liability Are the Best Measures for Calculating Damages and Is Qualified to Estimate the Value of the Plans' Service Cost and UPMC's Transition Credits**

For a witness to be qualified to offer an expert opinion, he must possess "specialized expertise," which includes a "broad range" of knowledge, skills, and training. *Calhoun*, 350 F.3d at 321. Generally, arguments about an expert's qualifications relate more to the weight to be given the expert's testimony than to its admissibility. *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 782 (3d Cir. 1996). Thus, a witness may testify as an expert even though he may not be the "best" qualified or possess a certain specialization or background. *Id.*

The Court holds that Demchick is qualified to testify that GAAP measures of pension liabilities are the most appropriate measures for assessing damages. An expert witness may rely on facts which the witness does not have personal knowledge of if other experts in his field would "reasonably rely" on those kinds of facts to form an opinion on the subject. Fed. R. Evid. 703. Although an expert may not "parrot" the opinions of other experts, an expert may rely on the reports of other experts when forming his own opinions. *In re Wagner*, No. 06-cv-1026, 2007 WL 966010, at *4 (E.D. Pa. Mar. 29, 2007). Demchick is qualified to calculate damages because he has years of experience performing valuations of distressed businesses. Demchick may rely on the opinions of other experts as a basis for his opinion because he reliably used his specialized knowledge to apply those opinions to his own opinion. *Id.* Because Demchick applied his own

specialized knowledge in assessing damages to conclude that that GAAP measures are preferable when calculating damages, he did not need an actuarial background to make this conclusion.

The Court also holds that Demchick is qualified to estimate the value of the Plans' service cost and UPMC's transition credits. Defendants' objections to Demchick's qualifications are similar to those raised against Demchick in *In re Greater Southeast Community Hospital Corp.*, No. 02-02250, 2007 WL 7230958 (Bankr. D.D.C. Jan. 3, 2007). In that case, Demchick determined the fair market value of a hospital by calculating its net assets. *Id.* at *3. To do so, he relied upon real estate and equipment appraisals conducted by other experts. *Id.* the defendants asserted that Demchick was not qualified to offer his valuation opinion because he was not qualified to conduct asset appraisals. *Id.* The court held that Demchick was qualified to offer a valuation opinion because Demchick was not required to be able to personally perform the asset appraisals upon which he relied. *Id.* The court noted that Demchick had an extensive background in the field of business valuation and that he could rely upon appraisals prepared by others so long as those appraisals are of the type experts in the field of business valuation would reasonably rely upon. *Id.* at *3–4.

Here, like in *Greater Southeast Community Hospital Corp.*, Demchick may rely upon the calculations of other experts as a basis for his opinion and he need not be personally qualified to perform the calculations they performed. Demchick used his own expertise in preparing business valuations and damages models to form his opinion, not actuarial expertise. Demchick has specialized expertise in valuing businesses and is therefore qualified to estimate the Plans' service cost and UPMC's transition credits as components of his damages models.

### 3. Demchick's Malpractice and Lost Opportunity Damages Models Are Admissible

#### a. The Parties' Arguments

Defendants argue that the Court should exclude Demchick's Malpractice and Lost Opportunity Damages Models because they are unreliable. (ECF No. 210 at 31.) These models are unreliable because they improperly rely on GAAP measures of pension liability as opposed to ERISA measures. (*Id.* at 33.) Even if GAAP measures are appropriate, Demchick erred in his calculation because he used PBO, not ABO, to estimate the Plans' liability in his Balance Sheet Method. (*Id.*) PBO includes projected future salary increases and Demchick should not have included those increases because, if the plans had been frozen, Altoona would not have had to account for future salary increases. (*Id.* at 34–35.) Including future salary increases in his calculation improperly increases the amount of Altoona's claimed damages. (*Id.* at 35.)

As part of Demchick's analysis of UMPC Altoona's damages, Demchick improperly offers an opinion on Altoona's ability to restructure or cut costs. (*Id.* at 46.) This opinion is unreliable because he has no sufficient basis for the opinion. (*Id.*) Demchick undertook no restructuring analysis and his only basis for that opinion was his discussion with Altoona's CEO and minutes from Altoona's board meetings, which is not enough information from which to form a reliable opinion. (*Id.* at 47.)

Plaintiffs respond that Defendants' concerns about Demchick's Malpractice and Lost Opportunity Damages Models are not proper grounds for exclusion because they are matters of the opinion's weight, not its admissibility. (ECF No. 228 at 33–34.) Demchick may rely on GAAP measures of the Plans' pension liability because it is for the jury to decide whether ERISA or

GAAP measures are appropriate to determine damages in this case. (*Id.* at 33.) If the jury chooses GAAP measures, then the jury can decide whether PBO or ABO is the better measure of Altoona's loss. (*Id.*) The PBO measure is relevant to the damages calculation because it represents what actually occurred without the distress termination—no plan freeze and no PBGC relief. (*Id.* at 34.)

Additionally, Demchick has not offered an opinion about Altoona's ability to cut costs or restructure in this case. (*Id.* at 40.) Instead, he opined that Altoona was in a distressed business condition, an opinion he is qualified to make. (*Id.* at 41.) In his report, Demchick explained Altoona's financial position according to its financial statements and analyzed whether Altoona had sufficient assets available to fund pension costs. (*Id.*) He does not, however, go beyond this explanation of Altoona's financial position to analyze whether Altoona could have engaged in further cost cutting. (*Id.* at 42.)

### b. Demchick's Malpractice and Lost Opportunity Damages Models Are Reliable

The Court holds that Demchick's Malpractice and Lost Opportunity Damages Models are reliable. In denying Defendants' Motion for Summary Judgment, the Court held that ERISA does not mandate a specific measure by which to calculate damages. (ECF No. 252 at 25.) Therefore, the fact that Demchick applied GAAP measures in his damages models, rather than ERISA measures, does not automatically render his opinions unreliable. Additionally, Demchick may rely on PBO as a measure of the Plans' liability in determining damages because whether PBO or ABO provides a better measure of the Plans' liabilities is a question of fact to be determined by the jury. *In re Hechinger Inv. Co. of Del.*, 147 F. App'x 248, 251 (3d Cir. 2005) (citing *Amerada Hess*

*Corp. v. C.I.R.*, 517 F.2d 75, 82 (3d Cir. 1975)).  Both PBO and ABO are reliable measures of assessing pension liability under GAAP; whether one is a better measure of the Plans' liability is the proper subject of cross examination.  *Oddi v. Ford Motor Co.*, 234 F.3d 136, 146 (3d Cir. 2000).

The Court also holds that Demchick has not improperly offered an opinion about Altoona's ability to cut costs or restructure.  Altoona's CEO formed this opinion and Demchick relied upon it to conclude that Altoona was in a distressed business condition.  In forming his opinion on Altoona's financial condition, Demchick also reviewed Altoona's financial statements. Demchick may rely on this information as a basis for his opinion on Altoona's financial condition because other experts in his field would also rely on this information.  Fed. R. Evid. 703.

Accordingly, the Court denies Defendants' motion to exclude Demchick's Malpractice and Lost Opportunity Damages Models.

### 4. Demchick's Negligent Misrepresentation Damages Models Are Admissible

#### a. The Parties' Arguments

Defendants argue that the Court should exclude Demchick's Negligent Misrepresentation Damages Models because they are unreliable.  (ECF No. 210 at 10.)  In determining Altoona's value, Demchick improperly excluded the $84 million in value UPMC's Health Plan gained from the Altoona affiliation.  (*Id.* at 11–13.)  Section 552B requires that the entire value UPMC received from the transaction be included in the damage equation; because Demchick did not include this post-transaction gain, his opinion is wrong as a matter of law and therefore inadmissible.  (*Id.* at 13.)

In his consequential damages calculation, Demchick improperly includes the $28.3 million post-closing, unknown increase in the Plan's projected liabilities. (*Id.* at 26.) The added post-closing pension liabilities result from a change in the discount rate and, if included, improperly increase value given by UPMC to acquire Altoona. (*Id.* at 27.) The continuing pension liability after the date of the transaction is part of the purchase price, or value given; it is not consequential damages. (*Id.* at 29.)

Additionally, the Court should exclude Demchick's Alternative Calculation because it measures UPMC's expectancy interest from acquiring Altoona, not its actual value. (*Id.* at 29–31.) Plaintiffs cannot recover expectancy damages on a negligent misrepresentation claim; damages must be measured according to Section 552B, which requires actual value rather than expectancy value. (*Id.* at 30.) Because Demchick's Alternative Calculation measures expectancy value rather than actual value, the model is unreliable.[9] (*Id.*)

Plaintiffs respond that the Court should not exclude Demchick's Negligent Misrepresentation Damages Models because they are reliable. (ECF No. 228 at 20.) Demchick applied the correct legal standard because Section 552B does not require, as a matter of law, that a damages calculation include the increase in value to UPMC's Health Plan resulting from the Altoona acquisition. (*Id.* at 22.) The parties agree that market value is the appropriate measure of UPMC's damages, but disagree as to how that "value" should be defined. (*Id.*) Fair market value does not typically include the increase in the buyer's health plan's value as a result of a

---

[9] Defendants also argue that Demchick's Negligent Misrepresentation Damages Models are unreliable because Demchick improperly applied GAAP measures of the Plans' liabilities instead of using ERISA measures. (*Id.* at 22.) The Court denies Defendants' motion on these grounds for the same reasons discussed *supra* Section VI.D.3.b.

transaction because it is not value that any buyer could acquire.  (*Id.* at 22–23.)   Demchick properly excluded this value because UPMC did not realize any value from new patients from Altoona until after closing; including this value in the models would allow Defendants to impermissibly offset UPMC's damages by this subsequent beneficial event.  (*Id.* at 23–24.) Defendants' concerns about Demchick's model are about how to measure value, an issue of weight, not admissibility.  (*Id.* at 25.)

Plaintiffs also assert that Demchick's Negligent Misrepresentation Damages Models can include, as consequential damages, the increase in Altoona's pension liability post-closing and Altoona's savings resulting from the December 2014 plan freeze because those amounts are additional expenditures that UPMC would not have incurred if not for Defendants' misrepresentations.  (*Id.* at 28.)  The price UPMC paid to acquire Altoona did not reflect the post-closing growth in the pension liabilities and this increase was not a cost incurred to fund the purchase.  (*Id.* at 29.)  This increase is recoverable as consequential damages because it directly relates to Defendants' malpractice and is a risk that was foreseeable by Defendants.  (*Id.*) Although including the post-closing growth in Altoona's pension liabilities increased the purchase price, Demchick then decreased the price from the savings resulting from the December 2014 plan freeze.  (*Id.* at 30.)  Both of these post-closing adjustments are necessary to show the actual economic effect on UPMC post-closing, which is what UPMC is entitled to recover as damages.  (*Id.*)

Demchick's Alternative Calculation is admissible as another permissible measure of damages under Section 552B.  (*Id.* at 26.)  The Alternative Calculation measures the loss in value UPMC suffered from an effective change in the price UPMC paid to acquire Altoona due to the

increased pension liabilities as a result of Defendants' malpractice, which is another way to calculate UPMC's out-of-pocket loss. (*Id.*) UPMC did not have a contract with Defendants, so the exclusion from recovering expectancy interests on its negligent misrepresentation claim does not apply. (*Id.* at 27.)

### b. Demchick's Negligent Misrepresentation Damages Models Are Reliable

Under Section 552B, a party who prevails on a negligent misrepresentation claim is entitled to recover the difference between the value of what it has received in the transaction and its value given for it, plus consequential losses suffered as a result of the party's reliance upon the misrepresentation. *UPMC v. CBIZ, Inc.*, No. 3:16-cv-204, 2017 WL 4129654, at *4 (W.D. Pa. Sept. 15, 2017). "Value" is generally determined by looking at an asset's market value. *Neuman v. Corn Exch. Nat. Bank & Tr. Co.*, 51 A.2d 759, 766 (Pa. 1947).

The Court holds that Demchick employed a reliable methodology in valuing Altoona. Courts have consistently recognized that a discounted cash flow analysis is a reliable way to determine the value of a business. *See, e.g., Lippe v. Bairnco Corp.*, 288 B.R. 678, 689 (S.D.N.Y. 2003), *aff'd*, 99 F. App'x 274 (2d Cir. 2004); *Gross v. Comm'r*, 78 T.C.M. (CCH) 201 (T.C. 1999), *aff'd*, 272 F.3d 333 (6th Cir. 2001). Differences in the values used in the method do not affect the reliability of the methodology. *Gross*, 78 T.C.M. (CCH) 201. In fact, Defendant's expert Marc Brown used a similar discounted cash flow method to conclude that Altoona's value exceeded its purchase price. (ECF No. 228 at 13.) That Demchick and Brown valued Altoona differently is not a basis for excluding Demchick's opinion.

Next, the Court holds that Demchick's inclusion of the unknown, post-closing increase in Altoona's pension liability as consequential damages does not render his opinion unreliable. Consequential damages are "losses that do not flow directly and immediately from an injurious act, but that result indirectly from the act." *Todd Heller, Inc. v. United Parcel Serv., Inc.*, 754 A.2d 689, 700 n.3 (Pa. Super. Ct. 2000). Consequential damages are recoverable if the damages are of a kind that might "reasonably be expected to result from reliance upon the misrepresentation." Restatement (Second) of Torts § 549 cmt. d; *see also* Judge's Instructions/Charge to the Jury, *Brand Mktg. Grp. LLC v. Intertek Testing Servs., N.A., Inc.*, No. 2:12-cv-1572, 2014 WL 10537877 (W.D. Pa. Mar. 5, 2014) (explaining that consequential damages in a negligent misrepresentation case are "the additional expenses and losses incurred as a result of the misrepresentation"). Demchick has "good grounds" for believing that the additional unknown pension liability resulting from PBO was an indirect consequence of Defendants' misrepresentations. *Calhoun*, 350 F.3d at 321. Moreover, even if inclusion of this amount as consequential damages was improper, this error would only affect the weight given to Demchick's opinion, not its admissibility. *Karlo*, 849 F.3d at 83.

Finally, the Court holds that Demchick's Alternative Calculation is a reliable method to calculate the price UPMC paid to acquire Altoona. Section 552B allows a plaintiff to recover expectation damages in a negligent misrepresentation case unless the damages stem from a plaintiff's contract with the defendant. *Brand Mktg. Grp. LLC v. Intertek Testing Servs., N.A., Inc.*, 801 F.3d 347, 357 (3d Cir. 2015). Here, expectation damages are a permissible measure for UPMC's negligent misrepresentation damages because UPMC did not have a contract with Defendants. Demchick can therefore opine that another way to view UPMC's damages resulting

from Defendants alleged misrepresentations is by measuring the difference in the liability that UPMC assumed as a result of Defendants' representations.  Demchick has "good grounds" for concluding that his Alternative Calculation is another method to attempt to measure UPMC's out-of-pocket loss.  *Calhoun*, 350 F.3d at 321.

Accordingly, the Court denies Defendants' motion to exclude Demchick's Negligent Misrepresentation Damages Models.

## VII. Conclusion

For the forgoing reasons, the Court denies Defendants' Motions.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UPMC d/b/a UNIVERSITY OF<br>PITTSBURGH MEDICAL CENTER, and<br>UPMC ALTOONA f/k/a ALTOONA<br>REGIONAL HEALTH SYSTEM,<br><br>        Plaintiffs,<br><br>    v.<br><br>CBIZ, INC., CBIZ BENEFITS &<br>INSURANCES SERVICES, INC., and<br>JON S. KETZNER,<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 3:16-cv-204<br><br>JUDGE KIM R. GIBSON |

## ORDER

AND NOW, this 26th day of May, 2020, upon consideration of Defendants' Motion to Exclude Certain Expert Opinions Proffered by Messrs. Galante and Campbell (ECF No. 203), Motion to Exclude Proposed Expert Testimony of Eugene Connors (ECF No. 205), Motion to Exclude Proposed Expert Testimony of John Spencer III and Joshua Gotbaum (ECF No. 207), and Motion to Exclude Proposed Expert Testimony of Neil Demchick (ECF No. 209), and for the reasons set forth in the accompanying Memorandum Opinion, it is **HEREBY ORDERED** that said Motions are **DENIED**.

BY THE COURT:

**KIM R. GIBSON**
**UNITED STATES DISTRICT JUDGE**